**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | | |
|---|---|---|
| FLORIDA 2005 THEATERS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 20-CV-07503 |
| | ) | |
| AMERICAN MULTI-CINEMA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1332(a), 1441, and 1446, Defendant American Multi-Cinema, Inc. ("AMC") hereby removes this civil action, entitled *Florida 2005 Theaters LLC v. American Multi-Cinema, Inc.*, Case Number 2020LO12058 (the "State Court Action"), from the Circuit Court of Cook County, Illinois to the United States District Court for the Northern District of Illinois. In support of this removal, AMC states as follows:

1. Plaintiff Florida 2005 Theaters LLC ("Plaintiff") filed its Complaint in the State Court Action on or about November 9, 2020, purporting to assert claims against AMC for breach of a lease agreement and guaranty, and seeking damages "in the amount of $679,134.00 plus interest . . ., as well as late charges, attorney's fees, [and] costs." *See* Complaint at 7-8.

2. Plaintiff is a limited liability company organized under Delaware law whose sole member is iSTAR Inc., a Maryland corporation having its principal place of business in New York.

3. AMC is a registered Missouri corporation in good standing having its principal place of business in Leawood, Kansas.

4. Thus, Plaintiff is a citizen of the states of Maryland and New York, while AMC is a citizen of the states of Missouri and Kansas. Neither Plaintiff nor AMC is a citizen of the State of Illinois.

5.      Accordingly, Plaintiff's Complaint in the State Court Action is within this Court's original diversity jurisdiction under 28 U.S.C. § 1332(a), the amount in controversy exceeds $75,000, and the action is therefore removable to this Court pursuant to 28 U.S.C. § 1441.

6.      AMC was served with a copy of the Summons and Complaint through its registered agent Corporate Creations Network Inc. on November 20, 2020.  Hence, this Notice of Removal is timely filed under 28 U.S.C. § 1446(b).

7.      In compliance with 28 U.S.C. § 1446(d), AMC will provide written notice of this Notice of Removal to Plaintiff and will file a copy of the Notice of Removal with the Clerk of the Circuit Court of Cook County, Illinois.

8.      In compliance with 28 U.S.C. § 1446(a), AMC has, contemporaneously with the filing of this Notice of Removal, submitted copies of all process, pleadings, and orders served upon it in the State Court Action, attached hereto as "**Exhibit A**."

9.      No admission of fact, law or liability is intended by this Notice of Removal, and all defenses, affirmative defenses and motions are hereby reserved.

WHEREFORE, AMC respectfully removes this action to this Court for further proceedings according to law.

Dated this 18th day of December, 2020.

Respectfully Submitted,

By: /s/  *Jordan D. Shea*
　　　　Jordan D. Shea, ARDC#6293777
　　　　WILLIAMS MONTGOMERY & JOHN LTD.
　　　　233 S. Wacker Dr., Suite 6800
　　　　Chicago, IL 60606
　　　　Tel: (312) 443-3200
　　　　Email:  jds@willmont.com

ATTORNEYS FOR AMERICAN MULTI-CINEMA, INC.

**CERTIFICATE OF SERVICE**

I certify that on this 18th day of December 2020, I electronically filed the foregoing Notice of Removal with the Clerk of the Court using the CM/ECF system, and I hereby certify that I have mailed a single copy of the document by first class mail, postage prepaid, and emailed it to the following:

Timothy J. Patenode, Esq.
Debra K. Lefler, Esq.
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, Illinois 60661
Timothy.patenode@katten.com
Debra.lefler@katten.com

ATTORNEYS FOR PLAINTIFF

/s/   *Jordan D. Shea*
         Jordan D. Shea, ARDC#6293777
         WILLIAMS MONTGOMERY & JOHN LTD.
         233 S. Wacker Dr., Suite 6800
         Chicago, IL 60606
         Tel: (312) 443-3200
         Email: jds@willmont.com

ATTORNEYS FOR AMERICAN MULTI-CINEMA, INC.

# EXHIBIT A



**CORPORATE CREATIONS**®
Registered Agent • Director • Incorporation

**Corporate Creations Network Inc.**
801 US Highway 1 North Palm Beach, FL 33408

American Multi-Cinema, Inc.                                                    11/20/2020
Gail McClenton Legal Administrator
AMC - American Multi-Cinema, Inc.
11500 Ash Street
Leawood KS 66211

# SERVICE OF PROCESS NOTICE

The following is a courtesy summary of the enclosed document(s).  **ALL information should be verified by you.**

Item: 2020-270

Note: Any questions regarding the substance of the matter described below, including the status or how to respond, should be directed to the contact set forth in line 12 below or to the court or government agency where the matter is being heard. IMPORTANT: All changes or updates to the SOP contact individuals or their contact information must be submitted in writing to SOPcontact@corpcreations.com. Any changes will become effective upon written confirmation of Corporate Creations.

| 1. | **Entity Served:** | American Multi-Cinema, Inc. |
|---|---|---|
| 2. | **Title of Action:** | Florida 2005 Theaters LLC vs. American Multi-Cinema, Inc., a Missouri Corporation Individually and As Successor-In-Interest to Eastwynn Theaters, Inc., Et Al. |
| 3. | **Document(s) Served:** | Summons<br>Complaint<br>Exhibits |
| 4. | **Court/Agency:** | Cook County Circuit Court |
| 5. | **State Served:** | Illinois |
| 6. | **Case Number:** | 2020 L 012058 |
| 7. | **Case Type:** | Action for Rent Due and Unpaid |
| 8. | **Method of Service:** | Hand Delivered |
| 9. | **Date Received:** | Thursday 11/19/2020 |
| 10. | **Date to Client:** | Friday 11/20/2020 |
| 11. | **# Days When Answer Due:**<br>**Answer Due Date:** | 30<br>Saturday 12/19/2020 | <span style="color:red">CAUTION:</span> Client is solely responsible for verifying the accuracy of the estimated Answer Due Date. To avoid missing a crucial deadline, we recommend immediately confirming in writing with opposing counsel that the date of the service in their records matches the Date Received. |
| 12. | **Sop Sender:**<br>(Name, City, State, and Phone Number) | Katten Muchin Rosenman LLP<br>Chicago,IL<br>312-902-5200 |
| 13. | **Shipped To Client By:** | Email Only with PDF Link |
| 14. | **Tracking Number:** | |
| 15. | **Handled By:** | 141 |
| 16. | **Notes:** | None |

NOTE: This notice and the information above is provided for general informational purposes only and should not be considered a legal opinion. The client and their legal counsel are solely responsible for reviewing the service of process and verifying the accuracy of all information.  At Corporate Creations, we take pride in developing systems that effectively manage risk so our clients feel comfortable with the reliability of our service. We always deliver service of process so our clients avoid the risk of a default judgment. As registered agent, our role is to receive and forward service of process.  To decrease risk for our clients, it is not our role to determine the merits of whether service of process is valid and effective.  It is the role of legal counsel to assess whether service of process is invalid or defective. Registered agent services are provided by Corporate Creations Network Inc.



\* 5 0 0 4 1 6 7 4 \*
FILED
11/10/2020 4:35 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L012058

11093044

2120 - Served                 2121 - Served

2220 - Not Served          2221 - Not Served

2320 - Served By Mail    2321 - Served By Mail

2420 - Served By Publication 2421 - Served By Publication

Summons - Alias Summons                                    (08/01/18) CCG 0001 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

FLORIDA 2005 THEATERS LLC

(Name all parties)          Case No.    2020 L 012058

v.

AMERICAN MULTI-CINEMA, INC., et al.

### ☑ SUMMONS  ☐ ALIAS SUMMONS

To each Defendant:  **American Multi-Cinema, Inc. c/o Corporate Creations Network IN,**
**350 S. Northwest Highway, #300, Park Ridge, IL 60068**

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee **within thirty (30) days after service of this Summons**, not counting the day of service. To file your answer or appearance you need access to the internet. Please visit www.cookcountyclerkofcourt.org to initiate this process. Kiosks with internet access are available at all Clerk's Office locations. Please refer to the last page of this document for location information.

**If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.**

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**



Summons - Alias Summons                                         (08/01/18) CCG 0001 B 7 *

E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first
create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm
to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://
www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office.

FILED DATE: 11/10/2020 4:35 PM  2020L012058

Atty. No.: 41832

Atty Name: Debra K. Lefler

Atty. for: Plaintiff

Address: Katten 525 W Monroe St

City: Chicago

State: IL   Zip: 60661

Telephone: 312-902-5200

Primary Email: debra.lefler@katten.com

Witness: 11/10/2020 4:35 PM DOROTHY BROWN

DOROTHY BROWN, Clerk of Court

Date of Service: _____
(To be inserted by officer on copy left with
Defendant or other person):



* 5 0 0 4 1 6 7 4 *

## CLERK OF THE CIRCUIT COURT OF COOK COUNTY OFFICE LOCATIONS

FILED DATE: 11/10/2020 4:35 PM 2020L012058

- Richard J Daley Center
  50 W Washington
  Chicago, IL 60602

- District 2 - Skokie
  5600 Old Orchard Rd
  Skokie, IL 60077

- District 3 - Rolling Meadows
  2121 Euclid
  Rolling Meadows, IL 60008

- District 4 - Maywood
  1500 Maybrook Ave
  Maywood, IL 60153

- District 5 - Bridgeview
  10220 S 76th Ave
  Bridgeview, IL 60455

- District 6 - Markham
  16501 S Kedzie Pkwy
  Markham, IL 60428

- Domestic Violence Court
  555 W Harrison
  Chicago, IL 60607

- Juvenile Center Building
  2245 W Ogden Ave, Rm 13
  Chicago, IL 60602

- Criminal Court Building
  2650 S California Ave, Rm 526
  Chicago, IL 60608

### Daley Center Divisions/Departments

- Civil Division
  Richard J Daley Center
  50 W Washington, Rm 601
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Chancery Division
  Richard J Daley Center
  50 W Washington, Rm 802
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Domestic Relations Division
  Richard J Daley Center
  50 W Washington, Rm 802
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Civil Appeals
  Richard J Daley Center
  50 W Washington, Rm 801
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Criminal Department
  Richard J Daley Center
  50 W Washington, Rm 1006
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- County Division
  Richard J Daley Center
  50 W Washington, Rm 1202
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Probate Division
  Richard J Daley Center
  50 W Washington, Rm 1202
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Law Division
  Richard J Daley Center
  50 W Washington, Rm 801
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Traffic Division
  Richard J Daley Center
  50 W Washington, Lower Level
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm



* 5 0 0 4 1 6 7 4 *

FILED
11/10/2020 4:35 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L012058

11093044

**2120 - Served**       **2121 - Served**

**2220 - Not Served**   **2221 - Not Served**

**2320 - Served By Mail**   **2321 - Served By Mail**

**2420 - Served By Publication 2421 - Served By Publication**

Summons - Alias Summons                     (08/01/18) CCG 0001 A

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

FLORIDA 2005 THEATERS LLC

_____
(Name all parties)      Case No.    2020 L 012058

v.

AMERICAN MULTI-CINEMA, INC., et al.

☑ **SUMMONS**   ☐ **ALIAS SUMMONS**

To each Defendant: **American Multi-Cinema, Inc. c/o Corporate Creations Network IN,
350 S. Northwest Highway, #300, Park Ridge, IL 60068**

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee **within thirty (30) days after service of this Summons**, not counting the day of service. To file your answer or appearance you need access to the internet. Please visit www.cookcountyclerkofcourt.org to initiate this process. Kiosks with internet access are available at all Clerk's Office locations. Please refer to the last page of this document for location information.

**If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.**

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**
Page 1 of 3

FILED DATE: 11/10/2020 4:35 PM   2020L012058



**Summons – Alias Summons** (08/01/18) CCG 0001 B 7

E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office.

Atty. No.: 41832

Atty Name: Debra K. Lefler

Atty. for: Plaintiff

Address: Katten 525 W Monroe St

City: Chicago

State: IL   Zip: 60661

Telephone: 312-902-5200

Primary Email: debra.lefler@katten.com

Witness: _____ 11/10/2020 4:35 PM DOROTHY BROWN

DOROTHY BROWN, Clerk of Court

Date of Service: _____
(To be inserted by officer on copy left with Defendant or other person):

FILED DATE: 11/10/2020 4:35 PM  2020L012058

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**
Page 2 of 3



* 5 0 0 4 1 6 7 4 *

## CLERK OF THE CIRCUIT COURT OF COOK COUNTY OFFICE LOCATIONS

FILED DATE: 11/10/2020 4:35 PM    2020L012058

Richard J Daley Center
50 W Washington
Chicago, IL 60602

District 2 - Skokie
5600 Old Orchard Rd
Skokie, IL 60077

District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

District 4 - Maywood
1500 Maybrook Ave
Maywood, IL 60153

District 5 - Bridgeview
10220 S 76th Ave
Bridgeview, IL 60455

District 6 - Markham
16501 S Kedzie Pkwy
Markham, IL 60428

Domestic Violence Court
555 W Harrison
Chicago, IL 60607

Juvenile Center Building
2245 W Ogden Ave, Rm 13
Chicago, IL 60602

Criminal Court Building
2650 S California Ave, Rm 526
Chicago, IL 60608

### Daley Center Divisions/Departments

Civil Division
Richard J Daley Center
50 W Washington, Rm 601
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

Chancery Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

Domestic Relations Division
Richard J Daley Center
50 W Washington, Rm 802
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

Civil Appeals
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

Criminal Department
Richard J Daley Center
50 W Washington, Rm 1006
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

County Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

Probate Division
Richard J Daley Center
50 W Washington, Rm 1202
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

Law Division
Richard J Daley Center
50 W Washington, Rm 801
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

Traffic Division
Richard J Daley Center
50 W Washington, Lower Level
Chicago, IL 60602
Hours:  8:30 am - 4:30 pm

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org



* 5 0 0 4 1 6 7 4 *

FILED
11/9/2020 6:08 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
11078392

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

FILED DATE: 11/9/2020 6:08 PM   2020L012058

| | |
|---|---|
| FLORIDA 2005 THEATERS LLC, a Delaware limited liability company, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| AMERICAN MULTI-CINEMA, INC., a Missouri corporation, individually and as successor-in-interest to EASTWYNN THEATERS, INC., CARMIKE CINEMAS, INC., and GKC THEATERS, INC., | ) ) ) ) ) ) |
| Defendants. | ) ) |

Case No. 2020L012058

## COMPLAINT

Plaintiff Florida 2005 Theaters LLC, by its attorneys, hereby complains of defendant American Multi-Cinema, Inc., alleging as follows:

### NATURE OF THE CASE

1.      Plaintiff Florida 2005 Theaters LLC ("Landlord") files this action against defendant American Multi-Cinema, Inc. ("Tenant"), to recover unpaid rent due November 1, 2020 and to obtain a declaration of Landlord's right to call on a letter of credit held as a security deposit.

### PARTIES, JURISDICTION, AND VENUE

2.      Landlord is a Delaware limited liability company that owns certain movie theatres located in Cook County, Illinois, California and Florida.

3.      Tenant is a Missouri corporation that leases the theatres from Landlord. Tenant is the successor-by-merger to three corporations that were in the theatre business: Eastwynn Theatres, Inc. Carmike Cinemas, Inc., and GKC Theaters, Inc. (the "Three Theatres").



FILED DATE: 11/9/2020 6:08 PM   2020L012058

4.      Under Paragraph 16(h) of the Lease (defined below), Tenant agreed that Landlord could commence an action in the State of Illinois for the purpose of adjudicating any Event of Default, and Tenant agreed to personal jurisdiction and venue in any such Illinois court. In addition, under Paragraph 14 of the Guaranty (defined below), Tenant submitted to the personal jurisdiction of the Illinois state courts located in Cook County and waived any objection to venue in that court.

<div align="center">

**GENERAL ALLEGATIONS**

</div>

**I.      The Lease and Guaranty**

5.      On or around March 19, 2009, Landlord and Muvico Entertainment, LLC ("Muvico"), as tenant, entered into that certain Third Amended, Restated and Consolidated Lease Agreement ("Original Lease").  A true and correct partially redacted copy of the Original Lease without exhibits is attached hereto as Exhibit A.

6.      Pursuant to the terms and conditions of the Original Lease, Landlord agreed to lease to Muvico four sites:

> a.   The "BayWalk Site" then commonly known as the Muvico BayWalk 20 Theater in St. Petersburg, Florida.
>
> b.   The "Oaks Site" located in the shopping center commonly known as The Oaks, on Hillcrest Drive in Thousand Oaks, California.
>
> c.   The "Parisian Site" then commonly known as the Muvico Parisian 20 Theater in West Palm Beach, Florida.
>
> d.   The "Rosemont Site" then commonly known as the Rosemont 18 Theater in Rosemont, Illinois.

The BayWalk Site, the Oaks Site, the Parisian Site, and the Rosemont Site are collectively referred to herein as the "Sites."

<div align="center">

2

</div>

* 5 0 0 4 1 6 7 4 *

7.      Pursuant to an Agreement for the Purchase and Sale of Assets dated as of November 4, 2013, Muvico assigned its interest under the Original Lease to the Three Theatres, and the Three Theatres agreed to assume all of Muvico's obligations under the Original Lease.

8.      On or around November 20, 2013, Landlord and the Three Theatres entered into that certain First Amendment to the Lease ("First Amendment"). A true and correct partially redacted copy of the First Amendment is attached hereto as Exhibit B.

9.      On or around August 24, 2017, Landlord and the Three Theatres entered into that certain Second Amendment to the Lease ("Second Amendment"). A true and correct copy of the Second Amendment is attached hereto as Exhibit C.

10.     On or around January 8, 2018, Landlord and the Three Theatres entered into that certain Third Amendment to the Lease ("Third Amendment"). A true and correct copy of the Third Amendment is attached hereto as Exhibit D.

11.     On or around December 13, 2018, Landlord and the Three Theatres entered into that certain Fourth Amendment to the Lease ("Fourth Amendment"). A true and correct copy of the Fourth Amendment is attached hereto as Exhibit E.

12.     The Original Lease, as amended by the First Amendment, Second Amendment, Third Amendment, and Fourth Amendment are collectively referred to herein as the "Lease."

13.     At or around the time of the execution of the Third Amendment, Tenant acquired the stock of the Three Theatres.

14.     On or around January 8, 2018, Tenant signed that certain Guaranty ("Guaranty") and agreed to "absolutely, unconditionally and irrevocably guarantee[] to Landlord the prompt and complete payment and, in the case of non-pecuniary obligations, performance of all the Guaranteed Obligations (as defined below) in full, when and as the same shall become due, whether on any

FILED DATE: 11/9/2020 6:08 PM   2020L012058

* 5 0 0 4 1 6 7 4 *

due date or performance date, or upon demand or otherwise." A true and correct copy of the Guaranty is attached hereto as Exhibit F.

15.     At or around January 2020, the Three Theatres were merged into Tenant. Tenant thereby became the tenant under the Lease, and remained the guarantor under the Guaranty.

**II.     Tenant's Failure to Comply with the Lease**

16.     Under Paragraph 5 of the Lease, Tenant is to pay rent of various kinds. Tenant is to pay "Fixed Rent" and "Percentage Replacement Fixed Rent" (together, "Fixed Rent") on or before the first Business Day of each month to the wire transfer address of Landlord as specified in the Basic Lease Information or such other accounts as the Landlord may designate. As of November 1, 2020, the monthly amount of such Fixed Rent was $679,134.00.

17.     Under the Fourth Amendment to the Lease, Tenant was to make certain "Renovations" to the four theatre Sites. The Renovations included certain work described on Exhibit J to the Lease and the Renovations FF&E described on Exhibit K to the Lease, all of which would be detailed and agreed to in the Renovations Final Plans to be approved by Landlord. The Renovations were to be completed by December 31, 2019.

18.     Tenant did not complete the Renovations by December 31, 2019. On March 26, 2020, Landlord delivered a notice to Tenant of Tenant's default in its obligation to timely complete the Renovations. Under the March 26, 2020 notice, the failure to timely complete the Renovations would become an Event of Default under the Lease, unless cured within the time period established by Paragraph 15(e) of the Lease.

19.     Tenant failed to pay the Rent for April 2020 on or before the first Business Day of April 2020 in accordance with Paragraph 5 of the Lease. On April 2, 2020, Landlord delivered to Tenant a notice of its default in payment of that April 2020 Rent. Tenant cured the default within five calendar days of the notice.

4

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

20.     Under the Fourth Amendment, upon completion of the Renovations, Landlord was to pay the "Landlord Contribution" in accordance with Paragraph 31(d) of the Lease. Under that paragraph, the Landlord Contribution was payable "within thirty (30) days of Landlord's receipt of the following: (a) confirmation of final completion of the Renovations, and (b) the Renovations Closeout Items." Delivery of these items to Landlord was a condition precedent to Landlord's obligation to pay the Landlord Contribution. The Renovation Closeout Items were defined in the Lease to include, among other things "unconditional lien waivers from Tenant's general contractor and all subcontractors with contracts exceeding Fifty Thousand and no/100th Dollars ($50,000)," "an original certificate of substantial completion signed by Tenant and Tenant's general contractor and architect," and "evidence satisfactory to Landlord that the Renovations are lien free and completed in accordance with all applicable Legal Requirements."

21.     On August 31, 2020, Landlord received from Tenant a package of materials. That package did not confirm final completion of the Renovations, did not include all required Renovations Closeout Items, and did not satisfy the conditions precedent to any obligation of Landlord to pay the Landlord's Contribution. Tenant did not deliver all required lien and lien bond releases and certificates of substantial completion, and did not provide evidence satisfactory to Landlord that the Renovations were lien free and completed in accordance with Legal Requirements.

22.     On or About September 11, 2020, Landlord advised Tenant of its failure to satisfy the conditions precedent of Paragraph 31(d). On September 18, 2020, Tenant delivered additional materials in an effort to comply with those conditions precedent.

23.     Paragraph 31(d) further provides a remedy if Landlord fails to pay Landlord's Contribution within thirty days after satisfaction of the conditions precedent to payment: "If

5

* 5 0 0 4 1 6 7 4 *

Landlord fails to pay Tenant all or any portion of the Landlord Contribution when due ..., then ... upon thirty (30) days' prior written notice of Tenant's intent to offset Fixed Rent and to the extent Landlord does not subsequently pay Landlord's Contribution, Tenant may withhold payment of 100% of the Fixed Rent payable under the Lease, as herein amended, until Tenant has recouped the amount of the Landlord Contribution . . . ."

24.     On October 2, 2020, Landlord received from Tenant a notice of intent to offset beginning with November 1, 2020 rent. That notice and purported offset were premature and in violation of Lease Paragraph 31(d). At the time of that notice, Landlord's Contribution was not yet due, because thirty days had not elapsed since any satisfaction of the conditions precedent of Paragraph 31(d) to the payment of Landlord's Contribution. Even if Tenant had satisfied all conditions precedent to payment of the Landlord's Contribution on September 18, 2020, Tenant would not have a right to offset November 2020 rent. On October 23, 2020, Tenant reiterated its intention to not pay November 2020 rent.

25.     Tenant failed to pay Fixed Rent on the first Business Day of November 2020 in accordance with Paragraph 5 of the Lease. That failure to pay is an Event of Default under the Lease. Tenant's anticipatory breach of the rent provision waives any right of notice; alternatively, no notice of that default is necessary under the Lease.

## COUNT I
### Action for Rent Due and Unpaid.

26.     Landlord incorporates all previous paragraphs as if fully set forth herein.

27.     Tenant is in default of its obligations under the Lease for failing to fully pay Fixed Rent for November 2020 in the amount of $679,134.00 on the due date or thereafter.

28.     Tenant's failure to pay Fixed Rent when due is an Event of Default under the Lease Agreement.

FILED DATE: 11/9/2020 6:08 PM    2020L012058

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

29.     Under Paragraphs 1 and 5(c) of the Lease, Landlord is entitled to interest on unpaid Fixed Rent at the "Overdue Rate," equal to the greater of: (a) twelve percent (12%) per annum or (b) the sum of six percent (6%) plus the prime interest rate as reported from time to time in *The Wall Street Journal*, which interest begins accruing five business days after the due date of November 1, 2020. Landlord is also entitled to a late charge of three percent (3%) on the delinquent amount.

30.     Under Paragraph 16(f) of the Lease, Landlord is entitled to recover all sums and expenses incurred in enforcing its rights under the Lease, including all court costs, any and all legal fees and expenses, including those incurred in connection with this litigation.

31.     Any and all conditions precedent to Landlord's recovery under the Lease of Fixed Rent for November 2020 have occurred, been performed, or been excused.

WHEREFORE, Landlord respectfully asks this Court enter judgment in its favor and against Tenants in the amount of $679,134.00 plus interest at the Overdue Rate from November 6, 2020 through the date of judgment as well as late charges, attorney's fees, costs, and such further relief as is appropriate.

## COUNT II
## Breach of the Guaranty

32.     Landlord incorporates all previous paragraphs as if fully set forth herein.

33.     The Guaranteed Obligations include, without limitation, "all of the indebtedness, liabilities and obligations of every kind and nature of Tenant to Landlord relating to the payment of money arising under or in any way relating to the Lease . . . including timely full payment of all Rent and all other amounts payable by Tenant under the Lease."

34.     Tenant's failure to pay Fixed Rent due under the Lease for November 2020 is a breach of and a default under the Guaranty.

7

* 5 0 0 4 1 6 7 4 *

35.     Under Guaranty, Tenant is also liable for all "Enforcement Costs," including, without limitation, the attorneys' fees, costs and expenses incurred in connection with the Guaranty.

36.     Any and all conditions precedent to Landlord's recovery under the Guaranty of Fixed Rent for November 2020 have occurred, been performed, or been excused.

WHEREFORE, Landlord respectfully asks this Court enter judgment in its favor and against Tenant in the amount of $679,134.00 plus interest at the Overdue Rate from November 6, 2020 through the date of judgment as well as late charges, attorney's fees, costs, and such further relief as is appropriate.

## COUNT III
### Declaratory Judgment Regarding Security Deposit

37.     Landlord incorporates all previous paragraphs as though fully set forth herein.

38.     Under Paragraph 5(d) of the Lease and to secure the full and faithful performance of Tenant's obligations under the Lease, Tenant supplied a Security Deposit in the form of an irrevocable standby letter of credit in the amount of $2 million. If there is an Event of Default at any time during the Term of the Lease, Landlord has the right, but not the obligation, to draw upon all or any part of the Security Deposit to cure the Event of Default.

39.     A justiciable controversy exists between Landlord and Tenant empowering the Court under Section 2-701 of the Illinois Code of Civil Procedure to declare the rights of the parties with respect to the Security Deposit.

40.     Landlord is entitled to a declaration that it may draw upon the letter of credit to cure the Event of Default arising from Tenant's failure to pay the November 2020 rent, together with all interest, late charges and attorneys' fees in connection therewith.

FILED DATE: 11/9/2020 6:08 PM    2020L012058

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM 2020L012058

WHEREFORE, Landlord respectfully asks this Court to declare that Landlord may draw on the letter of credit to cure the Event of Default arising from Tenant's failure to pay the November 2020 rent, together with all interest and attorneys' fees in connection therewith and to provide such other and further relief as the Court deems just.

Dated: November 9, 2020

Respectfully Submitted,

FLORIDA 2005 THEATERS, LLC

By: *Timothy J. Patenode*
One of its attorneys

Timothy J. Patenode
Debra K. Lefler
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, Illinois 60661
Telephone: 312-902-5200
Facsimile: 312-902-1061
timothy.patenode@katten.com
debra.lefler@katten.com
Firm No. 41832

# EXHIBIT A

FILED DATE: 11/9/2020 6:08 PM   2020L012058



* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

## BASIC LEASE INFORMATION

**Third Amended, Restated and Consolidated
Lease Agreement dated as of March 19, 2009**

Landlord:  Florida 2005 Theaters LLC, a Delaware limited liability company, together with any successor or assign.

Tenant:  Muvico Entertainment, L.L.C., a Delaware limited liability company, together with any successor or assign permitted by the Lease.

Initial Commencement Date: (i) With respect to the BayWalk Site, the Palace Site and the Parisian Site (collectively, the "**Group One Sites**"), as of February 25, 2005 (the "**Group One Initial Commencement Date**"), (ii) with respect to the Boynton Site and the Rosemont Site (together the "**Group Two Sites**"), as of August 25, 2006 (the "**Group Two Initial Commencement Date**"), and (iii) with respect to the Oaks Site, March 31, 2008 (together with the Group One Initial Commencement Date and the Group Two Initial Commencement Date, as applicable, the "**Initial Commencement Date**").

Consolidated Lease Commencement Date: March 19, 2009

Lease Expiration Date: February 28, 2029, which is the last day of the 239th full calendar month following the Consolidated Lease Commencement Date.

Lease Consideration: As a condition precedent to, in consideration of, and as an inducement to Landlord for (i) Landlord entering into this Lease, (ii) terminating this Lease on a going forward basis for the Palace Site and the Boynton Site, (iii) restructuring the Fixed Rent and Annual Percentage Rent under the Second Consolidated Lease, and (iv) other changes as set forth in this Lease, all upon the terms and conditions set forth in this Lease, as of the Consolidated Lease Commencement Date, Landlord shall have fully earned, as of the Consolidated Lease Commencement Date, a Lease modification fee in the amount of Twenty Million and No/100 Dollars (          ) ("**Lease Modification Fee**"). The Lease Modification Fee shall be due and payable by Tenant to Landlord upon the occurrence of an Event of Default under subparagraphs 15(a), (b), (c) or 5(d) at any time prior to the day immediately preceding the Lease Expiration Date, as extended, if at all; provided, however, that if the Lease Modification Fee does not become due and payable as set forth above prior to the day immediately preceding the Lease Expiration Date, as extended, if at all, then Landlord shall waive the requirement that Tenant pay the Lease Modification Fee.

Primary Term and any Extension Term Fixed Rent: The annual "**Fixed Rent**" during the Primary Term and any applicable Extension Term of the Lease shall be defined as and equal to and shall be payable in monthly installments in advance (unless specifically set forth to be paid at a different time below) as follows:

(a)  Second Consolidated Lease: From the applicable Initial Commencement Date through the Consolidated Lease Commencement Date, Fixed Rent which remains unpaid and is for the period from October 1, 2008 through the day immediately preceding the

i

* 5 0 0 4 1 6 7 4 *

Consolidated Lease Commencement Date for all four (4) Sites, the Palace Site and the Boynton Site based upon reconstituted Fixed Rent for such period equals $██████ and Landlord is currently holding a payment by Tenant received on February 19, 2009, in the amount of $████████ which amount, as of the Consolidated Lease Commencement Date shall be credited towards such unpaid Fixed Rent, leaving a balance of unpaid Fixed Rent payable under the Second Consolidated Lease as of the Consolidated Lease Commencement Date of $████████ Tenant shall pay Landlord such ██████████ on or before the date which is one day following the Consolidated Lease Commencement Date.

(b)     From the Consolidated Lease Commencement Date through the 119th full calendar month after the Consolidated Lease Commencement Date for each Site which is included in the Premises at such time: for the Rosemont Site, at the annual rate of ████ (subject to increase as set forth in the last sentence of this paragraph); for the Parisian Site, at the annual rate of ████ for the BayWalk Site, at the annual rate of ████ and for the Oaks Site, at the annual rate of ████ in each case, one twelfth (1/12) of which shall be payable in advance on the first day of each month, commencing (i) if the Consolidated Lease Commencement Date does not occur on the first day of a month, then on the first day of the month following the month in which the Consolidated Lease Commencement Date occurs, and (ii) if the Consolidated Lease Commencement Date occurs on the first day of a month, then on the Consolidated Lease Commencement Date. Additionally, if the Consolidated Lease Commencement Date does not occur on the first day of a month, then on the Consolidated Lease Commencement Date, a payment of an amount equal to the product of one twelfth (1/12) of the sum of the total annual Fixed Rent for the Rosemont Site, Parisian Site, Baywalk Site and Oaks Site, which product is then multiplied by a fraction, the numerator of which is the number of calendar days in the month from and including the Consolidated Lease Commencement Date through the end of the month in which the Consolidated Lease Commencement Date occurs, and the denominator of which is the total number of calendar days in the month in which the Consolidated Lease Commencement Date occurs. In addition to the foregoing, if real estate taxes (once finally determined for 2008) for the Rosemont Site are less than ██████ for such year then the annual rate of Fixed Rent for the Rosemont Site from the Consolidated Lease Commencement Date through the 119th full calendar month after the Consolidated Lease Commencement Date shall be increased from ██████ to be the sum of (A) ██████ plus (B) the product of 0.5 multiplied by the amount by which such real estate taxes for 2008 for the Rosemont Site are less than ██████ (and there shall be no reduction in such annual rate if such real estate taxes equal or exceed ██████ for 2008 or any subsequent year) and, within five (5) Business Days of such determination, Tenant shall pay Landlord any amounts theretofore unpaid on a retroactive basis from the Consolidated Lease Commencement Date.

(c)     Beginning with the 120th full calendar month after the Consolidated Lease Commencement Date through the 179th full calendar month after the Consolidated Lease Commencement Date for each Site which is included in the Premises at such time: at the annual rate for each such Site equal to the product of (A) 1.3 multiplied by (B) the annual Fixed Rent for such Site for the twelve (12) calendar month period immediately preceding such 121st full calendar month after the Consolidated Lease Commencement

50524468_9_208972_00182



* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

Date, in each case one twelfth (1/12) of which shall be payable in advance on the first day of each month, commencing with the 120th full calendar month after the Consolidated Lease Commencement Date.

(d)     Beginning with the 180th full calendar month after the Consolidated Lease Commencement Date through the 239th full calendar month after the Consolidated Lease Commencement Date and, to the extent applicable, during each of the Extension Terms (the first day of such 180th full calendar month after the Consolidated Lease Commencement Date and the first day of each Extension Term is herein called a "**Fixed Rent Adjustment Date**") for such Site which is included in the Premises at such time: at the annual rate for each Site equal to the product of (A) 1.15 multiplied by (B) the annual Fixed Rent for such Site for the twelve (12) calendar month period immediately preceding such Fixed Rent Adjustment Date, in each case one twelfth (1/12) of which shall be payable in advance on the first day of each month, commencing with each Fixed Rent Adjustment Date.

Percentage Rent:  In addition to the Fixed Rent, Tenant shall pay Landlord as percentage rent (the "**Annual Percentage Rent**") an amount for each Lease Year commencing with the Consolidated Lease Commencement Date computed as follows:

During each Lease Year of the Term, the Annual Percentage Rent:

(a)     with respect to the Rosemont Site, shall be (i) if Tenant's Gross Receipts in such Lease Year for such Site are equal to or less than ▮▮▮▮ then ▮▮▮▮ or (ii) if Tenant's Gross Receipts in such Lease Year for such Site are greater than ▮▮▮▮ and equal to or less than ▮▮▮▮ then twenty percent (20%) of Tenant's Gross Receipts in such Lease Year for such Site in excess of ▮▮▮▮, or (iii) if Tenant's Gross Receipts in such Lease Year for such Site are greater than ▮▮▮▮ and equal to or less than ▮▮▮▮ then twenty-five percent (25%) of Tenant's Gross Receipts in such Lease Year for such Site in excess of ▮▮▮▮, or (iv) if Tenant's Gross Receipts in such Lease Year for such Site are greater than ▮▮▮▮ then thirty percent (30%) of Tenant's Gross Receipts in such Lease Year for such Site in excess of ▮▮▮▮ provided, however, that for each Lease Year the Annual Percentage Rent for the Rosemont Site shall be reduced by an amount equal to the amount by which the total Fixed Rent paid in such Lease Year for the Rosemont Site is in excess of ▮▮▮▮ if at all.

(b)     with respect to the Parisian Site, shall be (i) if Tenant's Gross Receipts in such Lease Year for such Site are equal to or less than ▮▮▮▮ then ▮▮ or (ii) if Tenant's Gross Receipts in such Lease Year for such Site are greater than ▮▮▮▮ and equal to or less than ▮▮▮▮ then twenty percent (20%) of Tenant's Gross Receipts in such Lease Year in excess of ▮▮▮▮ or (iii) if Tenant's Gross Receipts in such Lease Year for such Site are greater than ▮▮▮▮ then twenty-five percent (25%) of Tenant's Gross Receipts in such Lease Year for such Site in excess of ▮▮▮▮; provided, however, that for each Lease Year the Annual Percentage Rent for the Parisian Site shall be reduced

iii

* 5 0 0 4 1 6 7 4 *

by an amount equal to the amount by which the total Fixed Rent paid in such Lease Year for the Parisian Site is in excess of ███████ if at all.

(c)   with respect to the BayWalk Site, shall be (i) if Tenant's Gross Receipts in such Lease Year for such Site are equal to or less than ███████, then ███, or (ii) if Tenant's Gross Receipts in such Lease Year for such Site are greater than ███████ and equal to or less than ███████ then fifteen percent (15%) of Tenant's Gross Receipts in such Lease Year for such Site in excess of $ or (iii) if Tenant's Gross Receipts in such Lease Year for such Site are greater than ███████ then twenty percent (20%) of Tenant's Gross Receipts in such Lease Year for such Site in excess of ███████, provided, however, that for each Lease Year the Annual Percentage Rent for the BayWalk Site shall be reduced by an amount equal to the amount by which the total Fixed Rent paid in such Lease Year for the BayWalk Site is in excess of ███████ if at all.

(d)   with respect to the Oaks Site, shall be thirty percent (30%) of Tenant's Gross Receipts in such Lease Year for such Site in excess of ███████ provided, however, that for each Lease Year the Annual Percentage Rent for the Oaks Site shall be reduced by an amount equal to the amount by which the total Fixed Rent paid in such Lease Year for the Oaks Site is in excess of ███████ if at all.

For the purpose of computing the Annual Percentage Rent for any Lease Year which does not include twelve (12) full calendar months for a Site (including the first Lease Year and any other Lease Year because Tenant's leasehold interest in a Site is terminated for any reason), the Annual Percentage Rent for such Site shall be calculated based upon the Gross Receipts for such Site for such partial Lease Year, and in such event, all of the foregoing amounts upon which Annual Percentage Rent for such Site is calculated (including floor amounts and thresholds) shall be multiplied by a fraction, the numerator of which is the total number of days in such Lease Year, and the denominator of which is three hundred sixty-five (365).

Within sixty (60) days following the end of each Lease Year or partial Lease Year for any Site for which this Lease is terminated, Tenant shall furnish Landlord with a statement, verified by a corporate officer of Tenant, showing the amount of Gross Receipts for the preceding Lease Year (or other period, as applicable) for each Site, which statement shall be accompanied by Tenant's payment of Annual Percentage Rent, if any is due.

The term "Lease Year" as used in this Lease generally shall be a period of twelve (12) full calendar months; provided, however, the first Lease Year shall begin on the Consolidated Lease Commencement Date and continue until February 28, 2010, the second Lease Year shall commence on March 1, 2010 and include a period of twelve (12) full calendar months and each succeeding Lease Year thereafter shall commence on March 1 of each year, as applicable, and include twelve (12) full calendar months.

Landlord shall have the right, not more often than once each year, to audit Tenant's records of Gross Receipts, but only for the purpose of ascertaining the amount of the

50524468_9_208972_00182

FILED DATE: 11/9/2020 6:08 PM  2020L012058

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM    2020L012058

Gross Receipts during the applicable preceding Lease Year. Such audit shall be made on behalf of Landlord by a certified public accountant to be selected by Landlord. If Landlord wishes to audit Tenant's records for any Lease Year, Landlord shall notify Tenant and proceed with such audit within thirty-six (36) months after the end of the Lease Year in question. Should Landlord fail to exercise the right to audit the records of Tenant within thirty-six (36) months after the end of any Lease Year, then Landlord shall have no further right to audit the records of Tenant for such Lease Year, and Tenant's statement of Gross Receipts for such Lease Year shall conclusively be deemed to be correct. Any such audit by Landlord shall be at Landlord's own expense, except as hereinafter provided. If any such audit discloses that Tenant has understated the Gross Receipts for any Site for such Lease Year by more than three percent (3%) and Landlord is entitled to any additional Annual Percentage Rent as a result of such understatement, then Tenant shall promptly pay to Landlord the cost of such audit. Tenant shall, in any event, pay Landlord the amount of any deficiency in Annual Percentage Rent, with interest thereon at the Overdue Rate from the date such payment should have been originally made. Landlord shall keep confidential all information obtained from such statements or inspections (including, specifically, the amount of Gross Receipts made by Tenant in the Premises) and shall not disclose any of such information to any party, except for disclosures to the taxing authorities with authority to inquire therein, to an existing or bona fide prospective purchaser of the Premises (after reasonable prior notice to Tenant of such proposed disclosure and then only after such purchaser has entered into a confidentiality agreement in form and substance reasonably satisfactory to Tenant and such purchaser), or as required by law. Landlord further agrees, if requested by Tenant at any time, and from time to time, to execute and deliver a confidentiality agreement in form and substance satisfactory to Tenant.

The term "Gross Receipts" as used in this Lease shall mean all cash, credit card and other receipts received by Tenant in, from or related to the Premises or the use of the Premises (including from the sale of all goods, wares, merchandise and services at the Premises) during each Lease Year; PROVIDED, HOWEVER, there shall be deducted from such receipts in the computation of Gross Receipts to the extent the same are included in Tenant's computations:

    (i)     Credits or refunds made to customers in the ordinary course of Tenant's business.

    (ii)    All federal, state, county and city sales taxes or other similar taxes collected from customers, and all occupational taxes, use taxes and other taxes which must be paid by Tenant or collected by Tenant, by whatever name they are known or assessed, and regardless of whether or not they are imposed under any existing or future orders, regulations, laws or ordinances.

    (iii)   Agency commissions paid to independent third parties for selling tickets, surcharges in excess of the standard ticket price for tickets purchased by use of credit cards and surcharges and fees paid to any Person, including the Company (but, for the Company, only to the extent such surcharges

50574468_9_208972_00182

* 5 0 0 4 1 6 7 4 *

and fees paid to the Company are at market rates which would have been paid to unrelated third parties for such items), in excess of the standard ticket price for tickets purchased online.

(iv)    Receipts from the sale of student and senior citizens discount cards permitting discounts on tickets or other items constituting Gross Receipts.

(v)    Proceeds from the sale of Tenant's Property.

(vi)    Bar and restaurant revenues, which revenues shall include revenues from alcoholic beverages sold to patrons of the "21 and over" theaters; provided, however, that all receipts from the sales of tickets for "21 and over" theater seating shall be included in Gross Receipts.

(vii)    Advertising revenues including media sponsorship and promotional advertising of any kind.

(viii)    Internet or other e-commerce advertising or other internet or e-commerce revenues (except that vouchers or other evidence of purchase of tickets, concessions, merchandise and/or any other services and/or property purchased over the internet or through any other e-commerce format shall be included in Gross Receipts upon their redemption at the Premises less any service fees charged thereon.).

(ix)    Any box office premium charged by Tenant for motion pictures or other media offered at a premium charge in connection with changing motion picture technology (for example, without limitation, digital and/or 3-D motion pictures, but specifically excluding, however, any premiums for reserved or preferential seating or services) over the amount that Tenant is then charging for standard motion pictures to the extent any portion of such charge is paid to unaffiliated third parties for such exhibition (for example, without limitation, motion picture rental and license, lease and other fees for 3-D motion pictures, 3-D viewing glasses and IMAX sharing fees).

(x)    Any subtenant rents permitted under this Lease (exclusive of "four-walled" deals pursuant to subparagraph 25(h) which are included in Gross Receipts).

<u>Security Deposit Amount</u>: ███████ subject to the provisions set forth in <u>subparagraph 5(d)</u>.

<u>Landlord Address for Payment by wire transfer to</u>:

> JPMorgan Chase Bank
> ABA # 021000021
> Acct Name:  iStar Real Estate Services Inc.
> ████████
> Ref:  Muvico

vi

FILED DATE: 11/9/2020 6:08 PM   2020L012058

Tenant Address:          Muvico Entertainment, L.L.C.
3101 North Federal Highway, Sixth Floor
Ft. Lauderdale, Florida 33306
Attn: Michael F. Whalen, Jr.

50524468_9_208972_00182



* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

# THIRD AMENDED, RESTATED AND CONSOLIDATED
## LEASE AGREEMENT

Between

## FLORIDA 2005 THEATERS LLC

as Landlord

and

## MUVICO ENTERTAINMENT, L.L.C.

as Tenant

Dated as of March 19, 2009



FILED DATE: 11/9/2020 6:08 PM 2020L012058

## TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| 1. | DEFINITIONS | 2 |
| 2. | DEMISE OF PREMISES | 16 |
| 3. | USE | 17 |
| 3A. | OBLIGATIONS UNDER GROUND LEASES, PROJECT AGREEMENTS AND PROJECT ENTITLEMENTS | 19 |
| 4. | TERM | 20 |
| 5. | RENTAL; SECURITY DEPOSIT | 22 |
| 6. | TAXES | 26 |
| 7. | NET LEASE; NON-TERMINABILITY | 28 |
| 8. | SERVICES | 30 |
| 9. | REPAIRS AND MAINTENANCE; REPLACEMENT | 30 |
| 10. | DESTRUCTION OF OR DAMAGE TO PREMISES | 32 |
| 11. | INSURANCE, HOLD HARMLESS AND INDEMNIFICATION | 34 |
| 12. | COMPLIANCE WITH LAWS, COVENANTS | 37 |
| 13. | PARTIAL OR SUBSTANTIAL TAKING | 39 |
| 14. | SITE TERMINATIONS | 40 |
| 15. | DEFAULT: EVENTS OF DEFAULT | 41 |
| 16. | REMEDIES | 44 |
| 17. | SUBORDINATION | 47 |
| 18. | LANDLORD'S RIGHT OF ENTRY | 48 |
| 19. | NOTICES | 49 |
| 20. | ESTOPPEL CERTIFICATE; FINANCIAL DATA | 50 |
| 21. | MECHANICS' LIENS | 52 |
| 22. | END OF TERM | 54 |
| 23. | ALTERATIONS | 55 |
| 24. | SHORT FORM OF LEASE | 57 |
| 25. | SUBLETTING/ASSIGNMENT | 57 |
| 26. | HAZARDOUS MATERIAL | 60 |
| 27. | FINANCING | 63 |
| 28. | MISCELLANEOUS PROVISIONS | 64 |

50524468_9_208972_001R2

\* 5 0 0 4 1 6 7 4 \*

FILED DATE: 11/9/2020 6:08 PM   2020L012058

29.  TENANT'S PROPERTY AND LEASEHOLD INTEREST .......................................67
30.  PRIORITY OF GROUND LEASE ...............................................................67
31.  NON-COMPETE CLAUSE ......................................................................68
32.  NOTICE CONCERNING RADON GAS ........................................................68
33.  ENERGY DISCLOSURE.........................................................................69
34.  RIGHTS AGAINST CONTRACTORS AND MECHANICS .....................................69
35.  FORMER TENANT PROPERTY RESERVE ACCOUNT.......................................69
36.  NO CLAIMS......................................................................................69
37.  CONSTRUCTION MANAGMENT AGREEMENT REAFFIRMATION ......................69

50524468_9_208972_00182

\* 5 0 0 4 1 6 7 4 \*

FILED DATE: 11/9/2020 6:08 PM   2020L012058

**EXHIBITS:**

| | |
|---|---|
| A-1 | LEGAL DESCRIPTION FOR THE BAYWALK SITE |
| A-2 | LEGAL DESCRIPTION FOR THE PARISIAN SITE |
| A-3 | LEGAL DESCRIPTION FOR THE ROSEMONT SITE |
| A-4 | LEGAL DESCRIPTION FOR THE OAKS SITE |
| B-1 | EQUIPMENT |
| B-2 | TENANT'S PROPERTY |
| C | PERMITTED ENCUMBRANCES |
| D-1 | FORM OF SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT FOR BAYWALK SITE |
| D-2 | FORM OF SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT FOR PARISIAN SITE |
| D-3 | FORM OF SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT FOR ROSEMONT SITE |
| D-4 | FORM OF SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT FOR OAKS SITE |
| E | ENERGY DISCLOSURE BROCHURE |
| F | FORM LETTER OF CREDIT |
| G | TENANT WORK |
| H | [INTENTIONALLY OMITTED] |
| I | LANDLORD'S INVESTMENT AMOUNT |

50524468_9_208972_00182

* 5 0 0 4 1 6 7 4 *

THIS THIRD AMENDED, RESTATED AND CONSOLIDATED LEASE AGREEMENT (together with all amendments and supplements hereto, this "Lease") is made and entered into as of the date set forth in the Basic Lease Information, by and between **FLORIDA 2005 THEATERS LLC**, a Delaware limited liability company, f/k/a MUVICO REALTY, L.L.C., a Delaware limited liability company, with offices c/o iStar Financial Inc., 1114 Avenue of the Americas, 38th Floor, New York, New York 10036 (together with any successor or assign, hereinafter called the "**Landlord**"), and **MUVICO ENTERTAINMENT, L.L.C.**, a Delaware limited liability company, having an address at 3101 N. Federal Hwy., 6th Floor, Fort Lauderdale, FL 33306 (together with any successor or assign permitted by this Lease, hereinafter collectively called the "**Tenant**").

## RECITALS

A.    Landlord and Tenant have entered into leases dated February 25, 2005 as follows:

(1)    that certain lease (the "**Palace Lease**") relating to the Palace Site (as defined in the Palace Lease);

(2)    that certain lease (the "**Parisian Lease**") relating to the Parisian Site (as hereinafter defined); and

(3)    that certain lease (the "**BayWalk Lease**," collectively with the Palace Lease and the Parisian Lease, the "**Original Leases**," and each, an "**Original Lease**") relating to the BayWalk Site (hereinafter defined).

B.    Landlord and Tenant have entered into that certain Amended, Restated and Consolidated Lease dated as of February 25, 2005, with a Consolidated Lease Commencement Date (as defined therein) of September 1, 2006, whereby each of the Original Leases were amended and restated, and consolidated into one and the same lease (the "**First Consolidated Lease**").

C.    Landlord and Tenant have entered into leases dated as of August 25, 2006 as follows:

(1)    that certain lease (the "**Boynton Lease**") relating to the Boynton Site (as defined in the Boynton Lease); and

(2)    that certain lease relating to the Rosemont Site (hereinafter defined) (the "**Rosemont Lease**," collectively with the First Consolidated Lease and the Boynton Lease, the "**2006 Existing Leases**," and each, a "**2006 Existing Lease**").

D.    Landlord and Tenant have entered into the Second Amended, Restated and Consolidated Lease Agreement dated as of March 31, 2008 (the "**Second Consolidated Lease**"), with a Consolidated Lease Commencement Date (as defined therein) of March 31, 2008, whereby:

(1)    Landlord and Tenant entered into a new sublease for an additional Site relating to the Oaks Site (hereinafter defined); and

S0524468_9_208972_00182

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM 2020L012058

(2)    whereby each of the 2006 Existing Leases and the sublease of the Oaks Site were amended and restated and consolidated into one and the same Lease.

E.    Tenant has requested, and Landlord has agreed, subject to the terms and conditions of this Lease, to terminate this Lease on a going forward basis for the Palace Site and Boynton Site and to amend and restate the Second Consolidated Lease for the remaining Sites (such Sites being the Parisian Site, the BayWalk Site, the Rosemont Site, and the Oaks Site).

NOW THEREFORE, for the herein stated consideration and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord and Tenant hereby amend, restate and consolidate the Second Consolidated Lease as this Lease, in accordance with the following terms and conditions.

## 1.    DEFINITIONS

Capitalized terms used herein shall have the following meanings for all purposes of this Lease and shall be equally applicable to both the singular and plural forms of the terms herein defined.

"**2006 Existing Leases**" is defined in the recitals hereto.

"**Additional Rent**" shall mean all amounts, liabilities and obligations other than Fixed Rent and Percentage Rent which Tenant assumes or agrees to pay under this Lease to Landlord or others and that are identified as Additional Rent.

"**Affiliated Subtenant**" shall mean Muvico Thousand Oaks, LLC.

"**Affiliates**" shall mean Persons (other than individuals) Controlled by, Controlling, or under Common Control with Tenant.

"**Alternative Credit Rating Agency**" shall mean if either or both of S & P and Moody's no longer exist or no longer assign Credit Ratings, such other nationally recognized statistical credit rating agency designated by Landlord, acting in its sole discretion.

"**Annual Percentage Rent**" is defined and shall have the meaning specified in the Basic Lease Information.

"**Basic Lease Information**" shall mean the page(s) preceding this Lease, as the same may be amended from time to time, which are hereby incorporated by reference.

"**BayWalk Site**" shall mean that portion of the Premises legally described in **Exhibit A-1**, commonly known as the Muvico BayWalk 20 Theater in St. Petersburg, Florida.

"**BayWalk Termination Date**" is defined in subparagraph 14(b) of this Lease.

"**Boynton Lease**" is defined in the recitals for this Lease.

"**Boynton Site**" as defined in the recitals for this Lease.

50524468_9_208972_00182

\* 5 0 0 4 1 6 7 4 \*

"**Business Days**" or "**Business Day**" shall mean any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are closed.

"**Casualty**" shall mean any damage or destruction caused to any Site by any reason, including fire.

"**Casualty Repair**" is defined in subparagraph 10(b) of this Lease.

"**Casualty Shortfall**" is defined in subparagraph 10(d) of this Lease.

"**Casualty Termination Date**" is defined in subparagraph 10(c) of this Lease.

"**Casualty Threshold**" is defined in subparagraph 10(d) of this Lease.

"**City**" shall mean (a) with respect to the BayWalk Site, the City of St. Petersburg, Florida, a municipal corporation organized under the laws of the State of Florida, and (b) with respect to any other Site, the municipal governing body having jurisdiction over such Site.

"**Company**" shall mean Tenant, Holding, Theaters and any subsidiaries of Tenant.

"**Consolidated Lease Commencement Date**" is defined and shall have the meaning specified in the Basic Lease Information.

"**Construction Management Agreement**" shall mean that certain Construction Management Agreement dated as of March 31, 2008 by and between Landlord and Tenant with respect to the construction of the Oaks Site.

"**Control**" (including with correlative meanings, the terms "Controlling," "Controlled by" and "under Common Control with") shall mean the possession directly or indirectly of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contracts or otherwise.

"**Corporate Control Event**" shall mean any of the following: (i) a merger or consolidation of Tenant, Holding or Theaters with another entity, (ii) the sale of all or substantially all the assets of Tenant, Holding or Theaters to any party, (iii) any one Person acquiring fifty percent (50%) or more of publicly traded common stock, voting securities or economic benefits and burdens (including distributions) of Tenant, Holding or Theaters within any twelve (12)-month period, (iv) a change of Tenant's, Holding's or Theaters' board of directors in any twelve (12)-month period, as a result of which change Persons controlling fifty percent (50%) or more of the total votes of Tenant's, Holding's or Theaters' board of directors (or its functional equivalent) prior to such change no longer control fifty percent (50%) or more of such votes, (v) Holding having, at any time, an Independent Manager (as defined in Holding's Limited Liability Company Agreement effective as of the Consolidated Lease Commencement Date) which has not been approved by Landlord, or (vi) Company has sold, or has committed to sell, such assets that, cumulatively, such sale would reduce EBITDA, on a trailing twelve (12)-month and pro forma basis, by fifty percent (50%).

3

* 5 0 0 4 1 6 7 4 *

"**CPRLLC**" shall mean CityPlace Retail, L.L.C., a Delaware limited liability company.

"**Credit Rating**" shall mean the senior unsecured debt rating issued by S&P and Moody's or if either or both no longer exist or no longer issue ratings then, for either or both as so applicable, an Alternative Credit Rating Agency. All references to specific levels of a Credit Rating mean such rating with a "stable" or "positive" outlook, but not a "negative" outlook or "on watch" associated with such rating.

"**Debt**" of any Person shall mean as at the date when any determination thereof is being made or to be made and in respect of all: (A) indebtedness of such Person for borrowed money; (B) obligations of such Person evidenced by bonds, debentures, notes or other similar instruments; (C) obligations, other than inter-company items, of such Person to pay the deferred purchase price of property or services under conditional sales or other similar agreements relating to property purchased by such Person to the extent of the value of such property (other than customary retentions or reservations under agreements with suppliers entered into in the ordinary course of business) which provide for the deferral of payment of the purchase price for a period in excess of one year following the date of receipt and acceptance of the complete delivery of such property and/or services; (D) obligations of such Person as tenant under leases which obligations are, in accordance with GAAP, recorded as capital lease obligations, but excluding all obligations of Tenant or its Affiliates under or in any manner relating to this Lease, regardless of their treatment under GAAP; and (E) obligations of such Persons under direct or indirect guaranties in respect of, and obligations (contingent or otherwise) of such Person to purchase or otherwise acquire, indebtedness or obligations of others of the kinds referred to in clauses (A) through (D) above. Whenever any determination of the amount of Debt is required or permitted to be, or is otherwise being or to be, made for any purpose under this Lease, the amount of any such Debt denominated in any currency other than United States dollars shall be calculated at the United States dollar equivalent of such Debt as at the date when such determination of the amount of debt is being or to be made, except that, if all or any portion of the principal amount of any such Debt which is payable in a currency other than United States dollars is hedged into United States dollars, the principal amount of such hedged Debt, or the hedged portion thereof, shall be deemed to be equal to the amount of United States dollars specified in, or determined pursuant to, the applicable hedging contract.

"**Developer**" shall mean, with respect to the BayWalk Site, STP Redevelopment Ltd., a Florida limited partnership, its successors and assigns.

"**Development Agreement**" shall mean, with respect to the BayWalk Site, that certain Agreement Related to Development of Mid Core and North Core Blocks in the City of St. Petersburg between Developer and Tenant, dated as of August 30, 1999, and recorded September 3, 1999, in Official Records Book 10649, at Page 158, of the Records.

"**Development and Use Agreement**" shall mean, with respect to the Rosemont Site, that certain Development and Use Agreement by and between Landlord and the Village, as acknowledged by Tenant, dated as of August 22, 2006, which has been submitted for recording in the Records.

4

* 5 0 0 4 1 6 7 4 *

"**EBITDA**" shall mean, with respect to any period, the Net Income (Loss) of Company on a combined basis for such period, plus the following (without duplication and only to the extent included in the calculation of Net Income (Loss)): (i) interest expense (including the amortized cost of obtaining and maintaining a rate cap agreement, if any); (ii) tax expense; (iii) amortization expense; (iv) depreciation expense; (v) non-cash interest expense, (vi) Pre-Opening Expenses, not to exceed $350,000 per theater owned by Company, (vii) to the extent not added back pursuant to (iii) above, the amortized cost of the commitment fee for any loan from SFI I, LLC; (viii) extraordinary losses, (ix) [omitted], and (x) non-recurring, extraordinary one-time expenses (i.e., unreimbursed expenses incurred in connection with hurricane damage to a theater or any one time severance payment made to a terminated employee of Company), and _minus_ extraordinary gains, in each case, of Tenant or Tenant's subsidiaries on a consolidated basis for such period, determined in accordance with GAAP. Landlord agrees that modifications to the above calculation shall be made as follows: (1) EBITDA shall be calculated without reference to the historical results of Tenant's so-called "IMAX Orlando" theater and the historical results of the operation of theaters, or portions thereof, which are no longer owned or operated by Company and which results are no longer reported according to GAAP at the time of such calculation and (2) capital and operating lease rental expense shall be accounted for on a cash basis rather than according to GAAP. For purposes of calculating EBITDA (and without duplication), monthly lease payments under this Lease shall be accounted for on a cash basis rather than according to GAAP and on a Lease Year annualized or Quarterly Lease Year Period, as applicable, regardless of whether such payments were actually made. Additionally, for purposes of computing EBITDA for all periods prior to the Consolidated Lease Commencement Date, the following shall apply: (x) Tenant shall assume the first year's Fixed Rent chargeable under this Lease after the Consolidated Lease Commencement Date will be deemed to apply to the period prior to the Consolidated Lease Commencement Date and (y) Tenant shall assume that only the assets it owns from and after the Consolidated Lease Commencement Date will be deemed owned for the period prior to the Consolidated Lease Commencement Date.

"**EBITDA Certification**" is defined in subparagraph 20(e) of this Lease.

"**EBITDAR**" shall mean, with respect to any period and computed separately for each Site, the sum of EBITDA for such Site plus the Fixed Rent for such Site (assuming for all periods prior to the Consolidated Lease Commencement Date that the first year's Fixed Rent applicable under this Lease for the period after the Consolidated Lease Commencement Date apply). "EBITDAR" when used for the Premises, shall mean the sum of EBITDAR for all Sites for such period.

"**EBITDAR Certification**" is defined in subparagraph 20(f) of this Lease.

"**EBITDAR Minimum Ratio**" shall mean 1.2.

"**EBITDAR Ratio**" shall mean, and be computed as of the end of each Quarterly Lease Year Period, (1) when referring to the Premises: the ratio of (A) EBITDAR for the Premises for the immediately preceding twelve (12)-month period to (B) Fixed Rent for the Premises for the immediately preceding twelve (12)-month period (assuming for all periods prior to the Consolidated Lease Commencement Date that the first year's Fixed Rent applicable under this Lease for the period after the Consolidated Lease Commencement Date apply), and (2) when

5

* 5 0 0 4 1 6 7 4 *

referring to any Site: the ratio of (A) EBITDAR for such Site for the immediately preceding twelve (12)-month period to (B) Fixed Rent for such Site for the immediately preceding twelve (12)-month period (assuming for all periods prior to the Consolidated Lease Commencement Date that the first year's Fixed Rent applicable under this Lease for the period after the Consolidated Lease Commencement Date apply).

"**Entertainment**" shall mean Muvico Entertainment, L.L.C., a Delaware limited liability company, the Tenant under this Lease.

"**Environmental Laws**" is defined in subparagraph 26(b) of this Lease.

"**Environmental Reports**" is defined in subparagraph 26(c) of this Lease.

"**Equipment**" shall mean the equipment listed on **Exhibit B-1**.

"**Event of Default**" is defined in paragraph 15 of this Lease.

"**Excluded Taxes**" shall mean any income or franchise taxes based upon, measured by, or calculated with respect to net income or profits (but not including any franchise tax based upon gross receipts with respect to the Rent), inheritance, estate, succession, transfer or any similar taxes.

"**Extension Term Expiration Date**" is defined in subparagraph 4(c) of this Lease.

"**Extension Terms**" is defined in subparagraph 4(c) of this Lease.

"**Failed Ratio Site**" is defined in subparagraph 14(c) of this Lease.

"**Failed Ratio Site Termination Date**" is defined in subparagraph 14(c) of this Lease.

"**Final Disposition Agreement**" shall mean, with respect to the BayWalk Site, that certain Final Disposition Agreement between the City, The Community Redevelopment Agency of the City and Developer's predecessors-in-interest, dated June 5, 1998, as amended, a memorandum of which amended Final Disposition Agreement dated August 30, 1999, was recorded September 3, 1999, in Official Records Book 10648, at Page 2056, of the Records.

"**First Consolidated Lease**" is defined in the recitals for this Lease.

"**Fixed Rent**" is defined and shall have the meaning specified in the Basic Lease Information.

"**Fixed Rent Adjustment Date**" is defined and shall have the meaning specified in the Basic Lease Information.

"**GAAP**" shall mean generally accepted accounting principles recognized as such in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the Financial Accounting Standards Board.

6

FILED DATE: 11/9/2020 6:08 PM    2020L012058

* 5 0 0 4 1 6 7 4 *

"**General Cinema**" shall mean General Cinema Corp. of West Palm Beach, a Florida corporation.

"**Governmental Authorities**" shall mean all federal, state, county, municipal and local departments, commissions, boards, bureaus, agencies and offices thereof, having or claiming jurisdiction over all or any part of the Premises or the use thereof.

"**Gross Receipts**" is defined and shall have the meaning specified in the Basic Lease Information.

"**Ground Landlord**" shall mean the ground lessor under a Ground Lease. With respect to the Parisian Site, the Ground Landlord is CityPlace Retail, L.L.C. a Delaware limited liability company. With respect to the Oaks Site, the Ground Landlord is Macerich Oaks LLC, a Delaware limited liability company.

"**Ground Lease**" shall mean the Parisian Ground Lease, and the Oaks Ground Lease, individually or collectively, as the case may be.

"**Ground Lease Extension Option**" shall mean Landlord's option(s) to extend the term of the Parisian Ground Lease in accordance with the terms thereof.

"**Ground Lease Extension Term**" shall mean (A) with respect to the Parisian Ground Lease, an "Extension Term" as defined in the Parisian Ground Lease; and (B) with respect to the Oaks Ground Lease, as applicable, the "First Extended Term"; the "Second Extended Term" the "Third Extended Term"; the "Fourth Extended Term"; the "Fifth Extended Term" or the "Sixth Extended Term," as each term is defined in the Oaks Ground Lease.

"**Ground Lease Extension Term Rent**" is defined in subparagraph 4(e) of this Lease.

"**Ground Rent**" shall mean all sums which are due and payable by Landlord, as tenant, pursuant to a Ground Lease.

"**Group One Initial Commencement Date**" is defined and shall have the meaning specified in the Basic Lease Information.

"**Group One Sites**" is defined and shall have the meaning specified in the Basic Lease Information.

"**Group Two Initial Commencement Date**" is defined and shall have the meaning specified in the Basic Lease Information.

"**Group Two Sites**" is defined and shall have the meaning specified in the Basic Lease Information.

"**Hazardous Materials**" is defined in subparagraph 26(b) of this Lease.

"**Holding**" shall mean Amco Holding, LLC, a Delaware limited liability company.

S0524468_9_208972_00182

* 5 0 0 4 1 6 7 4 *

"**Imposition**" shall mean the various taxes and other charges referred to in paragraph 6 of this Lease.

"**Improvements**" shall mean all of the buildings, structures, improvements, Equipment, heating, ventilation, air conditioning, plumbing, electrical, mechanical, utility and life safety systems, and all building fixtures therein (including parking areas, and driveways) now or hereafter located on the Land, other than and specifically excluding Tenant's Property.

The words "**include**", "**includes**", "**including**" and any other derivation of "include" means "including but not limited to" unless specifically set forth to the contrary.

"**Indemnified Party**" is defined in subparagraph 26(c) of this Lease.

"**Initial Commencement Date**" is defined and shall have the meaning specified in the Basic Lease Information.

"**Initial Proposed Use Notice**" is defined in subparagraph 3(c) of this Lease.

"**Institutional Lender**" shall mean a commercial bank, savings bank, savings and loan association, trust company, insurance company, real estate investment trust (other than Landlord) or pension, retirement or welfare fund, or the entity through which mortgage-backed securities are issued, and no other.

"**Investment Grade Criteria**" shall mean a Credit Rating of both "BBB-" or higher from S&P and "Baa3" or higher from Moody's, (or an equivalent Credit Rating from an Alternative Credit Rating Agency, as applicable).

"**Issuer**" is defined in sub-subparagraph 5(d)(ii) of this Lease.

"**Land**" shall mean, collectively or individually as the context may require, the four (4) parcels of real estate described or depicted on **Exhibits A-1**, **A-2**, **A-3**, and **A-4** hereto, any land lying in the bed of any existing dedicated street, road or alley adjoining thereto, all strips and gores adjoining thereto, and all rights, ways, easements, privileges and appurtenances thereunto belonging, including but not limited to, all applicable Project Entitlements, and all other property rights, tangible or otherwise, arising out of or connected with the ownership of such parcels of real estate or appurtenant thereto (but none of the Improvements thereon), and in all cases, only to the extent of Landlord's interest therein. Upon completion of the Survey of the Oaks Site in accordance with the Oaks Ground Lease and the Construction Management Agreement, the legal description for the Oaks Site shall be attached to this Lease as **Exhibit A-4**.

"**Landlord**" is defined in the first paragraph of this Lease, subject to the provisions of subparagraph 28(f) of this Lease.

"**Landlord's Lien Rights**" is defined in subparagraph 29(a) of this Lease.

"**Landlord Work**" is defined in subparagraph 2(f) of this Lease.

"**Lease**" is defined in the first sentence of this Lease.

50524468_9_208972_00182

FILED DATE: 11/9/2020 6:08 PM   2020L012058

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM  2020L012058

"**Lease Expiration Date**" is defined and shall have the meaning specified in the Basic Lease Information.

"**Lease Modification Fee**" is defined and shall have the meaning specified in the Basic Lease Information.

"**Lease Year**" is defined and shall have the meaning specified in the Basic Lease Information.

"**Leasehold Mortgage**" shall mean a mortgage, deed to secure debt, deed of trust or leasehold mortgage or other instrument of like nature evidencing a security interest in Landlord's leasehold interest in a Ground Lease.

"**Legal Requirements**" is defined in paragraph 12 of this Lease.

"**Letter of Credit**" is defined in sub-subparagraph 5(d)(ii) of this Lease.

"**Lien**" shall mean any lien, mortgage, pledge, charge, security interest or encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, including any arising under any conditional sale agreement, capital lease or other title retention agreement.

"**Limited Remedy Default**" is defined in subparagraph 16(g) of this Lease.

"**Monthly Subtenant Allowance**" is defined in subparagraph 25(c) of this Lease.

"**Moody's**" shall mean Moody's Investors Services, Inc. and its successors.

"**Mortgage**" shall mean a mortgage, deed to secure debt, deed of trust or mortgage, or other instrument of like nature evidencing a security interest in Landlord's interest in the Premises, including a Leasehold Mortgage.

"**Mortgagee**" shall mean any holder of a Mortgage or a Leasehold Mortgage with respect to the Premises or any part thereof.

"**Muvico**" shall mean Muvico Entertainment, L.L.C., a Delaware limited liability company.

"**Muvico WPB**" shall mean Muvico City Place WPB, L.L.C., a Delaware limited liability company.

"**Net Casualty Proceeds**" shall mean the compensation and/or insurance proceeds, net of the reasonable expenses of collecting such amounts incurred by Landlord, any Mortgagee (but only in its capacity as Proceeds Trustee) and Tenant, and received by any of Landlord, any and all Mortgagees, Tenant and any and all other named insureds or loss payees in respect of any portion of the Premises by reason of and on account of a Casualty.

9

* 5 0 0 4 1 6 7 4 *

"**Net Income (Loss)**" shall mean with respect to any Person and for any period, the aggregate net income (or loss) after taxes of such Person for such period, determined in accordance with GAAP.

"**Oaks Funds**" is defined in paragraph 35 of this Lease.

"**Oaks Ground Lease**" shall mean, with respect to the Oaks Site, that certain Ground Lease Agreement dated as of October 19, 2007 by and between Tenant and Ground Landlord, as assigned by Tenant to Landlord and as amended by that certain Assignment and First Amendment to Lease dated as of March 31, 2008, by and among Ground Landlord, Landlord and Tenant, and by that certain Second Amendment to Lease dated as of December 16, 2008, by and between Ground Landlord and Landlord.

"**Oaks REA**" shall mean, with respect to the Oaks Site, that certain Amendment to and Restatement of Construction, Operation and Reciprocal Easement Agreement dated March 2, 2007, executed by and between Ground Landlord, J.C. Penney Properties, Inc., a Delaware corporation and Macy's Department Stores, Inc., an Ohio corporation, dated March 24, 2007, and recorded April 18, 2007 as Instrument No. 07-0080407 of the Records, which amended and restated in their entirety the following documents: (i) Construction, Operation and Reciprocal Easement Agreement dated December 12, 1977 by and among Village Associates, a California limited partnership in which Ernest W. Hahn, Inc., a California corporation, is the general partner, Carter Hawley Hale Stores, Inc., a California corporation, J. C. Penney Properties, Inc., a Delaware corporation, Adcor Realty Corporation, a New York corporation, The May Department Stores Company, a New York corporation, and Federated Department Stores, Inc., a Delaware corporation, for mutual easements and the unified construction, maintenance and operation of the Shopping Center, recorded on December 12, 1977, in Book 5012, Page 537 of the Records, as Instrument No. 145489, as same has and shall run with the land, and as amended from time to time, (ii) as affected by that certain Consent and Approval attached thereto dated December 12, 1977, by Laniger, a California general partnership, recorded on December 12, 1977, in Book 5012, Page 526 of the Records, (iii) as amended by that certain unrecorded letter agreement dated July 28, 1978, by and among Village Associates, Carter Hawley Hale Stores, Inc., J. C. Penney Properties, Inc., Adcor Realty Corporation, The May Department Stores Company, and Federated Department Stores, Inc., as consented to and approved by Laniger, and (iv) as affected by that certain agreement dated December 8, 1976, by and among Village Associates, Carter Hawley Hale Stores, Inc., J. C. Penney Properties, Inc., The May Department Stores Company, and Federated Department Stores, Inc.

"**Oaks Site**" shall mean that portion of the Premises depicted or legally described in **Exhibit A-4**, located in the Shopping Center commonly known as The Oaks, on Hillcrest Drive in Thousand Oaks, California.

"**OEA**" shall mean, with respect to the BayWalk Site, that certain Operation and Easement Agreement between Developer and Tenant, dated as of August 30, 1999, and recorded September 3, 1999 in Official Records Book 10648 at Page 2116, of the Records, as amended by First Amendment to Operation and Easement Agreement dated as of December 20, 2000, and recorded January 3, 2001, in Official Records Book 11177, at Page 2365, of the Records.

50524468_9_208972_00182

FILED DATE: 11/9/2020 6:08 PM    2020L012058



* 5 0 0 4 1 6 7 4 *

"**Original Leases**" is defined in the recitals for this Lease.

"**Other Taxes**" is defined in subparagraph 6(b) of this Lease.

"**Overdue Rate**" shall mean the greater of: (x) twelve percent (12%) per annum or (y) the sum of six percent (6%) plus the prime interest rate as reported from time to time in *The Wall Street Journal*, but in any event, if lower, the maximum annual interest rate allowed by law for business loans (not primarily for personal, family or household purposes); provided, however, if *The Wall Street Journal* is no longer in existence or ceases to publish such information, Landlord shall use the prime interest rate as reported in a comparable publicly available publication selected by Landlord in its sole discretion.

"**Palace Lease**" is defined in the recitals for this Lease.

"**Palace Site**" is defined in the recitals for this Lease.

"**Parisian Ground Lease**" shall mean Lease Agreement dated February 25, 1998 by and between Partners, as landlord, and General Cinema, as tenant, as modified by First Amendment to Lease dated October 15, 1998 by and between Partners, as landlord, and General Cinema, as tenant, as assigned by CPRLLC, as successor landlord, and as assigned by General Cinema to Entertainment by Assignment and Assumption of Lease dated December 30, 1999, recorded in Official Records Book 11541, Page 1573, of the Records, as further amended by Second Amendment to Lease dated December 30, 1999 by and between CPRLLC and Entertainment, as memorialized in a Memorandum of Lease dated December 30, 1999 by and between CPRLLC and Entertainment recorded in Book 11541, Page 1586 of the Records, as further assigned by Entertainment to Muvico WPB, as further amended by Third Amendment to Lease dated as of August 15, 2000 by and between CPRLLC and Muvico WPB, as further amended by Fourth Amendment to Lease dated as of November 15, 2000 by and between CPRLLC and Muvico WPB, as further amended by letter dated as of March 30, 2001 by and between CPRLLC and Muvico WPB, as further assigned by way of merger of Muvico WPB into Entertainment, as further assigned by Entertainment to Florida 2005 Theaters LLC, f/k/a Muvico Realty, L.L.C., successor by conversion from The Muvico Realty Trust by that certain Assignment and Assumption of Lease and Easements dated February 3, 2005, recorded February 7, 2005 in Book 18111, Page 1062 of the Records, as further amended by that certain Fifth Amendment to Lease dated as of July 4, 2005 by and between CPRLLC and Florida 2005 Theaters LLC, and as further amended, assigned or modified from time to time.

"**Parisian Lease**" is defined in the recitals for this Lease.

"**Parisian Site**" shall mean that portion of the Premises legally described in Exhibit A-2, commonly known as the Muvico Parisian 20 Theater in West Palm Beach, Florida.

"**Parking Agreement**" shall mean, with respect to the Rosemont Site, together, that certain Parking Agreement, by and between Tenant and the Village, dated August 22, 2006, which has been submitted for recording in the Records, as assigned by Tenant to Landlord by that certain Assignment of Parking Agreement, by and between Tenant and Landlord, dated as of August 22, 2006, which has been submitted for recording in the Records.

11

FILED DATE: 11/9/2020 6:08 PM    2020L012058

* 5 0 0 4 1 6 7 4 *

"**Parking Garage**" shall mean, <u>with respect to the BayWalk Site</u>, the public parking garage located in the "Mid Core Building" (as defined in the Final Disposition Agreement) owned and operated by the City.

"**Partners**" shall mean City Place Partners, a Florida general partnership.

"**Pedestrian Corridor**" shall mean, <u>with respect to the BayWalk Site</u>, that certain real property comprising Parcel III described in **Exhibit A-2** attached hereto.

"**Pedestrian Corridor Agreement**" shall mean, <u>with respect to the BayWalk Site</u>, that certain Pedestrian Corridor Property Management Agreement between and the City and Developer, dated August 30, 1999, a memorandum of which was recorded September 3, 1999, in Official Records Book 10648, at Page 2102, of the Records.

"**Percentage Rent**" is defined and shall have the meaning specified in the Basic Lease Information.

"**Permitted Encumbrances**" shall mean for each Site:

(b)  Any of the following, which are not yet due and payable at the time in question: (i) liens for water, sewer, and other utility services and (ii) taxes, assessments and other governmental charges (whether federal, state, local or foreign) and Property Taxes;

(c)  The easements, rights-of-way, encroachments, encumbrances, restrictive covenants and other matters affecting the title to the Premises or any part thereof set forth on **Exhibit C** attached hereto;

(d)  Any Subordination, Non-Disturbance, and Attornment Agreement(s) recorded or otherwise, which are provided to Tenant pursuant to <u>paragraph 17</u> of this Lease or as otherwise entered into by and among Landlord, Tenant, and any Mortgagee;

(e)  Liens for taxes (whether federal, state, local or foreign) attributable to any taxable period whether before, on or after the applicable Initial Commencement Date which are being contested in good faith in accordance with the terms of this Lease by Tenant and for which Tenant has established adequate reserves; and

(f)  This Lease and the rights, privileges and entitlements of Tenant hereunder.

"**Permitted Use**" is defined in <u>subparagraph 3(a)</u> of this Lease.

"**Person**" shall mean any individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust, trustee(s) of a trust, unincorporated organization, or government or governmental authority, agency or political subdivision thereof.

"**Premises**" is defined in <u>subparagraphs 2(a)</u> and <u>2(b)</u> of this Lease, as same may be adjusted by the operation of <u>subparagraphs 4(d)</u>, <u>10(c)</u> and <u>13(b)</u> hereof.

* 5 0 0 4 1 6 7 4 *

"**Pre-Opening Expenses**" shall mean one-time expenses relating to the opening of a new theater, including advertising costs, costs for promotional materials, training costs, including salaries, travel expenses and costs of consultants,; cost of supplies used prior to opening, including supplies used in training and set-up of equipment, storage and labor costs relating to moving equipment, security costs, costs relating to grand opening events, and trailer costs, including utility and cleaning costs.

"**Primary Term**" is defined in subparagraph 4(a) of this Lease.

"**Proceeds Trustee**" shall mean any Person who would qualify as an Institutional Lender and who is designated by Landlord, subject to the prior written approval of any applicable Ground Landlord, such approval not to be unreasonably withheld, delayed, or conditioned; provided, however, if a Mortgage encumbers the Premises, the Mortgagee thereunder may, at its option, be appointed Proceeds Trustee for so long as such Mortgage remains outstanding and such Mortgagee does not control Landlord or is not controlled by or under common control with Landlord.

"**Project Agreements**" shall mean (a) with respect to the BayWalk Site, the Development Agreement, the Final Disposition Agreement, the OEA and the Pedestrian Corridor Agreement (other than such rights, covenants, licenses, easements and options that are personal to Tenant), (b) with respect to the Rosemont Site, the Development and Use Agreement, the Purchase Agreement, and the Parking Agreement, (c) with respect to the Oaks Site, the Oaks Ground Lease, the Oaks REA, and any other agreements, easements, covenants, restrictions or other documents, recorded or unrecorded, now existing or hereinafter executed, to which Landlord, as tenant under the Oaks Ground Lease, or the Oaks Site may be subject, by virtue of the Ground Lease or by the location of the Oaks Site within The Oaks Shopping Center, and (d) with respect to any Site, in addition to any aforementioned documents, as applicable, the agreements or other documents that govern the zoning or use of such Site.

"**Project Entitlements**" shall mean all rights, covenants, licenses, easements and options granted by, or arising from, the Project Agreements with respect to such Site or Sites.

"**Property Taxes**" is defined in subparagraph 6(a) of this Lease.

"**Proposed Use**" is defined in subparagraph 3(c) of this Lease.

"**Purchase Agreement**" shall mean, with respect to the Rosemont Site, collectively, that certain Real Estate Purchase Contract and Development Agreement, by and between Tenant and the Village, dated December 7, 2005, as amended by that certain First Amendment to Real Estate Purchase Contract and Development Agreement, by and between Tenant and the Village, dated as of August 22, 2006, as assigned by Tenant to Landlord by that certain Assignment of Real Estate Purchase Contract and Development Agreement and General Assignment, by and between Tenant and Landlord, dated as of August 22, 2006, which Purchase Agreement contains provisions which survive the closing of the transaction contemplated thereby.

"**Quarterly Lease Year Period**" shall mean each consecutive three month period during each Lease Year, the first being for the months of March, April and May, the second being for June, July and August, the third being for September, October and November, and the fourth

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

being for December, January and February in each Lease Year; provided, however, that for the first Lease Year the first Quarterly Lease Year Period shall begin on March 1, 2009 notwithstanding the Consolidated Lease Commencement Date occurred thereafter.

"**Radius Area**" is defined in paragraph 31 of this Lease.

"**Records**" shall mean the Public Records of the county where the Site is located, which for the BayWalk Site is Pinellas County, Florida, for the Parisian Site, is Palm Beach County, Florida, for the Rosemont Site is Cook County, Illinois, and for the Oaks Site is Ventura County, California.

"**Renewal Term Notice**" is defined in subparagraph 4(e) of this Lease.

"**Rent**" is defined in sub-subparagraph 5(a)(iii).

"**Restoration Documents**" is defined in subparagraph 10(b) of this Lease.

"**Restoration Fund**" is defined in subparagraph 10(d) of this Lease.

"**Rosemont Lease**" is defined in the recitals for this Lease.

"**Rosemont Site**" shall mean that portion of the Premises legally described in **Exhibit A-3**, commonly known as the Rosemont 18 Theater in Rosemont, Illinois.

"**S&P**" shall mean Standard & Poor's Rating Service and its successors or assigns.

"**Second Consolidated Lease**" is defined in the recitals for this Lease.

"**Second Notice**" is defined in subparagraph 25(f) of this Lease.

"**Second Proposed Use Notice**" is defined in subparagraph 3(c) of this Lease.

"**Security Deposit**" is defined in subparagraph 5(d) of this Lease.

"**Security Deposit Amount**" is defined and shall have the meaning specified in the Basic Lease Information.

"**Short Form of Lease**" is defined in paragraph 24 of this Lease.

"**Site**" is defined in subparagraph 2(b) of this Lease.

"**Site Assessments**" is defined in subparagraph 26(d) of this Lease.

"**Site Reviewers**" is defined in subparagraph 26(d) of this Lease.

"**Site Termination Date**" is defined in subparagraph 13(b) of this Lease.

"**Subordination, Non-Disturbance and Attornment Agreement**" is defined in subparagraph 17(a) of this Lease.

S0524468_9_208972_00182

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

"**Substantial Casualty**" is defined in subparagraph 10(c) of this Lease.

"**Tenant**" is defined in the first paragraph of this Lease.

"**Tenant's Property**" shall mean all personal property of Tenant in or on the Premises, affixed or not (so long as any affixed personal property is removable from the Premises without causing any structural damage to the Premises), which is not necessary for the operation of the Improvements, and shall include the equipment and trade fixtures owned by Tenant and listed on **Exhibit B-2**, but shall specifically exclude the Equipment.

"**Tenant Work**" is defined in subparagraph 2(f) of this Lease.

"**Term**" is defined in subparagraph 4(c) of this Lease.

"**Termination Notice**" is defined in subparagraph 10(c) of this Lease.

"**Theaters**" shall mean Muvico Theaters, Inc., a Florida corporation.

"**Transferee**" is defined in sub-subparagraph 5(d)(v) of this Lease.

"**Treasury Rate**" shall mean the yield to maturity of a debt obligation of the United States Treasury having a maturity date closest to but not earlier than the then-existing remaining Term of the Lease (excluding any then-unexercised options for any Extension Terms) and, if more than one have been issued with such maturity date, then using the debt obligation first issued on or closest to the date of any termination by Landlord under this Lease.

"**UCC**" shall mean the Uniform Commercial Code as in effect in the State where the applicable Site is located.

"**Village**" shall mean the Village of Rosemont, Illinois, an Illinois home rule municipal corporation.

2.    **DEMISE OF PREMISES**

(a)    Landlord hereby demises and leases to Tenant and Tenant hereby leases and rents from Landlord the Premises, IN ITS "AS IS" CONDITION, SUBJECT TO THE EXISTING STATE OF TITLE (WITHOUT EXPRESS OR IMPLIED WARRANTY OF LANDLORD WITH RESPECT TO THE CONDITION, QUALITY, REPAIR OR FITNESS OF THE PREMISES FOR A PARTICULAR USE OR TITLE THERETO, ALL SUCH WARRANTIES BEING HEREBY DISCLAIMED BY LANDLORD AND WAIVED AND RENOUNCED BY TENANT). The "**Premises**" consists of collectively, Landlord's interest in the Land, the Improvements, together with any easements, rights, and appurtenances in connection therewith or belonging to said Land and Improvements. The foregoing disclaimer in this subparagraph 2(a) has been negotiated by Landlord and Tenant, each being represented by independent counsel, and is intended as a complete negation of any representation or warranty by Landlord, express or implied, with respect to the condition, quality, repair, or fitness of the Premises for a particular use, or title thereto.

15

* 5 0 0 4 1 6 7 4 *

(b)     The Premises includes Landlord's interest in the Land and Improvements located at the respective addresses commonly known as: (a) 545 Hibiscus Street, West Palm Beach, Florida, including a 20-screen cinema totaling approximately 92,000 square feet of space (the Parisian Site); (b) 151 2nd Avenue North, St. Petersburg, Florida, including a 20-screen cinema totaling approximately 84,000 square feet of space (the BayWalk Site); (c) 9701 Bryn Mawr Avenue, Rosemont, Illinois, including an 18-screen cinema totaling approximately 110,000 square feet of space (the Rosemont Site); and (d) Landlord's leasehold interest in the Land and Improvements located in the Shopping Center in Thousand Oaks, Ventura County, California, including a 14-screen cinema totaling no more than 75,000 square feet on the ground floor and totaling approximately 110,000 square feet of space, as generally depicted on the site plan attached hereto as Schedule 1 to **Exhibit A-4** (the Oaks Site).  The Parisian Site, the BayWalk Site, the Rosemont Site and the Oaks Site collectively constitute the Premises, and each individually is herein called a "Site," and together are herein "Sites."

(c)     Landlord represents and warrants to Tenant that Landlord has full power and lawful authority to enter into and perform Landlord's obligations under this Lease for the Term hereof.

(d)     Landlord agrees to promptly notify Tenant in writing of any change in the ownership of any Ground Lease or the Premises, giving the name and address of the new Landlord or owner, as the case may be, and instructions regarding the payment of Rent or other amounts payable hereunder.  In the event of any change in or transfer of title of Landlord in and to any Ground Lease or other portion of the Premises, whether voluntary or involuntary, or by act of Landlord or by operation of law, Tenant shall have the right to pay Rent or other charges thereafter accruing to the party to which Tenant was making payments prior to such change in title until (i) Tenant shall have been notified of such change in title and given satisfactory proof thereof, and (ii) such new owner shall execute and deliver an agreement, in recordable form, whereby such new owner assumes and agrees with Tenant to discharge all obligations of Landlord under this Lease.

(e)     Effective as of March 31, 2008, Landlord has entered into that certain Construction Management Agreement with Tenant, pursuant to which, among other things, Landlord engaged Tenant to act as Landlord's construction manager for the construction of certain improvements to the Land on the Oaks Site, all upon the terms and subject to the conditions set forth therein.  Pursuant to the Construction Management Agreement, Landlord agreed to fund an amount up to the amount which would result in Landlord's Total Investment being, but not exceeding, $28,000,000.00, such funding to be used for the construction of such improvements to the Oaks Site (upon the terms and conditions set forth therein).  All amounts so funded by Landlord are included in the definition of Landlord's Investment Amount as set forth on **Exhibit I**.  Pursuant to the Construction Management Agreement, Tenant has agreed to act as Landlord's construction manager for the improvements to be constructed on the Oaks Site in accordance with the terms and conditions of the Construction Management Agreement.

(f)     Effective as of March 31, 2008, in addition to the Improvements to be made to the Oaks Site and paid for by Landlord pursuant to the Construction Management Agreement (collectively, the "**Landlord Work**") Landlord specifically consented to Tenant installing the furniture, fixtures, equipment and other Tenant work as described on **Exhibit G** hereto, together

16

FILED DATE: 11/9/2020 6:08 PM   2020L012058

* 5 0 0 4 1 6 7 4 *

with all other work Tenant is permitted or required to perform under the Construction Management Agreement (collectively, "**Tenant Work**"), which Tenant Work shall be paid for by Tenant and, together with the Landlord Work, administered as set forth in the Construction Management Agreement (and not by the construction provisions of this Lease).

3.    **USE**

(a)    Tenant shall, subject to applicable zoning restrictions and any recorded covenants or restrictions in the Records upon the applicable Initial Commencement Date, use and occupy the Premises, including each Site, primarily as a megaplex theatre and auditoria for the presentation of motion pictures, telecasts and other audio-visual presentations, or for meetings or other public presentations, or for other entertainment or educational purposes, and for the supplemental retail sale within the Premises of food, beverages (including liquor) and refreshments, (subject to Section 1.14 of the Oaks Ground Lease), and for other lawful purposes which are both associated and related to such uses, including, but not limited to: (i) the supplemental operation therein of games and other amusement devices (electronic or otherwise); (ii) the supplemental sale of records, compact discs, videos, books, magazines, toys, gift items and novelties (but in the case of the Parisian Site, subject to Section 13.1(d) of the Parisian Ground Lease); and (iii) the supplemental sale of other goods, wares, merchandise and services (including "babysitting") related to the foregoing specified uses; provided, however, the supplemental matters described in clauses (i) through (iii) shall be accessible only to persons who have purchased an admission ticket to a particular presentation, or who are otherwise theater patrons attending a particular presentation (collectively, the "**Permitted Use**"). Except for the recordation of any Mortgage and any replacements, renewals, amendments, consolidations, modifications, extensions or refinancing thereof or as otherwise required by governmental order or by the terms and provisions of any applicable Ground Lease, from and after the Initial Commencement Date, without first having obtained Tenant's prior written consent which may be withheld or granted in Tenant's sole and absolute discretion, Landlord shall not (i) record, or otherwise take any voluntary action to subject the Premises or Land to, any covenants, restrictions, easements or other encumbrances (whether of record or otherwise) in addition to those covenants, restrictions, easements or other encumbrances appearing of record as of the Initial Commencement Date, (ii) modify or amend any covenants, restrictions, easements or other encumbrances in existence as of the Initial Commencement Date, or (iii) take any action in connection with, related to or in support of any rezoning of the Premises from the zoning classifications presently in existence as of the Initial Commencement Date. Tenant shall not use, suffer or permit the Premises, or any portion thereof, to be used by Tenant, any third party or the public, as such, without restriction or in such manner as might adversely affect Landlord's title to or interest in the Premises, or in such manner as might make possible a claim or claims of adverse possession by the public, as such, or third Persons, or of implied dedication of the Premises, or any portion thereof.

(b)    If no Event of Default has occurred and is continuing, Landlord shall, promptly upon request by Tenant, join with Tenant (at Tenant's cost and expense), to (i) grant easements, licenses, rights of way and other rights and privileges in the nature of easements for the purposes of providing utilities and the like to the Premises, (ii) release existing easements and appurtenances relating to the provision of utilities and the like to the Premises, and (iii) execute and deliver any instrument, in form and substance acceptable to Landlord, necessary or

17

* 5 0 0 4 1 6 7 4 *

appropriate to make or confirm such grants or releases to any Person, with or without consideration; provided that such grant or release does not interfere with and is not detrimental to the conduct of business on the Premises and does not adversely affect the utility, useful life or value of the Premises.

(c)     Subject to the terms of any applicable Ground Lease, Tenant may anytime after the fifteenth (15th) anniversary of the Group One Initial Commencement Date with Landlord's consent, which consent shall not be unreasonably withheld, conditioned or delayed, change its use of the Premises from the Permitted Use to any lawful retail, service or entertainment purpose(s), or any other uses permitted under applicable law which (i) are not specifically prohibited under this Lease and (ii) do not, in Landlord's commercially reasonable judgment, diminish the value of the Premises, the Fixed Rent, or the Percentage Rent; provided, however prior to the fifteenth (15th) anniversary of the Group One Initial Commencement Date, Landlord may accept or reject Tenant's proposal to change the use of the Premises in Landlord's sole and absolute discretion. If Tenant proposes to change the use of the Premises, Tenant shall first notify Landlord in writing (the **"Initial Proposed Use Notice"**) of the proposed primary use (the **"Proposed Use"**). Landlord shall then have a period of fifteen (15) Business Days after Landlord's receipt of the Initial Proposed Use Notice within which to give or withhold its consent to such Proposed Use. If Landlord fails to respond to the Initial Proposed Use Notice within such fifteen (15) Business Day period, then Tenant shall send an additional written notice to Landlord, which notice shall include the following language (which shall be clearly typed on the front page of the notice and in bold type): **"FAILURE TO RESPOND TO THIS NOTICE WITHIN FIVE (5) DAYS AFTER RECEIPT THEREOF SHALL CONSTITUTE A DEEMED CONSENT TO THE MATTERS SET FORTH HEREIN"** (the "**Second Proposed Use Notice**"). If Landlord fails to respond to the Second Proposed Use Notice within five (5) days after receipt thereof, Landlord shall be deemed to have consented to Tenant's change of use. Upon Landlord's consent, such Proposed Use shall, together with the uses specified in subparagraph (a) above and all other uses to which Landlord has previously consented pursuant to this subparagraph (b), shall constitute the Permitted Use.

(d)     Except as otherwise permitted in subparagraph 25(h), Tenant has no authority, without Landlord's prior written consent (which consent will not be unreasonably withheld, conditioned or delayed), to grant to, or create in favor of, any Person any easement, hereditament, entitlement, property right or covenant running with the land in, to or with respect to the Land or the Premises, and any attempt by Tenant to do so shall be null and void.

3A.    **OBLIGATIONS UNDER GROUND LEASES, PROJECT AGREEMENTS AND PROJECT ENTITLEMENTS**

(a)     Tenant covenants, with respect to the Premises, that Tenant will observe and perform all the terms, conditions, covenants and provisions contained in each Ground Lease to be performed by Landlord, and that it is subject to, and it shall perform, each and every term, condition, covenant and provision required by the respective Ground Lease to be performed by Landlord with respect to the respective Site in the time and manner provided by the respective Ground Lease in the same manner as if Tenant had been the tenant in the Ground Lease. Wherever the terms, covenants and conditions of this Lease shall conflict with the terms, covenants and conditions of any Ground Lease, the terms, covenants and conditions of the

18

* 5 0 0 4 1 6 7 4 *

document which is most restrictive or which requires greater performance or the expenditure of a greater sum shall control.

(b)     Tenant shall observe and perform all of the terms, conditions, covenants and provisions of each of the respective Project Agreements to be performed by Landlord.

(c)     During the Term of this Lease, Tenant shall observe and perform all of the terms, conditions, covenants and provisions of the Project Agreements to be performed by Landlord as owner of the Premises or by Tenant as occupant of the Premises, and Tenant shall do so in the time and manner provided by the Project Agreements as if Tenant were: (i) with respect to the BayWalk Site, the "Party" that owns the "Muvico Tract" (as those terms are defined in the OEA) and the owner of the "Muvico Premises" (as that term is defined in the Development Agreement), (ii) with respect to the Rosemont Site, the "Developer" that owns the "Developer Parcel" (as such terms are defined in the Parking Agreement), the "Theater Parcel Owner" (as such term is defined in the Development and Use Agreement), and the "Developer" that owns and shall develop the "Complex Site" (as such terms are defined in the Purchase Agreement); and (iii) with respect to the Oaks Site, the tenant under the Oaks Ground Lease and the operator of a "Developer Non-Mall Store" or a "Developer Plaza Store" under the Oaks REA. Tenant shall indemnify and defend Landlord against and hold Landlord harmless from all claims, demands, liabilities, damages, losses, costs and expenses, including reasonable attorneys' fees and disbursements, arising from or related to Tenant's failure during the Term of this Lease to comply with the Project Agreements. Tenant's liability to Landlord under this paragraph 3A shall survive the termination of this Lease.

Landlord hereby delegates and assigns to Tenant (so long as such Person is a party to this Lease as tenant hereunder), and Tenant (so long as such Person is a party to this Lease as tenant hereunder) shall have, the exclusive right, without prior notice to or the consent of Landlord, to exercise and enforce, in its own right and on behalf of Landlord, the Project Entitlements. Without limiting the generality of the foregoing, Tenant (so long as such Person is a party to this Lease as tenant hereunder) shall have the exclusive right, without prior notice to or the consent of, Landlord: (i) to exercise Landlord's rights to obtain the "Muvico Assignment and Assumption" (as that term is defined in the Development Agreement), (ii) to enforce the Developer's obligations to maintain the Parking Garage and the Pedestrian Corridor in the event the Developer exercises the "Building Option" (as that term is defined in the Development Agreement), (iii) to approve any assignment by the Developer of its rights pursuant to the Pedestrian Corridor Agreement, and in connection therewith, to request and receive information about the proposed assignee, and (iv) to receive from the Developer copies of all notices required to be delivered by the Developer pursuant to the Project Agreements.

(d)     Landlord agrees that Tenant may act in Landlord's stead for the purposes of carrying out the intent and terms of this paragraph 3A, and in furtherance thereof, Landlord hereby appoints Tenant as Landlord's attorney-in-fact (coupled with an interest) to do so; provided, however, nothing contained herein shall permit Tenant to create or incur any other obligations on Landlord's behalf. Notwithstanding anything contained in this subparagraph 3A(d), nothing shall prevent Landlord from curing Tenant's failure to pay or perform under the Project Agreements in accordance with paragraph 16 of this Lease.

S0524468_9_208972_00182

* 5 0 0 4 1 6 7 4 *

(e)     In no event shall Landlord modify, amend or terminate the Project Agreements, or consent to any modification, amendment or termination of the Project Entitlements, without the prior written consent of Tenant, which consent may be arbitrarily withheld in Tenant's sole discretion.

(f)     Landlord shall promptly deliver to Tenant, and Tenant shall promptly deliver to Landlord, copies of any notices given or received by Landlord or by Tenant, respectively, to or from any party to, or any third party in connection with, the Project Entitlements or the Project Agreements, including all notices related to default, condemnation or eminent domain, fire or other casualty loss and notices related to the Building Option or approval rights or any repurchase rights.

(g)     Wherever the terms, covenants and conditions of this Lease shall conflict with the terms, covenants and conditions of any Ground Lease, the terms, covenants and conditions of the document which is most restrictive or which requires greater performance or the expenditure of a greater sum shall control.

4.     TERM

(a)     The primary term of this Lease (the "**Primary Term**"), subject to the terms and conditions of this Lease, for each Site commenced as set forth in the Basic Lease Information and for all Sites remaining after the Consolidated Lease Commencement Date continuing for a period of approximately twenty (20) years, ending on the Lease Expiration Date.

(b)     Notwithstanding the foregoing, Tenant acknowledges that the "Initial Term" (as such term is defined in the Parisian Ground Lease) and the first and second Ground Lease Extension Terms of the Parisian Ground Lease shall expire during the Primary Term hereof, and Landlord shall have no liability for such disparity between the lengths of such terms. Tenant covenants that it shall not act or fail to act in any manner that shall limit Landlord's right to exercise its Ground Lease Extension Option to extend the term of the Parisian Ground Lease through the Lease Expiration Date. Landlord shall exercise all Ground Lease Extension Options necessary to extend the term of the Parisian Ground Lease through the Lease Expiration Date, provided, however, that Landlord shall have no liability for the Ground Landlord's failure to honor the Ground Lease Extension Option on account of any act or omission of Tenant in violation of the Parisian Ground Lease, including Section 3.7 of the Parisian Ground Lease. In the event Landlord fails to act in accordance with the requirements of this subparagraph 4(b) in any way and fails to cure such failure within twenty (20) days following written notice thereof from Tenant, Tenant may act in Landlord's stead for the limited purposes of carrying out the intent and terms of this subparagraph 4(b), and in furtherance thereof, Landlord appoints Tenant as Landlord's attorney-in-fact (coupled with an interest and for the sole purpose of extending the term of the Parisian Ground Lease through the Lease Expiration Date); provided, however, nothing contained herein shall permit Tenant to create or incur any other obligations on Landlord's behalf.

(c)     Subject to the terms and conditions (including length of term) under the respective Ground Lease, Tenant shall have the right, at its option, to extend the Primary Term of this Lease with respect to the entire Premises for three (3) consecutive extension terms (the "**Extension**

S0524468_9_208977_00182

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

Terms"), each of which being five (5) years in length. Each Extension Term shall commence on the day after the expiration of the preceding term and shall expire on the fifth (5th) anniversary of the Lease Expiration Date in the case of the first (1st) Extension Term, and on the tenth (10th) and fifteenth (15th) anniversaries of the Lease Expiration Date in the case of the second (2nd) and third (3rd) Extension Terms. The date each Extension Term shall expire as herein provided shall be referred to as an "**Extension Term Expiration Date**," and sometimes referred to as the First, Second, or Third Extension Term Expiration Date. The options to extend the Term of this Lease as described above shall not be deemed exercised by Tenant with respect to any Site subject to a Ground Lease unless the related Ground Lease is extended as provided in subparagraph 4(e) below. Tenant's failure to timely deliver the applicable Renewal Term Notice to Landlord shall terminate all future Extension Terms, if any, following the Extension Term to which such Renewal Term Notice specifically relates. Subject to the provisions of paragraph 5, the terms and conditions of this Lease shall apply to each Extension Term with the same force and effect as if such Extension Term had originally been included in the Primary Term of this Lease. The right of Tenant to the Extension Terms shall be conditioned upon this Lease being in full force and effect and no Event of Default then existing as of the Lease Expiration Date, for the first (1st) Extension Term, or the Extension Term Expiration Date for the first (1st) and second (2nd) Extension Term, as the case may be, for the second (2nd) and third (3rd) Extension Terms, respectively. In addition, with respect to any Site subject to a Ground Lease, such Ground Lease shall be in full force and effect. The Primary Term, together with any Extension Term with respect to which Tenant properly exercises its option, and for which the conditions related thereto are satisfied, shall constitute the "**Term**" of this Lease.

(d)     If a Ground Lease expires for any reason prior to the expiration of this Lease and as a result, Landlord's leasehold estate under such Ground Lease is terminated, Tenant, as of the effective date of such termination, shall have no right of possession of the Site that is the subject of such Ground Lease, Tenant shall surrender such Site as required pursuant to this Lease and such Ground Lease and such Site shall no longer form a part of the Premises. Tenant's obligations and liabilities with respect to such Site shall be governed by paragraph 22 below and this Lease shall remain in full force and effect for the remaining Sites, except that, upon such Ground Lease expiration and absent an Event of Default hereunder, Fixed Rent, Annual Percentage Rent, and Additional Rent payable for such Site which is no longer a portion of the Premises shall no longer be owed for the period after the effective date of such termination. Landlord and Tenant shall execute an amendment to the Lease confirming the foregoing, which amendment shall be prepared by or on behalf of Landlord and be reasonably acceptable to Tenant.

(e)     Landlord and Tenant agree that, in order for Tenant to be able to exercise its rights to any Extension Term under this Lease with respect to any Site that is subject to a Ground Lease, it will be necessary for Landlord to extend the term of each such related Ground Lease from time to time. If Tenant desires to extend the Term of the Lease beyond the Primary Term, or any Extension Term, as the case may be, then Tenant shall, at least two (2) years prior to the Lease Expiration Date or applicable Extension Term Expiration Date, as the case may be, give Landlord written notice of its desire to exercise its option to extend the Term of this Lease (the "**Renewal Term Notice**") and shall direct Landlord to exercise, in accordance with the terms and conditions of the Ground Leases, the Ground Lease Extension Option for each Ground Lease Extension Term (for the Parisian Ground Lease, Oaks Ground Lease, as applicable, one or more)

21

* 5 0 0 4 1 6 7 4 *

that include(s) the Extension Term Expiration Date of the Extension Term by which Tenant desires to extend this Lease. Any Renewal Term Notice shall be irrevocable once delivered to Landlord by Tenant. After Landlord receives such written notice from Tenant, Landlord shall exercise the Ground Lease Extension Option(s) for such Ground Lease Extension Term(s) and diligently work with Ground Landlord to determine the Ground Rent payable during such Ground Lease Extension Term (the "**Ground Lease Extension Term Rent**"). Landlord agrees that Tenant, at its option, may participate with Landlord and Ground Landlord in determining the Ground Lease Extension Rent. Additionally, Tenant, at its option, prior to delivering the Renewal Term Notice, may commence conversations with Ground Landlord regarding what the Ground Lease Extension Term Rent may be for a particular Ground Lease Extension Term; provided, however, Tenant may not enter into any extension agreements, modifications or amendments of the Ground Lease or otherwise act in any manner that would create any additional obligations for Landlord under the Ground Lease or extend the term of the Ground Lease without first obtaining Landlord's prior written consent and approval, each of which may be granted or withheld in Landlord's reasonable discretion. Tenant covenants that it shall not act or fail to act in any manner that shall limit Landlord's right to exercise any Ground Lease Extension Option in accordance herewith. All costs and expenses incurred by Landlord in connection with its exercise of a Ground Lease Extension Option shall be paid (upon demand) by Tenant. In the event Landlord does not act in accordance with the requirements of this subparagraph 4(e) in any way after twenty (20) days' written notice from Tenant of such failure, Tenant may act in Landlord's stead for the limited purposes of carrying out the intent and terms of this subparagraph 4(e), and in furtherance thereof, Landlord appoints Tenant as Landlord's attorney-in-fact (coupled with an interest) for the sole purpose of extending the term of a Ground Lease; provided, however, nothing contained herein shall permit Tenant to create or incur any other obligations on Landlord's behalf.

5. **RENTAL; SECURITY DEPOSIT**

    (a)    Tenant shall pay the following amounts as Rent for the Premises:

        (i)    During the Term of this Lease, Tenant shall pay to Landlord, as fixed monthly rent, the amount of monthly Fixed Rent specified in the Basic Lease Information.

        (ii)    During the Term of this Lease, Tenant shall pay to Landlord, as annual percentage rent, the amount of Annual Percentage Rent specified in the Basic Lease Information.

        (iii)    During the Term of this Lease, Tenant shall pay, as Additional Rent, all sums, including Ground Rent, due and payable by the tenant under each Ground Lease.

As used in this Lease, "**Rent**" shall mean and include all Fixed Rent, Annual Percentage Rent and Additional Rent payable by Tenant in accordance with this Lease.

    (b)    It is the intention of Landlord and Tenant that the Fixed Rent and Percentage Rent payable by Tenant to Landlord during the entire Term of this Lease shall be absolutely net of all costs and expenses incurred in connection with the management, operation, maintenance, repair and replacement of the Premises in accordance with this Lease. Except as otherwise provided in this Lease, Landlord shall have no obligations or liabilities whatsoever with respect to the

22

* 5 0 0 4 1 6 7 4 *

management, operation, maintenance, repair or replacement of the Premises during the Term of this Lease, and Tenant shall manage, operate, maintain and repair and replace the Premises in accordance with this Lease and shall pay all costs and expenses incurred in connection therewith before such costs or expenses become delinquent. Without limiting the generality of the foregoing, throughout the entire Term of this Lease, Tenant shall pay, in its own right and for its own account, (i) all premiums for all property and liability insurance covering the Premises required under this Lease, (ii) all Property Taxes and all Other Taxes that accrue during or are allocable to the Term of this Lease, and (iii) all Property Taxes and Other Taxes, allocable for any period of time prior to the Term of this Lease. Tenant shall pay all Additional Rent directly to the applicable Ground Landlord as and when due under the provisions of the related Ground Lease, taking into account all applicable grace periods thereunder.

(c)     Tenant shall pay all Fixed Rent to Landlord, in advance, on or before the first Business Day of each and every calendar month during the Term of this Lease (other than the payment due on the Initial Commencement Date or Consolidated Lease Commencement Date, as the case may be, which is due as set forth in the Basic Lease Information) without notice, demand, deduction or offset, in lawful money of the United States of America, to the wire transfer address of Landlord specified in the Basic Lease Information, or to such other accounts and/or Person or Persons or at such other place or places as Landlord may from time to time designate in writing (or otherwise so there are collected funds available to Landlord on the due date). Landlord shall not require nor accept any payment of Fixed Rent or any other payments or charges under this Lease for more than two (2) months in advance of the due date for such Fixed Rent or any other payment or charge. Interest at the Overdue Rate shall accrue on unpaid Fixed Rent and Annual Percentage Rent from the date which is five (5) Business Days after the due date thereof to the date of actual payment. If the Fixed Rent or Annual Percentage Rent is paid more than five (5) Business Days after its due date, a late charge of three percent (3%) of the delinquent amount shall be due and payable. Tenant shall pay all Additional Rent directly to the applicable Ground Landlord as and when due under the provisions of each respective Ground Lease, taking into account all applicable grace periods thereunder.

(d)     Security Deposit requirements are set forth below.

(i)     Subject to sub-subparagraph 5(d)(iv) below, Tenant shall deliver and maintain when required, if at all, the Security Deposit Amount to Landlord as a security deposit ("**Security Deposit**") in the form of an irrevocable standby letter of credit meeting the requirements of this subparagraph 5(d) to secure the full and faithful performance of Tenant's obligations under this Lease. If there is an Event of Default at any time during the Term or any holdover period, Landlord shall have the right, but not the obligation, in accordance with the terms of such letter of credit and this Lease, from time to time to draw upon all or any part of the Security Deposit but only in such amounts as are necessary to cure or partially cure the Event of Default which can be cured or partially cured with the payment of money, or to pay itself any Rents then due, damages or other amounts that Landlord would be entitled to recover and which are currently due from Tenant on account of the Event of Default. If Landlord draws upon such Security Deposit, Landlord shall apply such proceeds to such amounts otherwise due from Tenant as set forth above. If Landlord shall so draw on the Security Deposit and apply all of such proceeds so drawn as set forth above, upon Landlord's demand, Tenant shall, within five (5) Business Days following notice, restore the Security Deposit to its previous amount and any

23

* 5 0 0 4 1 6 7 4 *

failure to do so shall be an Event of Default without further notice. Tenant may not use the Security Deposit to pay Rent or otherwise cause Landlord to offset any amounts payable by Tenant against the Security Deposit (except as provided herein). Once delivered, if applicable, the Security Deposit shall be returned to Tenant within thirty (30) calendar days after the first to occur of (1) the waiver set forth in sub-subparagraph 5(d)(iv) being applicable, and (2) the expiration or earlier termination of the Term and Tenant's surrender of the Premises to Landlord as required by paragraph 22 of this Lease, in each case less such amounts as may have been used to cure or partially cure any Events of Default by Tenant. Tenant's failure to deposit, maintain and replenish the Security Deposit as required by this Lease shall constitute an immediate Event of Default under this Lease.

(ii)     When required, the Security Deposit shall be made by delivering an irrevocable standby letter of credit to Landlord, such letter of credit shall meet all of the following requirements: (a) it is a sight draft letter of credit from a financial institution (the "Issuer") acceptable to Landlord and Mortgagee, each in their respective sole and absolute discretion; provided, however, any financial institution having a Credit Rating of "A1" or higher from Moody's and "A+" or higher from S&P, or, as applicable, an equivalent rating from an Alternative Credit Rating Agency is pre-approved; (b) it has a face amount of not less than the Security Deposit Amount; (c) it shall be deemed automatically extended without written amendment for one (1) year from the present or any future expiration date unless at least thirty (30) calendar days prior to such expiration date, the Issuer notifies Landlord, Mortgagee, and Tenant in writing of its intention not to renew the letter of credit for any such additional periods, and such letter of credit shall remain in effect and shall not expire earlier than one hundred twenty (120) days after the Lease Expiration Date or the expiration of any Extension Term exercised by Tenant; (d) it is freely assignable by Landlord and/or Mortgagee, provided that the transferor and transferee shall have complied with the Issuer's customary transfer requirements and pay when due the reasonable costs charged by such Issuer in connection with such assignment; (e) it may be drawn upon by Landlord or Mortgagee to cure Events of Default by Tenant under this Lease, but only in accordance with its terms and the terms of this Lease; and (f) it is otherwise reasonably satisfactory to Landlord and is substantially similar to the letter of credit form attached hereto as **Exhibit F** and incorporated herein by this reference (a letter of credit satisfying the foregoing requirements is herein called a "**Letter of Credit**"). If the Issuer ceases to have a Credit Rating of both "A+" or higher by S&P and "A1" or higher by Moody's, Tenant shall, within ten (10) Business Days following notice by Landlord to Tenant of the rating downgrade, replace the Letter of Credit with one issued by a financial institution having such rating. Tenant shall pay any and all costs and expenses associated with Tenant's changing the Issuer or substituting a new Letter of Credit for an existing Letter of Credit.

(iii)     Tenant shall execute such documents, instruments, financing statements, and acknowledgments as Landlord may reasonably request from time to time to grant and thereafter maintain a first-priority perfected security interest in the Security Deposit. Tenant hereby grants Landlord a security interest in the Security Deposit as it exists from time to time, and all proceeds and products thereof. Landlord and Tenant acknowledge that if and when Landlord obtains possession of the Security Deposit, Landlord's possession thereof will not require further documents, instruments or financing statements to provide Landlord with a first-priority perfected security interest in the Security Deposit. Tenant acknowledges and agrees that the Security Deposit may also be pledged as security to any Mortgagee and Tenant shall

24

S0524468_9_208972_00182

\* 5 0 0 4 1 6 7 4 \*

cooperate with, permit, and execute such documents and instruments as may be required to provide Mortgagee with such security.

(iv)    From time to time as set forth herein, when Tenant's EBITDAR Ratio for the Premises is equal to or exceeds the EBITDAR Minimum Ratio for two (2) consecutive Quarterly Lease Year Periods, the requirements of maintaining the Security Deposit shall be waived by Landlord upon Tenant's written request accompanied by evidence satisfactory to Landlord of satisfaction of such ratio requirements and the Security Deposit shall be returned to Tenant promptly. Landlord and Tenant recognize and agree that as of the Consolidated Lease Commencement Date such ratio requirements are deemed to be satisfied, and the requirement of maintaining the Security Deposit is waived by Landlord as of such date. Such Landlord's waiver shall cease if Tenant's EBITDAR Ratio for the Premises is less than the EBITDAR Minimum Ratio for any Quarterly Lease Year Period. If after being granted a waiver by Landlord of the requirement of maintaining the Security Deposit, Tenant thereafter fails to have an EBITDAR Ratio for the Premises equal to or in excess of the EBITDAR Minimum Ratio for any Quarterly Lease Year Period, Tenant's obligation to deposit and replenish and thereafter maintain such Security Deposit under this Lease shall be re-instated, without further act, deed or notice; provided, however, Tenant shall be afforded ten (10) Business Days after such cessation of such waiver within which to deposit the Security Deposit with Landlord (and the failure to do so shall be an Event of Default without notice or demand); provided, further, Landlord shall again be required to waive Tenant's obligation to maintain such Security Deposit when Tenant shall have satisfied the conditions precedent required for such waiver as set forth in the first sentence of this sub-subparagraph 5(d)(iv).

(v)    If (i) a transferee of Landlord's right, title, and interest in and to the Premises, this Lease, and such Security Deposit (a "**Transferee**") shall have assumed in writing Landlord's obligations hereunder and recognized Tenant in writing, as tenant under this Lease; (ii) Landlord and such Transferee, shall have delivered written evidence of such Transferee's assumption and recognition as aforesaid; and (iii) Landlord shall deliver the Letter of Credit to any such Transferee of Landlord's right, title, and interest as aforesaid, the then-current landlord delivering such Security Deposit to such Transferee shall be discharged from further liability therefor; provided, however, if the immediately preceding conditions (i), (ii), and (iii) are not satisfied, Tenant shall have no obligations hereunder to such Transferee solely with respect to the Security Deposit (including any replenishment, replacement, or transfer obligations) unless and until such conditions shall have been satisfied and the then-current landlord shall have delivered the Security Deposit to such Transferee.

## 6.    TAXES

(a)    Tenant shall pay any Property Taxes assessed or charged against the Premises or any part thereof as and when required to be paid by Landlord, as fee owner of the Premises, or as tenant under any Ground Lease. Tenant shall pay all Property Taxes prior to the assessment of any interest or penalty for late payment (subject to Tenant's rights under this subparagraph 6(a) to make payment thereof in installments or under subparagraph 6(e) below or to protest Property Taxes); provided, however, if and to the extent Landlord or Mortgagee is holding Tenant's estimated payments thereof pursuant to subparagraph 6(f) below, Landlord or Mortgagee shall instead make such payments timely (to permit the maximum available discount upon notice from

* S 0 0 4 1 6 7 4 *

Tenant) upon Tenant's behalf; provided, further, if any such Property Taxes may legally be paid in installments, Tenant may, at its option, pay such Property Taxes in such installments together with any interest due thereon provided that Tenant shall have paid all such installments, or provided to Landlord or Mortgagee, such amounts as are necessary for the payment of, all such installments prior to the expiration or earlier termination of this Lease. "**Property Taxes**" shall mean all taxes, assessments, excises, levies, fees and charges (and any tax, assessment, excise, levy, municipal service fee, fee or charge levied wholly or partly in lieu thereof or as a substitute therefor or as an addition thereto) of every kind and description, general or special, ordinary or extraordinary, foreseen or unforeseen, secured or unsecured, whether or not now customary or within the contemplation of Landlord and Tenant, that are levied, assessed, charged, confirmed or imposed by any public or government authority on or against, or otherwise with respect to, the Premises or any part thereof or any personal property used in connection with the Premises, including Landlord's franchise taxes based upon gross receipts with respect to the receipt of Rent (but not including net income or franchise taxes based upon, measured by or calculated with respect to net income or profits or derivatives thereof). Property Taxes shall not include any Other Taxes or Excluded Taxes arising out of or levied in connection with this Lease, in each case, of Landlord, unless and only to the extent levied or assessed against Landlord as a substitute for any Property Taxes. In addition, "**Property Taxes**" shall include any taxes as a result of any change in ownership with respect to the Premises pursuant to Section 62 of the State of California Revenue and Taxation Code, and the costs (amortized over such period as Landlord shall reasonably determine) of any transit impact development fees, housing and child care contributions or other similar or dissimilar impositions required of Landlord or otherwise imposed by the local governmental or quasi-governmental instrumentalities and interest on the unamortized balance at the Overdue Rate.

(b) Tenant shall pay all Other Taxes prior to the assessment of any interest or penalty for late payment (subject to Tenant's rights under this subparagraph 6(b) and subparagraph 6(e) below, to make payment in installments or to protest Other Taxes); provided, however, if Landlord or Mortgagee is holding Tenant's estimated payments thereof pursuant to subparagraph 6(f) below, Landlord or Mortgagee shall instead make such payments timely (to permit the maximum available discount upon notice from Tenant) upon Tenant's behalf; provided, further, if any such Other Taxes may legally be paid in installments, Tenant may, at its option, pay such Other Taxes in such installments together with any interest due thereon provided that Tenant shall have paid, or provided to Landlord or Mortgagee, such amounts as are necessary for the payment of, all such installments prior to the expiration or earlier termination of this Lease. "**Other Taxes**" shall mean all taxes, assessments, excises, levies, fees and charges, including any sales tax imposed or assessed by the State of Florida, Illinois or California, as the case may be, and all payments related to the cost or occupation of providing facilities or services, whether or not now customary or within the contemplation of Landlord and Tenant, that are levied, assessed, charged, confirmed or imposed by any public or government authority upon, or measured by, or reasonably attributable to (i) the Premises, (ii) the cost or value of Tenant's Property or the cost or value of any leasehold improvements made in or to the Premises by or for Tenant, regardless of whether title to such improvements is vested in Tenant or Landlord, (iii) any Rent payable under this Lease, including any gross receipts tax or excise tax levied by any public or government authority with respect to the receipt of any such Rent but only to the extent that such taxes are in lieu of or a substitute for any Property Taxes, (iv) the possession, leasing, operation, management, maintenance, alteration, repair, use or occupancy by Tenant of the

26

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM    2020L012058

Premises, or (v) this transaction or any document to which Tenant is a party creating or transferring an interest or an estate in the Premises. "Other Taxes" shall not include any Property Taxes or any Excluded Taxes arising out of or levied in connection with this Lease, in each case, of Landlord, unless and only to the extent levied or assessed against Landlord in whole or in part in lieu of, as a substitute for, or as an addition to any Other Taxes.

(c)     Except for any Excluded Taxes imposed on or with respect to the Rent, if at any time during the Term, any method of taxation shall be such that there shall be levied, assessed or imposed on Landlord, or on the Rent, or on the Premises, or any portion thereof, a capital levy, gross receipts tax on the Rent, occupational license tax, or a franchise tax, based upon gross receipts with respect to the Rent, but not including any income or franchise taxes based upon, measured by, or calculated with respect to net income or profits, Tenant, to the extent permitted by law, covenants to pay and discharge the same, it being the intention of the parties hereto that the Fixed Rent and Annual Percentage Rent to be paid hereunder shall be paid to Landlord absolutely net without deduction or charge of any nature whatsoever, foreseeable or unforeseeable, ordinary or extraordinary, or of any nature, kind, or description, except for Excluded Taxes and as otherwise expressly provided in this Lease.

(d)     Tenant covenants to furnish Landlord, within fifteen (15) calendar days after request by Landlord official receipts of the appropriate taxing authority, if any, or other appropriate proof reasonably satisfactory to Landlord, evidencing the payment of all Impositions.

(e)     Tenant shall have the right (but shall not be obligated) to contest the amount or validity, in whole or in part, of any Property Tax or Other Tax or to seek a reduction in the valuation of the Premises (or any part thereof) as assessed for real estate property tax purposes by appropriate proceedings diligently conducted in good faith (but only after the deposit or payments (whether under protest or otherwise) of any amounts required by applicable law to stay or prevent collection activities). Landlord shall not be required to join in any proceeding referred to in this subparagraph 6(e) except to the extent required by law, in which event Landlord shall, upon written request by Tenant, join in such proceedings or permit the same to be brought in its name, all at Tenant's expense. Landlord agrees to provide, at Tenant's expense, whatever assistance Tenant may reasonably require in connection with any such contest. Tenant covenants that Landlord shall not suffer or sustain any costs or expenses (including counsel fees) or any liability in connection with any such proceeding. No such contest shall subject Landlord to any civil liability or the risk of any criminal liability or forfeiture. Landlord shall not, during the pendency of any such contest, pay or discharge any Property Tax or Other Tax that is being contested by Tenant unless the Premises or any portion thereof shall be in danger of being forfeited or lost by reason of any such contest or non-payment of such Property Tax or Other Tax.

(f)     During the continuance of any Event of Default, Tenant shall pay to Landlord on the first day of each calendar month an amount equal to one twelfth (1/12) of the Property Taxes and Other Taxes thereafter due and payable, as reasonably estimated by Landlord on the basis of assessments and bills and estimates thereof. Such amounts shall be held by Landlord or Mortgagee, without interest, and shall not be deemed to be trust funds but shall not be commingled with the general funds of Landlord and shall instead be held in a separate escrow account of Landlord or Mortgagee, as applicable, opened and maintained for this Lease alone;

50524468_9_208972_00182

* 5 0 0 4 1 6 7 4 *

provided, however, to the extent so received, any Mortgagee which is an entity unaffiliated with Landlord or any affiliate of Landlord, may commingle such funds. Landlord and Mortgagee shall apply such amounts paid by Tenant under this subparagraph 6(f) (including any amounts tendered by Tenant which are intended for interest if Tenant shall have elected to make such payments in installments) to the payment before delinquency of the Property Taxes and Other Taxes (and at such time and in such manner as to permit the maximum available discount upon notice from Tenant). Landlord and Mortgagee shall make no charge for holding and applying such amounts. If at any time the amount on deposit pursuant to this subparagraph 6(f) shall be less than the amount reasonably deemed necessary by Landlord to pay such Property Taxes or Other Taxes as they become due, Tenant shall pay to Landlord the amount necessary to make the deficiency within five (5) Business Days after notice from Landlord requesting payment thereof. Upon the expiration or termination of the term of this Lease (other than as a result of an Event of Default), Landlord shall promptly refund, and cause its Mortgagee to refund to Tenant any amount held by Landlord or its Mortgagee pursuant to this paragraph 6.

(g)     Landlord will, within thirty (30) calendar days after receipt, reimburse Tenant for any refund of Property Tax or Other Tax received by Landlord or Mortgagee as a result of any tax contest relating to the Term.

## 7.    NET LEASE; NON-TERMINABILITY

(a)     This is an absolutely net lease, and except as expressly provided herein, the Rent and all other sums payable hereunder by Tenant shall be paid without notice, demand, set-off, counterclaim, abatement, suspension, deduction or defense. It is the intention of the parties hereto that the Fixed Rent and Annual Percentage Rent shall be an absolutely net return to Landlord throughout the Term of this Lease. In order that such Rent shall be absolutely net to Landlord, Tenant shall pay when due, and save Landlord harmless from and against, any and all costs, charges and expenses attributable to the Premises, and any part thereof, during the Term of this Lease or arising out of Tenant's activities at the Premises prior to the Term of this Lease, including each fine, fee, penalty, charge (including governmental charges), assessments, sewer rent, Impositions, insurance premiums as may be required from time to time by Landlord or Mortgagee, utility expenses, carrying charges, costs, expenses and obligations of every kind and nature whatsoever, general and special, ordinary and extraordinary, foreseen and unforeseen, the payment for which Landlord or Tenant is, or shall become liable by reason of any rights or interest of Landlord or Tenant in, to or under the Premises or this Lease or in any manner relating to the ownership, leasing, operation, management, maintenance, repair, rebuilding, use or occupation of the Premises, or of any portion thereof; provided, however, that nothing herein contained shall be construed as imposing upon Tenant any obligation to pay any Excluded Taxes of Landlord arising out of, or levied in connection with, this Lease or Landlord's right or interest in the Premises or the Rent.

(b)     Except as otherwise expressly provided in this Lease (including subparagraph 7(e) below), this Lease shall not terminate, nor shall Tenant have any right to terminate this Lease, except as expressly provided in subparagraphs 10(c) and 13(b), nor shall Tenant be entitled to any abatement or reduction of Rent hereunder except as required by subparagraphs 4(d), 10(c) or 13(b), nor shall the obligations of Tenant under this Lease be affected, by reason of (i) subject to paragraph 10, any damage to or destruction of all or any part of the Premises from whatever

28

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

cause; (ii) subject to subparagraph 13, the taking of the Premises or any portion thereof by condemnation, requisition or eminent domain proceedings; (iii) the prohibition, limitation or restriction of Tenant's use of all or any part of the Premises, or any interference with such use; (iv) any eviction by paramount title or otherwise, (v) Tenant's acquisition or ownership of all or any part of the Premises otherwise than as expressly provided herein; (vi) any default on the part of Landlord under this Lease, or under any other agreement to which Landlord and Tenant may be parties; (vii) subject to subparagraph 4(d), Landlord or Tenant becoming dispossessed of any portion of the Premises leased by Landlord pursuant to any Ground Lease or any Project Agreement; (viii) the failure of all or any portion of the improvements to be constructed on the Land pursuant to the applicable Construction Management Agreement; or (ix) any other cause whether similar or dissimilar to the foregoing, any present or future law to the contrary notwithstanding. It is the intention of the parties hereto that the obligations of Tenant hereunder shall be separate and independent covenants and agreements, that the Rent and all other sums payable by Tenant hereunder shall continue to be payable in all events and that the obligations of Tenant hereunder shall continue unaffected unless the requirement to pay or perform the same shall have been terminated pursuant to any express provision of this Lease or subsequent agreement of the parties. Tenant agrees that Tenant will not be relieved of the obligations to pay the Rent in case of damage to or destruction of (except as expressly provided in paragraph 10) or condemnation (except as expressly provided in paragraph 13) of the Premises.

(c)     Tenant agrees that it will remain obligated under this Lease in accordance with its terms, and that it will not take any action to terminate, rescind or void this Lease in the event of (i) the bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution or winding-up or other proceeding affecting Landlord or its successor in interest, or (ii) any action with respect to this Lease which may be taken by any trustee or receiver of Landlord or its successor in interest or by any court in any such proceeding.

(d)     Tenant waives all rights which may now or hereafter be conferred by law (i) to quit, terminate or surrender this Lease or the Premises or any part thereof, or (ii) to any abatement, suspension, deferment or reduction of the Fixed Rent, Annual Percentage Rent, Additional Rent or any other sums payable under this Lease, except as otherwise expressly provided herein. With respect to the Oaks Site, Tenant hereby waives, to the maximum extent permitted by applicable laws, any rights that it may now or in the future have to quit or surrender or vacate the Premises, to terminate this Lease, or to any abatement, diminution, offset, reduction or suspension of Rent on account of Landlord's failure to timely or in a satisfactory manner deliver possession of the Premises to Tenant or on account of any other event or circumstance, including, any rights it might otherwise have with respect to the Oaks Site, under the provisions of sections 1932, 1933, 1941 and/or 1942 of the California Civil Code, it being the express intention of the parties, and therefore it being agreed by the parties, that the terms of this paragraph shall control under any circumstances in which said statutes might otherwise apply, and govern and replace any rights covered by said statutes.

(e)     It is, however, expressly understood and agreed that, notwithstanding anything to the contrary expressed or implied in this Lease, from and after the time and date that this Lease shall no longer apply to a Site, Tenant's obligations and liabilities with respect to such Site shall be governed by paragraph 22 below and this Lease shall remain in full force and effect for the remaining Sites except that the Fixed Rent, Annual Percentage Rent and Additional Rent payable

S0524468_9_208972_00182

* 5 0 0 4 1 6 7 4 *

for such Site to which this Lease no longer applies shall no longer be owed from and after the date this Lease no longer applies to such Site (but Tenant shall remain liable for liabilities which accrued prior thereto).

## 8.    SERVICES

Tenant shall, at Tenant's sole cost and expense, be responsible for supplying the Premises with electricity, heating, ventilating and air conditioning, water, natural gas, lighting, replacement for all lights, restroom supplies, telephone service, window washing, security service, janitor, pest control and disposal services (including, if applicable, hazardous and biological waste disposal), and such other services as Tenant determines to furnish to the Premises. Landlord shall not be in default hereunder or be liable for any damage or loss directly or indirectly resulting from, nor shall the Fixed Rent, Annual Percentage Rent or Additional Rent be abated or a constructive or other eviction be deemed to have occurred by reason of, the installation, use or interruption of use of any equipment in connection with the furnishing of any of the foregoing services, any failure to furnish or delay in furnishing any such services, whether such failure or delay is caused by accident or any condition beyond the control of Landlord or Tenant or by the making of repairs or improvements to the Premises, or any limitation, curtailment, rationing or restriction on use of water, electricity, gas or any form of energy serving the Premises, whether such results from mandatory governmental restriction or voluntary compliance with governmental guidelines. Tenant shall pay the full cost of all of the foregoing services and all other utilities and services supplied to the Premises as Additional Rent.

## 9.    REPAIRS AND MAINTENANCE; REPLACEMENT

(a)    Tenant shall, at its own sole cost and expense, keep the Premises in good order and condition as a first class facility consistent with the permitted uses set forth in this Lease at all times on and after the Initial Commencement Date to and including the date of the termination of the Term, by lapse of time or otherwise. Tenant shall timely and properly maintain, repair and replace all of the Premises and all its component parts, including parking surfaces and stripes, driveways, all landscaping, mechanical systems, electrical and lighting systems, plumbing and sewage systems, fixtures and appurtenances, interior and exterior walls, roof, foundations, floor slabs, columns and structural elements so as to preserve and protect the useful life, utility and value of such components, and in all events so as to preserve the effectiveness of any warranty relating thereto, such repairs and replacements to be at least in quality and class to the original work. If any building system or component shall become obsolete, non-functional, or uneconomic to repair, Tenant shall remove such item from the Premises and, promptly replace it with an item of comparable initial value and function. Promptly upon installation of any equipment which is not Tenant's Property, Tenant shall deliver to Landlord the original warranty relating to such equipment (which shall specify Landlord as the owner of the equipment and upon Landlord's receipt of such original warranty, Landlord shall be deemed to have granted Tenant a non-exclusive license and authority of Landlord solely to enforce such warranty during the Term of this Lease). Tenant shall deliver to Landlord a written statement showing all removals and replacements of such systems or components during the preceding calendar year, including manufacturers, model numbers, and serial numbers. Landlord may, upon two (2) Business Days' prior notice cause independent private inspectors to make inspections of any building and building systems on the Premises or segments thereof to

50524468 9 208972 00182

* 5 0 0 4 1 6 7 4 *

determine Tenant's compliance under this paragraph 9. Tenant shall pay the cost of one (1) such inspection at each Site by or on behalf of Landlord in each calendar year; provided, however, if such inspection by Landlord reveals that the Premises, or any portion thereof, including any equipment thereon, is not in the condition required by this Lease, then Tenant shall pay for such additional inspections performed by Landlord through the inspection approving the condition of such Premises as being in conformity with this Lease. Notwithstanding the foregoing requirements of this paragraph 9, Tenant shall have no obligation to deliver any warranties for any Tenant's Property at the Premises which may be and which are subsequently removed by Tenant upon expiration or earlier termination of this Lease.

Landlord may, but is not required to, after two (2) Business Days notice to Tenant (except in the case of emergency, in which case Tenant shall be given notice contemporaneously with entry), enter the Premises and make such repairs, alterations, improvements, additions, replacements or maintenance as Landlord deems necessary to cure any Event of Default of Tenant hereunder which remains uncured after the expiration of any notice and cure period provided under this Lease, as applicable, in a diligent fashion, and Tenant shall pay Landlord forthwith (and in any event within thirty (30) days) after being billed for same by Landlord the cost thereof plus an administrative fee of three percent (3%) of such cost, which bill shall be accompanied by reasonably supporting documentation. Such amounts shall bear interest at the Overdue Rate from the date of expenditure by Landlord to the date of repayment by Tenant.

(b)     It is intended by Tenant and Landlord that Landlord shall have no obligation, in any manner whatsoever, to repair or maintain the Premises (or any fixture or equipment therein), whether structural or nonstructural, all of which obligations are intended, as between Landlord and Tenant, to be those of Tenant. Tenant expressly waives the benefit of any statute now or in the future in effect which would otherwise afford Tenant the right to make repairs at Landlord's expense or to terminate this Lease because of Landlord's failure to keep the Premises in good order, condition and repair.

(c)     Tenant shall maintain on each Site, and turn over to Landlord upon expiration or termination of this Lease, then current operating manuals and original warranties (to the extent applicable) for the Equipment then located on the Premises specifically excluding, in all cases, Tenant's Property at the Premises which may and which are subsequently removed by Tenant upon expiration or earlier termination of this Lease.

10.     **DESTRUCTION OF OR DAMAGE TO PREMISES**

(a)     Tenant and Landlord agree and acknowledge that with respect to each Site that is subject to a Ground Lease, each of Tenant and Landlord are bound by and shall comply with all of the terms and conditions of each Ground Lease, including the provisions concerning damage, destruction and disposition of insurance proceeds in the event of a casualty; provided, however, as between Landlord and Tenant, the disposition of insurance proceeds shall be determined in accordance with the terms of this paragraph 10. All of Landlord's obligations, as tenant under each Ground Lease, shall be performed by Tenant; provided, however Tenant has no right to terminate a Ground Lease without Landlord's prior written consent (which consent may be withheld in Landlord's sole and absolute discretion). Tenant agrees that it will deliver to Landlord, simultaneously with its delivery to the appropriate Ground Landlord, all of the

31

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

documents and materials required under the applicable Ground Lease. With respect to the Oaks Site, the provisions of Sections 1932(2) and 1933(4) of the California Civil Code are hereby waived by Tenant, it being the intention of the parties that the express terms of this Lease shall control under any circumstances in which those provisions might otherwise be applicable.

(b)  If (1) at any time prior to the last five (5) years of the Primary Term of this Lease (if this Lease is then in full force and effect), any Site is damaged or destroyed by a Casualty or (2) during the last five (5) years of the Primary Term, or anytime during any Extension Term, of this Lease (if this Lease is then in full force and effect), the Premises is damaged or destroyed by a Casualty which is not a Substantial Casualty, then Tenant shall (a) repair such damage and restore such Site to substantially the same or better condition as existed before the occurrence of such Casualty using materials of the same or better grade than that of the materials being replaced (herein, a "Casualty Repair") and this Lease shall remain in full force and effect. Such repair and replacement by Tenant shall be done generally in accordance with paragraph 23 and the standards of paragraph 9 and this paragraph 10, and Tenant shall, at its expense, obtain all permits required for such work. An architect or engineer selected by Landlord shall review, at Landlord's option and at Tenant's expense, all plans and specifications and all draw requests hereunder. In no event shall Fixed Rent, Annual Percentage Rent or Additional Rent (if any) abate, nor shall this Lease terminate, by reason of such damage or destruction. Provided that no Event of Default by Tenant shall then exist under this Lease (and no event has occurred which, with the passage of time, the giving of notice, or both, would constitute an Event of Default), and provided: (i) Tenant has delivered to Landlord plans and specifications and a budget for such Casualty Repair (all of which Landlord shall have approved in its reasonable discretion) (the foregoing are referred to collectively, as the "Restoration Documents") and (ii) if the cost to repair any Casualty is equal to or greater than the Casualty Threshold, then Landlord shall make available to Tenant all Net Casualty Proceeds on account of such Casualty, for application to the costs of such approved repair and restoration, as set forth below.

(c)  If, at any time during the last five (5) years of the Primary Term of this Lease, or anytime during any Extension Term, a Site is damaged or destroyed by a Casualty to the extent of fifty percent (50%) or more of the amount it would cost to repair or replace the same in its entirety at the time such damage or destruction occurred (a "Substantial Casualty"), Tenant shall have the option to terminate this Lease with respect to such damaged Site only by giving Landlord written notice of its election within one hundred fifty (150) days after the date on which such damage or destruction occurred (the "Termination Notice"). If Tenant delivers the Termination Notice as provided herein, this Lease shall terminate with respect to such damaged Site on the earlier to occur of: (i) the date that Tenant vacates the damaged Site and (ii) thirty (30) days after Tenant delivers the Termination Notice to Landlord (the "Casualty Termination Date") relating to the damaged Site; provided, however, until and through the Casualty Termination Date, Tenant shall continue to pay Fixed Rent, Annual Percentage Rent and Additional Rent (if any) in accordance with the terms of this Lease without any abatement or reduction of the Fixed Rent, Annual Percentage Rent or Additional Rent (if any) due hereunder. As a condition precedent to the effectiveness of such termination, within three (3) Business Days after the Casualty Termination Date, Tenant shall (i) pay to Landlord an amount equal to all the insurance proceeds that Tenant has actually received on or before the Casualty Termination Date for such damage or destruction (except for any insurance proceeds that are attributable to Tenant's Property) and (ii) irrevocably assign to Landlord the right to receive any remaining

32

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

insurance proceeds for such damage or destruction (except for any insurance proceeds that are attributable to Tenant's Property) that may have not been paid to Tenant on or before the Casualty Termination Date. This Lease shall thereafter no longer apply to the Site as of the Casualty Termination Date relating to such Site except for liabilities which accrued prior thereto related to such damaged Site, this Lease shall remain in full force and effect for the remaining Sites except that the Fixed Rent, Annual Percentage Rent and Additional Rent payable for such terminated Site shall no longer be owed for the period after the Casualty Termination Date, and Landlord and Tenant shall execute an amendment to the Lease confirming the foregoing, which amendment shall be prepared by or on behalf of Landlord and be reasonably acceptable to Tenant.

(d)     For all Casualty Repairs, the following apply:

As used herein the "**Casualty Threshold**" means $500,000; provided, however, that if Tenant, at the time of such Casualty, has a Credit Rating of "BBB+" or higher from S&P and "Baa1" or higher from Moody's, then the "Casualty Threshold" shall be $1,000,000. If Landlord or Mortgagee or their respective Affiliates, receive any Net Casualty Proceeds and Landlord or Mortgagee is not otherwise required to pay such Net Casualty Proceeds to a Ground Landlord or Proceeds Trustee, then Landlord and Mortgagee each agree to pay such Net Casualty Proceeds directly to Tenant if such Net Casualty Proceeds are less than the Credit Threshold at the time of the applicable Casualty. If the Net Casualty Proceeds are equal to or greater than the Casualty Threshold at the time of the applicable Casualty, such Net Casualty Proceeds shall be paid to the Proceeds Trustee (herein called the "**Restoration Fund**"). The Proceeds Trustee shall not be required to disburse any funds from the Restoration Fund to Tenant in the event that the total cost of the Casualty Repair, as set forth in approved budget that is part of the Restoration Documents, exceeds the amount of Net Casualty Proceeds on account of such Casualty (the "**Casualty Shortfall**"), until Tenant has paid from its own funds an amount equal to the Casualty Shortfall; thereafter the Proceeds Trustee shall release the Restoration Funds directly to Tenant as restoration progresses, subject to and in accordance with subparagraph 23(c). Any Net Casualty Proceeds that are delivered directly to Tenant shall be applied by Tenant to the cost of restoration. If Landlord encumbers the Premises with a Mortgage, the Mortgagee thereunder may, at its option be appointed Proceeds Trustee for so long as such Mortgage remains outstanding and such Mortgagee does not Control Landlord or is not Controlled by or under Common Control with Landlord. Insurance proceeds shall be deposited in an interest bearing account and interest shall be distributed to Tenant upon completion of said installation, repair, replacement or rebuilding, provided no default has occurred and is continuing hereunder. All checks drawn on said account shall be signed by the Proceeds Trustee. Insurance proceeds shall be disbursed to Tenant by the Proceeds Trustee under the following procedure:

(i)     No more frequently than once per calendar month, Tenant may request that Landlord disburse to Tenant such insurance proceeds as are requested by Tenant to pay for all costs incurred by Tenant for repair and restoration work of the damaged Site that was performed during the immediately preceding calendar month. Tenant's request shall certify that all work for which reimbursement is requested was performed in compliance with the plans and specifications approved by Landlord pursuant to paragraph 23 and all applicable laws, and shall include reasonably satisfactory evidence of the costs incurred by Tenant and unconditional partial (as to the amount received compared to percentage completion) or final lien releases, as

33

* 5 0 0 4 1 6 7 4 *

applicable, in form and substance required by applicable law executed by all mechanic's, materialmen, laborers, suppliers and contractors who performed any portion of the repair work or supplied materials; and

(ii)     Within fifteen (15) Business Days after receiving Tenant's request, Landlord shall approve or disapprove Tenant's request, which approval shall not be unreasonably withheld, delayed, or conditioned by written notice to Tenant.  If Landlord approves all or any portion of a request, then Landlord shall instruct the Proceeds Trustee to disburse from the Restoration Fund the amounts so approved.  If Landlord disapproves all or any portion of a request, then Landlord's notice shall state the reasons for that disapproval. Landlord's failure to deliver a notice approving or disapproving a request shall be conclusively deemed Landlord's disapproval of the request.

## 11.     INSURANCE, HOLD HARMLESS AND INDEMNIFICATION

(a)     To the fullest extent permitted by law, Landlord shall not be liable to Tenant for any damage to or loss or theft of any property or for any bodily or personal injury, illness or death of any person in, on or about the Premises arising at any time and from any cause whatsoever.  Tenant waives all claims against Landlord arising from any liability described in this subparagraph 11(a).

(b)     Tenant hereby agrees to indemnify and defend Landlord against and hold Landlord harmless from all claims, demands, liabilities, damages, losses, costs and expenses, including reasonable attorneys' fees and disbursements, arising from or related to any use or occupancy of the Premises, or any condition of the Premises, or any default in the performance of Tenant's obligations hereunder, or any damage to any property (including property of employees and invitees of Tenant) or any bodily or personal injury, illness or death of any person (including employees and invitees of Tenant) occurring in, on or about the Premises or any part thereof or any part of the building or the land constituting a part of the Premises arising at any time and from any cause whatsoever or occurring outside the Premises when such damage, bodily or personal injury, illness or death is caused by any act or omission of Tenant or its agents, officers, employees, contractors, invitees or licensees.  This subparagraph 11(b) shall survive the termination of this Lease with respect to any damage, bodily or personal injury, illness or death occurring prior to such termination.

(c)     Tenant shall, at all times and during the Term of this Lease and at Tenant's sole cost and expense, obtain and keep in force commercial general liability, including contractual liability (specifically covering this Lease), cross liability, fire, legal liability, liquor liability and premises operations, all on an "occurrence" policy form, with a minimum combined single limit in the amount of Thirty Million Dollars ($30,000,000) per occurrence for bodily or personal injury to, illness of, or death of persons and damage to property occurring in, on or about the Premises, and such insurance shall name Landlord, any Mortgagee, and, if required, each Ground Landlord, and any other parties designated by Landlord as additional insureds.  Tenant shall, at Tenant's sole cost and expense, be responsible for insuring Tenant's Property.

(d)     Tenant shall, at all times during the Term of this Lease and at Tenant's sole cost and expense, obtain and keep in force worker's compensation and employer's liability insurance

34

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM 2020L012058

in all states in which the Premises and any other operations of Tenant are located and any other state in which Tenant may be subject to any statutory or other liability arising in any manner whatsoever out of the actual or alleged employment of others.

(e) Tenant shall, at all times during the Term of this Lease, at Tenant's sole cost and expense, obtain and keep in force or reimburse Landlord for the cost of (a) insurance against loss (including terrorism, earthquake and flood) or damage to the Premises by fire and all other risks of physical loss (including earthquake and flood) covered by insurance of the type now known as "all risk," with difference in conditions coverage, in an amount not less than the full replacement cost of the Premises (without deduction for depreciation), including the cost of debris removal and such endorsements as Landlord may reasonably require, and containing "Replacement Cost" and "Agreed Amount" endorsements; (b) boiler and machinery insurance covering pressure vessels, air tanks, boilers, machinery, pressure piping, heating, ventilation and air conditioning equipment, and elevator and escalator equipment, provided the Premises contain equipment of such nature and insurance against loss of occupancy or use arising from any breakdown of any such items, in such amounts as Landlord may reasonably determine; (c) [omitted]; (d) business interruption insurance insuring that the Fixed Rent will be paid to Landlord for up to one year if the Premises or any portion thereof are destroyed or rendered untenantable by any cause insured against (it being understood that the existence of such insurance does not reduce Tenant's obligation to pay Fixed Rent without diminution), and in the event of termination of this Lease due to any such insured cause, pay to Landlord one year's Fixed Rent; and (e) insurance in amounts and against such other risks as Landlord or Mortgagee may reasonably require and against such risks as are customarily insured against by operators of similar properties. In addition, during any period when any demolition or construction on the Land is underway, Tenant shall maintain the following insurance: (i) completed value builders risk insurance for the Premises, including all building materials thereon, covering loss or damage from fire, lightning, extended coverage periods, sprinkler, leakage, vandalism, malicious mischief and perils insured in an amount not less than the cost, as estimated by Landlord, of the construction of the Improvements or alterations thereto, and (ii) cause the contractor performing the work to maintain worker's compensation insurance covering the full statutory liability as an employer of the contractor performing the work of such construction or alterations.

(f) All insurance required to be maintained by Tenant under this paragraph 11 and all renewals thereof shall be issued by good and responsible companies qualified to do and doing business in the state of where the Premises are located and having an S&P claims paying ability rating of at least "BBB" or similar rating from AM Best and Company, Inc., and shall be reasonably satisfactory to Landlord. All deductible amounts shall not exceed $100,000 under each such insurance policy; provided however, that from time to time and so long as Tenant satisfies the Investment Grade Criteria then all deductible amounts shall not exceed $250,000 under each such insurance policy; provided, however, Landlord may, upon written request from Tenant, approve (in its reasonable discretion and subject to Landlord's underwriting considerations at the time Landlord receives Tenant's written request) an increase in the deductible thresholds in connection with windstorm, flood and earthquake insurance policies. Each policy to be maintained by Tenant shall expressly provide that the policy shall not be canceled or altered without thirty (30) days' prior written notice to Landlord and Mortgagee, except in cases of premium non-payment, for which ten (10) days' notice shall be given, and shall remain in effect notwithstanding any such cancellation or alteration until such notice shall

* 5 0 0 4 1 6 7 4 *

have been given to Landlord and such period of thirty (30) days, or ten (10) days, as applicable, shall have expired. All insurance under this paragraph 11 to be maintained by Tenant shall designate Landlord, Mortgagee, and any other parties designated by Landlord as an additional insured and loss payee, shall be primary and noncontributing with any insurance which may be carried by Landlord, shall afford coverage for all claims based on any act, omission, event or condition that occurred or arose (or the onset of which occurred or arose) during the policy period, and shall expressly provide that Landlord, although named as an additional insured, shall nevertheless be entitled to recover under the policy for any loss, injury or damage to Landlord. Tenant may carry such insurance under "blanket" policies, provided such policies expressly reserve an amount of coverage for the Premises equal to the amount required by this Lease. Upon the issuance of each such policy to be maintained by Tenant, Tenant shall use commercially reasonable efforts to deliver each such policy or a certified copy thereof, and shall deliver a certificate thereof (Accord 27 form) to Landlord for retention by Landlord. If Mortgagee participates in a securitization and sends written notice to Tenant that the insurance carrier's rating is insufficient for purposes of such securitization, then Tenant shall within ninety (90) days after receipt of such written notice replace the insurance carrier to comply with Mortgagee's requirements for such securitization.

(g)     Tenant and Landlord both mutually agree to waive all rights of subrogation against each other on property insurance that is required under this paragraph 11. Additionally, both Landlord and Tenant, as applicable, either prior to or immediately after the Initial Commencement Date, procure from each of their respective insurers providing the insurance required by this paragraph 11, a waiver of all rights of subrogation which such insurer might otherwise, if at all, have to any claims against Landlord or Tenant, as applicable. Tenant shall have the right to adjust losses under all policies of property insurance required by this Lease and Landlord shall have the right to participate in such process. If tenant fails to adjust losses in a diligent manner, Landlord may, upon two (2) Business Days' notice, assume control of the adjustment process.

(h)     During the continuance of any Event of Default, Tenant shall pay to Landlord on the first day of each calendar month an amount equal to one twelfth (1/12) of the premiums for the insurance required by this paragraph 11, as reasonably estimated by Landlord on the basis of bills and estimates thereof. If such premium payments shall have been made by Tenant, such amounts shall be held by Landlord or Mortgagee, without interest, and shall not be deemed to be trust funds and may be commingled with the general funds of Landlord or Mortgagee. Landlord shall apply such amounts to the payment of the insurance premiums with respect to which such amounts were paid, subject to any rights of Mortgagee thereto. Landlord shall make no charge for holding and applying such amounts. If at any time the amount on deposit pursuant to this subparagraph 11(h) shall be less than the amount deemed necessary by Landlord to pay such premiums as they become due, Tenant shall pay to Landlord the amount necessary to make the deficiency within five (5) calendar days after notice from Landlord requesting payment thereof. Upon the expiration or termination of the Term of this Lease (other than as a result of an Event of Default), Landlord shall promptly refund, and cause its Mortgagee to refund, to Tenant any amount held by Landlord or its Mortgagee pursuant to this paragraph 11. Notwithstanding anything to the contrary set forth in this subparagraph 11(h) or any other provision of this Lease, the aggregate amount Tenant shall be required to pay Landlord pursuant to the provisions of this

36

* 5 0 0 4 1 6 7 4 *

subparagraph 11(h) shall never exceed in total, at any one time, an amount equal to one sixth (1/6) of the annual Fixed Rent payable under this Lease at such time.

## 12.    COMPLIANCE WITH LAWS, COVENANTS

Tenant shall throughout the Term promptly comply or cause compliance with or remove or cure any violation of any and all present and future laws including the Americans with Disabilities Act of 1990 and, with respect to the Oaks Site, California Civil Code Section 3110.5, as the same may be amended from time to time, ordinances (zoning or otherwise), orders, rules, regulations and requirements of all federal, state, municipal and other governmental bodies having jurisdiction over the Premises and the appropriate departments, commissions, boards and officers thereof, and the orders, rules and regulations of the Board of Fire Underwriters where the Premises are situated, or any other body now or hereafter constituted exercising lawful or valid authority over the Premises (collectively, "**Legal Requirements**"), or any portion thereof, or the sidewalks, curbs, roadways, alleys or entrances adjacent or appurtenant thereto, or exercising authority with respect to the use or manner of use, maintenance, operation, repair, alteration or construction of the Premises, or such adjacent or appurtenant facilities, and whether the compliance, curing or removal of any such violation and the costs and expenses necessitated thereby shall have been foreseen or unforeseen, ordinary or extraordinary, and whether or not the same shall be presently within the contemplation of Landlord or Tenant or shall involve any change in governmental policy, or require structural or extraordinary repairs, alterations or additions by Tenant and irrespective of the amount of the costs thereof. Tenant, at its sole cost and expense, shall comply with all agreements, contracts, easements, restrictions, reservations or covenants, if any, running with the land or hereafter created by Tenant or consented to, in writing, by Tenant or requested, in writing, by Tenant. Tenant shall also comply with, observe and perform all provisions and requirements of all policies of insurance at any time in force with respect to the Premises and required to be obtained and maintained by Tenant under the terms of paragraph 11 hereof and shall comply with all development permits issued by Governmental Authorities issued in connection with development of the Premises; provided, however, Landlord agrees, upon request of Tenant, to sign promptly and without a charge therefor (except as provided in the final sentence of this subparagraph) any applications or filings (1) for such licenses and permits as may be required by Legal Requirements for the conduct, operation or restoration of the Premises and the business to be conducted therein in accordance with the terms hereof, and (2) the maintenance of the existing zoning for each Site to continue to permit Tenant's use thereof, in both cases where the signature of Landlord is required by Legal Requirements in force at the time. All costs incurred by Landlord in connection with obtaining any such licenses and permits and zoning matters shall be borne by Tenant.

If Tenant shall at any time fail to pay any Imposition in accordance with the provisions of paragraph 6 or amounts owed in accordance with the provisions of paragraph 26, fail to take out, pay for, maintain and deliver any of the insurance policies or certificates of insurance provided for in paragraph 11, or shall fail to make any other payment or perform any other act on its part to be made or performed hereunder, then Landlord, after five (5) Business Days' prior written notice to Tenant (or without notice in situations where Landlord determines that delay is likely to cause harm to Landlord's interest in the Premises), and without waiving or releasing Tenant from any obligation of Tenant contained in this Lease, may, but shall be under no obligation to do so,

37

* 5 0 0 4 1 6 7 4 *

(i)     pay any Imposition payable by Tenant pursuant to this Lease; or

(ii)    make any other payment or perform any other act on Tenant's part to be paid or performed hereunder which Tenant shall not have performed within the time required therefor, except that any time permitted to Tenant to perform any act required by this paragraph 12 shall be extended for such reasonable period not to exceed one hundred eighty (180) calendar days as may be necessary to effectuate such performance, provided throughout such time Tenant is continuously, diligently and in good faith prosecuting such performance.

Landlord may enter upon the Premises for any such cure purpose set forth in this paragraph 12 and take all such action in or on the Premises as may be necessary therefor pursuant to this paragraph 12. All sums, reasonable under the circumstances, actually so paid by Landlord and all costs and expenses, including attorney's fees, incurred by Landlord in connection with the performance of any such act, together with interest thereon at the Overdue Rate from the date so paid by Landlord until repayment by Tenant and an administrative fee equal to three percent (3%) of all such costs and expenses, shall be paid by Tenant to Landlord on demand and submission of reasonable evidence of such expenditures. Landlord shall not be limited in the proof of any damages which Landlord may claim against Tenant arising out of or by reason of Tenant's failure to provide and keep in force insurance as aforesaid, to the amount of the insurance premium or premiums not paid or incurred by Tenant, and which would have been payable upon such insurance, but Landlord shall also be entitled to recover, as damages for such breach, the uninsured amount of any loss, damages, costs and expenses of suit, including attorney's fees, suffered or incurred by reason of damage to or destruction of the Premises, or any portion thereof or other damage or loss which Tenant is required to insure against hereunder, occurring during any period when Tenant shall have failed or neglected to provide insurance as aforesaid.

**13.    PARTIAL OR SUBSTANTIAL TAKING**

(a)     Tenant and Landlord each agree and acknowledge that each of Tenant and Landlord are bound by and shall comply with all of the terms and conditions of each Ground Lease, including the disposition of condemnation proceeds in the event of a partial or substantial taking; provided, however, as between Landlord and Tenant the disposition of condemnation proceeds shall be determined in accordance with the terms of this paragraph 13. All of Landlord's obligations, as tenant under each Ground Lease, shall be performed by Tenant; provided, however Tenant has no right to terminate a Ground Lease without Landlord's prior written consent (which consent may be withheld in Landlord's sole and absolute discretion); Tenant agrees that it will deliver to Landlord, simultaneously with its delivery to the appropriate Ground Landlord, all of the documents and materials required under the applicable Ground Lease.

(b)     If (1) (A) all or substantially all of any Site shall be taken for public or quasi-public purposes, (B) any material portion of the parking areas not a part of the Premises but available for, or dedicated to, use by Tenant and counted within the minimum number of parking spaces required by Governmental Authority to lawfully conduct Tenant's Permitted Use of the Premises are taken for public or quasi-public purposes, or (C) the Pedestrian Corridor at the BayWalk Site or any other means of access to any Site from any public street abutting the

38

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

Premises shall be lost, terminated or materially altered by reason of any such taking, or (2) Tenant determines in its sole and absolute discretion that a taking of any portion of the Premises for public or quasi-public purposes has rendered the Site unavailable for use or unsuitable for restoration for continued use and occupancy in Tenant's business, then Tenant, may, not later than ninety (90) days after such occurrence (including a final determination of the condemnation award associated therewith), deliver to Landlord (A) notice of its intention to terminate this Lease solely for that portion of the Premises constituting such taken Site on a date occurring not more than one hundred eighty (180) calendar days nor less than sixty (60) calendar days after such notice (the "Site Termination Date"), (B) a certificate by the president or a vice president of Tenant describing the event giving rise to such termination, stating that such event has rendered such taken Site unavailable for use or unsuitable for restoration for continued use and occupancy in Tenant's business and that such termination will not violate any operating agreement or covenant then in effect and applicable to Tenant, and (C) an assignment of all of Tenant interests, rights and claims to any condemnation proceeds and a written direction to the condemning authority authorizing and instructing the condemning authority to deliver all condemnation proceeds to Landlord. On the Site Termination Date, this Lease shall remain in full force and effect for the remaining Sites (and such terminated Site shall no longer form a part of the Premises), except the Fixed Rent, Annual Percentage Rent and Additional Rent payable for such terminated Site shall no longer be owed for the period after the Site Termination Date, and Landlord and Tenant shall execute an amendment to this Lease confirming the foregoing, which amendment shall be prepared by or on behalf of Landlord and be reasonably acceptable to Tenant. If Tenant decides not to terminate this Lease, solely for that portion of the Premises constituting such taken Site, Tenant shall, at its sole cost and expense, restore, repair, replace or rebuild the improvements so taken in conformity with the requirement of paragraph 9 as nearly as practicable to the condition, size, quality of workmanship and value thereof immediately prior to such taking. There shall be no abatement of Rent during such period of restoration. In performing its obligations, Landlord shall make available to Tenant all condemnation proceeds available, which proceeds shall be used by Tenant for restoration or repair of the taken Site, or portion thereof, under the same terms and conditions for disbursement set forth for casualty insurance proceeds in paragraph 10 hereof. Tenant shall, at its sole cost and expense, negotiate and, if necessary, litigate, the amount of the award, and Landlord shall have the right to participate in such process, and if Tenant fails to diligently prosecute such efforts, Landlord may take control of the process. Any condemnation proceeds in excess of the amounts applied by Tenant to the costs of restoration or repair of the taken Site, or portion thereof, shall be the sole and exclusive property of Landlord, except for any condemnation proceeds otherwise specifically attributable to Tenant. If Tenant has not terminated this Lease for all of such Site as set forth above, and provided no Event of Default then exists, then to the extent that Landlord receives such excess amounts after the restoration of the taken Site, or portion thereof, is complete, the Fixed Rent shall be equitably adjusted based upon the amount Landlord so receives. Whether or not Landlord takes control of the process, Tenant shall have the right to make a separate claim, and shall be entitled to receive any separate award made by the condemning authority in respect of business loss or, if available, business relocation, as well as with respect to Tenant's Property, and any other claim permitted by law in each case to the extent such separate claim by Tenant does not diminish Landlord's recovery.

With respect to the Oaks Site, the provisions of Sections 1265.110, 1265.120, 1265.130 and 1265.140 of the California Code of Civil Procedure are hereby waived by Tenant, it being

50524468_9_208972_00182

* 5 0 0 4 1 6 7 4 *

the intention of the parties that the express terms of this Lease shall control under any circumstances in which those provisions might otherwise be applicable.

## 14. SITE TERMINATIONS

(a)     As of the Consolidated Lease Commencement Date, this Lease terminates with respect to the Palace Site and Boynton Site, and in regards to such sites, (1) Tenant shall have no further obligation to pay Fixed Rent, Annual Percentage Rent, or Additional Rent on or after the Consolidated Lease Commencement Date for the Palace Site or the Boynton Site, (2) Tenant shall vacate both the Palace Site and Boynton Site as of the Consolidated Lease Commencement Date and otherwise as required by paragraph 22, and (3) this Lease shall no longer apply to the Palace Site or the Boynton Site on or after the Consolidated Lease Commencement Date except for liabilities which accrued prior thereto relating to either the Palace Site or the Boynton Site.

(b)     As additional consideration for Landlord entering into this Lease and agreeing to terminate Tenant's leasehold interest in the Palace Site and Boynton Site as set forth in subparagraph 14(a), Tenant and Landlord agree that at anytime during the Term, Landlord has the option, exercisable by providing Tenant with no less than thirty (30) calendar days' advance written notice, to terminate this Lease with respect to the Baywalk Site on a date set forth in such written notice (herein, the **"Baywalk Termination Date"**), in which event all of the following shall occur:  (A) Tenant shall continue to pay Fixed Rent, Annual Percentage Rent, and Additional Rent in accordance with this Lease for the Baywalk Site through the Baywalk Termination Date without abatement or reduction of the Fixed Rent, Annual Percentage Rent or Additional Rent due hereunder, (B) Tenant shall vacate the Baywalk Site by 11:59 p.m. local time on the Baywalk Termination Date and as otherwise required by paragraph 22, except that Tenant shall leave at the Baywalk Site all of Tenant's Property applicable to such Baywalk Site, free and clear of all liens and encumbrances (other than those in favor of Landlord), and, at Landlord's option, Tenant shall deliver a bill of sale or other conveyance document acceptable to Landlord and Tenant sufficient to convey title in such Tenant's Property applicable to the Baywalk Site to Landlord, (C) this Lease shall no longer apply to the Baywalk Site after the Baywalk Termination Date except for liabilities which accrued prior thereto related to the Baywalk Site (excluding Tenant's obligations under subparagraph 5(d)), (D) this Lease shall remain in full force and effect for the remaining Sites except that the Fixed Rent, Annual Percentage Rent, and Additional Rent payable for the Baywalk Site shall no longer be owed for the period after the Baywalk Termination Date, (E) Landlord shall not be required to pay Tenant any amount for the termination of this Lease with respect to the Baywalk Site or the conveyance of Tenant's Property applicable to the Baywalk Site to Landlord, (F) Landlord hereby grants Tenant with a right of first negotiation for the first hiring of a new operator for the Baywalk Site following the Baywalk Termination Date (which shall not apply if Landlord sells or leases the Baywalk Site rather than hiring an operator), and (G) Landlord and Tenant shall execute an amendment to this Lease confirming the foregoing, which amendment shall be prepared by or on behalf of Landlord and be reasonably acceptable to Tenant.

(c)     For each Site from time to time, if such Site's EBITDAR Ratio for the most recent three consecutive quarters is not equal to or in excess of the EBITDAR Minimum Ratio (each such Site is herein called a **"Failed Ratio Site"**), then Landlord has the option, exercisable by providing Tenant with no less than thirty (30) calendar days' advance written notice, to

40

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM 2020L012058

terminate this Lease with respect to the Failed Ratio Site on a date set forth in such written notice (herein, the "**Failed Ratio Site Termination Date**"), in which event all of the following shall occur: (A) Tenant shall continue to pay Fixed Rent, Annual Percentage Rent, and Additional Rent in accordance with this Lease for the Failed Ratio Site through the Failed Ratio Site Termination Date without abatement or reduction of the Fixed Rent, Annual Percentage Rent or Additional Rent due hereunder, (B) Tenant shall vacate the Failed Ratio Site by 11:59 p.m. local time on the Failed Ratio Site Termination Date and as otherwise required by paragraph 22, except that Tenant shall leave at the Failed Ratio Site all of Tenant's Property applicable to such Failed Ratio Site, free and clear of all liens and encumbrances (other than those in favor of Landlord), and, at Landlord's option, Tenant shall deliver a bill of sale or other conveyance document acceptable to Landlord and Tenant sufficient to convey title in such Tenant's Property applicable to the Failed Ratio Site to Landlord, (C) this Lease shall no longer apply to the Failed Ratio Site after the Failed Ratio Site Termination Date except for liabilities which accrued prior thereto related to the Failed Ratio Site (excluding Tenant's obligations under subparagraph 5(d), (D) this Lease shall remain in full force and effect for the remaining Sites except that the Fixed Rent, Annual Percentage Rent, and Additional Rent payable for the Failed Ratio Site shall no longer be owed for the period after the Failed Ratio Site Termination Date, (E) Landlord shall not be required to pay Tenant any amount for the termination of this Lease with respect to the Failed Ratio Site or the conveyance of Tenant's Property applicable to the Failed Ratio Site to Landlord, and (F) Landlord and Tenant shall execute an amendment to this Lease confirming the foregoing, which amendment shall be prepared by or on behalf of Landlord and be reasonably acceptable to Tenant.

## 15. DEFAULT: EVENTS OF DEFAULT

The occurrence of any one or more of the following events ("**Event of Default**") shall constitute a breach of this Lease by Tenant:

(a) Tenant fails to pay any Fixed Rent or Annual Percentage Rent as and when such Fixed Rent or Annual Percentage Rent becomes due, and such failure continues for five (5) calendar days after written notice thereof, provided that if Tenant is more than five (5) calendar days late in the payment of Fixed Rent once in any twelve (12) consecutive month period, only one notice need be given by Landlord during such twelve (12)-month period and any subsequent failure to pay Fixed Rent on or before its due date within such twelve (12) consecutive months shall constitute an Event of Default after five (5) calendar days without notice; or

(b) Tenant fails to pay any Additional Rent as and when such Additional Rent becomes due and payable and such failure continues for more than five (5) calendar days after Landlord gives written notice thereof to Tenant; or

(c) Tenant fails to pay any other amount payable pursuant to the terms of this Lease as and when such other amount becomes due and payable and such failure continues for more than five (5) calendar days after Landlord gives written notice thereof to Tenant; or

(d) An Event of Default occurs under paragraph 25, subletting/assignment; or

41

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

(e)      Tenant fails to perform or breaches any agreement or covenant of this Lease not separately covered in this paragraph 15 to be performed or observed by Tenant as and when performance or observance is due and such failure or breach continues for more than thirty (30) calendar days after Landlord's giving written notice thereof to Tenant; provided, however, that if, by the nature of such agreement or covenant, such failure or breach cannot reasonably be cured within such period of thirty (30) calendar days, an Event of Default shall not exist as long as Tenant commences with due diligence and dispatch the curing of such failure or breach within such period of thirty (30) calendar days and, having so commenced, thereafter prosecutes with diligence and dispatch and completes the curing of such failure or breach within a reasonable time not to exceed one hundred eighty (180) calendar days; or

(f)      Tenant (i) files, or consents by answer or otherwise to the filing against Tenant of, a petition for relief or reorganization or arrangement or any other petition in bankruptcy or for liquidation or to take advantage of any bankruptcy, insolvency or other debtors' relief law of any jurisdiction, (ii) makes an assignment for the benefit of Tenant's creditors, (iii) consents to the appointment of a custodian, receiver, trustee or other officer with similar powers of Tenant or of any substantial part of Tenant's Property, or (iv) takes action for the purpose of any of the foregoing; or

(g)      A court or government authority enters an order, and such order is not stayed or vacated within sixty (60) calendar days, (i) appointing a custodian, receiver, trustee or other officer with similar powers with respect to Tenant or with respect to any substantial part of Tenant's Property, or (ii) constituting an order for relief or approving a petition for relief or reorganization or arrangement or any other petition in bankruptcy, insolvency or other debtors' relief law of any jurisdiction, or (iii) ordering the dissolution, winding-up or liquidation of Tenant; or

(h)      Any event occurs which is specifically stated to be an Event of Default under this Lease; or

(i)      An event of default shall occur under any loan agreement, indenture or other agreement related to Debt of Tenant securing or relating to an amount in excess of $10,000,000 and which event of default gives the lenders (or other parties) under such loan agreement, indenture or other agreement the right to accelerate the Debt or other obligations secured thereby. Tenant shall promptly give notice of any such default or acceleration to Landlord; or

(j)      Any representation or warranty of Tenant contained in any writing delivered to Landlord shall have been materially and adversely false as of the date it was made; or

(k)      Tenant's interest in this Lease or any estate of Tenant hereunder is levied upon under any attachment or execution and such attachment or execution is not stayed or vacated within ninety (90) calendar days after commencement thereof or thirty (30) days after receipt by Tenant of notice thereof from Landlord (unless Tenant is contesting such lien or attachment in accordance with this Lease); or

(l)      Tenant shall abandon the Premises or any portion thereof, including any Site, for an uninterrupted period of one hundred eighty (180) days; or

42

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM 2020L012058

(m)    Any judgment or order for the payment of money in excess of $10,000,000 shall be rendered against Tenant and not paid within sixty (60) calendar days after all rights to appeal shall have expired; or

(n)    Tenant fails to pay in a timely manner any amounts that are due to continuously maintain all insurance required to be maintained by Tenant in accordance with the terms and conditions of this Lease; or

(o)    Tenant defaults, after the expiration of all applicable notice and cure periods, with respect to the obligations of Landlord as the tenant under any Ground Lease; provided, however, it shall not be an Event of Default hereunder: if any "Event of Default" (as such term is defined in the Parisian Ground Lease) described in <u>Section 18.1.2(b) of the Parisian Ground Lease</u> occurs; or

(p)    Tenant defaults, after the expiration of all applicable notice and cure periods, with respect to the obligations of Landlord under any of the Project Agreements; or

(q)    Tenant acts or fails to act in any manner that shall limit Landlord's right to exercise the Ground Lease Extension Option in order to extend the term of the Parisian Ground Lease through the Lease Expiration Date; or

(r)    Tenant defaults, after the expiration of all applicable notice and cure periods, under the Construction Management Agreement.

Landlord may treat the occurrence of any one or more of the foregoing Events of Default as a breach of this Lease. For so long as such Event of Default continues, Landlord, at its option and with or without notice or demand of any kind to Tenant or any other Person, may have any one or more of the remedies provided in this Lease, in addition to all other remedies and rights provided at law or in equity.

## 16.    REMEDIES

Upon the occurrence of an Event of Default, Landlord shall, in addition to, and not in derogation of any remedies for any preceding breach, with or without notice of demand (except as otherwise expressly provided herein) and without limiting Landlord in the exercise of any right or remedy which Landlord may have by reason of such Event of Default have all of the following remedies available except where otherwise provided under applicable law:

(a)    Landlord shall have the right to recover possession of the Premises by any lawful means without terminating this Lease. Landlord shall use good faith and reasonably prompt efforts, to the extent required by applicable law of the state where the Premises are located, to re-let the Premises for the account of Tenant for such rent and upon such terms as may be satisfactory to Landlord. For the purposes of that re-letting, Landlord may repair, and perform normal remodeling and alterations to the Premises. If Landlord fails to re-let the Premises, Tenant shall pay to Landlord the Rent in this Lease for the balance of the Term as those amounts become due in accordance with the terms of this Lease. If Landlord re-lets the Premises, but fails to realize a sufficient sum from the re-letting to pay the full amount of Rent in this Lease for the balance of the Term as those amounts become due in accordance with the terms of this Lease,

S0524468_9_208972_00182

* 5 0 0 4 1 6 7 4 *

after paying all of the costs and expenses of all normal and customary decoration, repairs, remodeling, alterations and additions and the expenses of the re-letting and of the collection of the rent accruing from the re-letting, Tenant shall pay to Landlord the amount of any deficiency upon Landlord's demand from time to time made.

(b)    Landlord shall have the right at any time to give a written termination notice to Tenant and, on the date specified in such notice, Tenant's right to possession shall terminate and this Lease shall terminate. Upon such termination, Landlord shall have the right to recover from Tenant:

(i)    The worth at the time of determination of all unpaid Rent which had been earned at the time of termination;

(ii)    The worth at the time of determination of the amount of all unpaid Rent for the balance of the then-current Term of this Lease after the time of termination excluding the potential Lease term under any unexercised options for any Extension Terms reduced only to the extent of net rental proceeds actually received from any subsequent replacement tenant(s) for any Sites; provided, however, except to the extent any Site's state statutes or common law requires Landlord to mitigate its damages arising from an Event of Default by Tenant under this Lease, from and after any such Event of Default, Landlord shall have no duty to mitigate its damages by re-letting, or attempting to re-let, any Site to any replacement tenant(s); and

(iii)    The "worth at the time of determination" of the amounts referred to in clause (i) above shall be computed by allowing interest at the Overdue Rate. The "worth at the time of determination" of the amount referred to in clause (ii) above shall be computed by discounting such amount to present value by using the discount rate equal to the then Treasury Rate. For the purpose of determining unpaid Rent under clause (i) and (ii) above, the Rent reserved in this Lease shall be deemed to be the total Rent payable by Tenant under paragraph 5 hereof.

(c)    Acts of maintenance or preservation or efforts to relet the Premises or the appointment of a receiver upon initiative of Landlord to protect Landlord's interest under this Lease shall not constitute a termination of this Lease unless and until written notice of such termination is given by Landlord to Tenant. Landlord shall have unrestricted rights of entry for such purposes following an Event of Default. Landlord shall be entitled to an administrative fee of three percent (3%) of all amounts expended under this paragraph 16.

(d)    All agreements and covenants to be performed or observed by Tenant under this Lease shall be at Tenant's sole cost and expense and without any abatement of Rent. If Tenant fails to pay any sum of money to be paid by Tenant or to perform any other act to be performed by Tenant under this Lease as and when due or required to be performed, Landlord shall have the right, but shall not be obligated, and without waiving or releasing Tenant from any obligations of Tenant, to make any such payment or to perform any such other act on behalf of Tenant in accordance with this Lease. All sums so paid by Landlord and all necessary incidental costs shall be payable by Tenant to Landlord on demand, together with interest on all such sums from the date of expenditure by Landlord to the date of repayment by Tenant at the Overdue Rate. Landlord shall have, in addition to all other rights and remedies of Landlord, the same rights and

50574468_9_208972_00182

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM    2020L012058

remedies in the event of the nonpayment of such sums (plus interest at the Overdue Rate) by Tenant as in the case of default by Tenant in the payment of Rent.

(e)    If Tenant surrenders the Premises, or any portion thereof, including any Site or an Event of Default by Tenant pursuant to subparagraph 15(l) above shall have occurred, or Tenant is dispossessed by process of law or otherwise and such order of dispossession is not stayed, dismissed or reversed within ninety (90) days, any movable furniture, equipment, trade fixtures or personal property belonging to Tenant and left in the Premises, or any portion thereof, including any Site shall be deemed to be abandoned, at the option of Landlord, and Landlord shall have the right to sell or otherwise dispose of such personal property in any commercially reasonable manner.

(f)    Landlord shall be entitled to collect from Tenant all sums and expenses incurred by Landlord in enforcing, defending or interpreting its rights hereunder, including all advertising and leasing fees, all court costs, any and all legal fees and expenses of Landlord, including any and all such fees and expenses incurred in connection with litigation, mediation, arbitration, other alternative dispute resolution processes, administrative proceedings and bankruptcy proceedings, and any and all appeals from any of the foregoing, and all collection costs and fees charged by third parties in connection with Landlord's enforcement, defense or interpretation of its rights hereunder.

(g)    Notwithstanding anything to the contrary set forth in subparagraph 16(b) or any other provision of this Lease, if Landlord is exercising remedies due solely to any of the Events of Default described in subparagraphs 15(d), 15(i), 15(k), and 15(m) (provided that with respect to the Event of Default described in subparagraph 15(d), such Event of Default occurs at a time that Tenant is a Person whose securities are publicly traded) (each, a "**Limited Remedy Default**"), the aggregate amount Tenant shall be required to pay to Landlord pursuant to sub-subparagraph 16(b)(ii) shall in no case exceed an amount equal to Ninety Million and 00/100 Dollars ($90,000,000.00). Nothing contained in this subparagraph 16(g) shall limit any amounts payable by Tenant with respect to any Event of Default that is not a Limited Remedy Default.

(h)    Upon the occurrence of and during the continuance of an Event of Default, Landlord shall have the right to commence an action in any court of competent jurisdiction located in the State of Illinois for the purpose of adjudicating the Event of Default and any or all of Landlord's rights and remedies under the Lease. Tenant hereby consents to the exercise of personal jurisdiction over Tenant in any such court in Illinois and to Illinois as the choice of venue. Upon adjudication of Landlord's rights under the Lease, Landlord, at its option, shall have the right to file additional actions in any and all states in which the Sites are located for the purpose of enforcing Landlord's rights under the Lease, including obtaining orders of possession for the Site or Sites located in such state.

(i)    In addition to the foregoing subparagraphs (a) through (h), with respect to the Oaks Site, upon any Event of Default by Tenant, Landlord may, at any time thereafter, in its sole discretion, with or without further notice or demand and without limiting Landlord in the exercise of a right or remedy that Landlord may have by reason of such Event of Default:

45

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

(i)     Terminate Tenant's right to possession of the Oaks Site by any lawful means, in which case this Lease shall terminate and Tenant immediately shall surrender possession of the Oaks Site to Landlord.  In such event, Landlord shall be entitled to recover from Tenant all damages incurred by Landlord by reason of Tenant's default including: (A) the cost of recovering possession of the Oaks Site; (B) the worth at the time of the award of any unpaid Rent attributable to the Oaks Site which had been earned at the time of termination; (C) the worth at the time of the award of the amount by which the unpaid Rent which would have been earned after the termination until the time of the award exceeds the amount of such rental loss that Tenant proves could reasonably have been avoided; (D) reasonable expenses of placing the Oaks Site in good order, condition and repair; (E) reasonable expenses of reletting, including necessary renovation and alteration of the Oaks Site; (F) reasonable and actual attorneys' fees; (G) the worth at the time of award of the amount by which the unpaid Rent pertaining to the Oaks Site required to be paid by Tenant pursuant to this Lease for the balance of the term after the time of such award exceeds the amount of such rental loss for the same period that Tenant proves reasonably could be avoided; (H) that portion of any leasing commission paid by Landlord pertaining to the Oaks Site and applicable to the unexpired term of this Lease; and (I) any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including damages for diminution in the value of the Oaks Site.  As used in subparagraphs 16(b) and 16(c) above, the "worth at the time of award" is computed by allowing interest at the Overdue Rate.  As used in subparagraph (g), above, the "worth at the time of award" is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).  Unpaid installments of Rent or other sums shall bear interest from the date due at the Overdue Rate;

(ii)     Maintain Tenant's right to possession, in which case this Lease shall continue in full force and effect whether or not Tenant shall have abandoned the Oaks Site.  In such event, Landlord shall be entitled to enforce all of Landlord's rights and remedies under this Lease, including the right to recover the Rent as may become due hereunder, for which purposes Landlord may exercise the remedy described in California Civil Code section 1951.4 (Landlord may continue this Lease in effect after Tenant's breach and abandonment, and recover Rent attributable to the Oaks Site as it becomes due, if Tenant has the right to sublet or assign, subject only to reasonable limitations);

(iii)     Seek specific performance by Tenant, in the case of breach by Tenant of one or more of its covenants herein, below;

(iv)     Exercise the remedy described in California Civil Code section 1954 (and for such purposes, Tenant hereby waives any rights or benefits that may be available to it under said California Civil Code section 1954); and/or

(v)     Pursue every and any other remedy or right now or hereafter available to Landlord under the laws or judicial decisions of the State of California.

50524465_9_208972_00182


* 5 0 0 4 1 6 7 4 *

17.    **SUBORDINATION**

(a)    Subordination, Non-Disturbance.  Tenant agrees at any time hereafter, and from time to time within ten (10) Business Days of written request of Landlord, to execute and deliver to Landlord at Landlord's election either (1) an instrument in the form customarily used by any Institutional Lender becoming a Mortgagee or (2) a subordination, non-disturbance and attornment agreement substantially in the form attached hereto as **Exhibit D-1**, D-2, **D-3**, and **D-4**, as applicable to the respective Site (in either such case, such instrument, release, document, or agreement is herein called the "**Subordination, Non-Disturbance and Attornment Agreement**"), in either case subjecting and subordinating this Lease to the lien of any Mortgage which at any time may be placed upon the Premises, or any portion thereof, by Landlord, and to any replacements, renewals, amendments, consolidations, modifications, extensions or refinancing thereof.  It is agreed, nevertheless, that so long as there exists no Event of Default, such Subordination, Non-Disturbance and Attornment Agreement shall not interfere with, hinder or reduce the right of Tenant to continue to occupy the Premises, and all portions thereof, and to conduct its business thereon in accordance with the covenants, conditions, provisions, terms and agreements of this Lease.  The respective forms of Subordination, Non-Disturbance and Attornment Agreements attached hereto are set forth for the respective Sites individually for convenience only.  The costs of preparing and recording such document shall be borne by Landlord, but Tenant shall be responsible for its own counsel fees.  In no event shall Tenant's rights to insurance or condemnation proceeds with respect to the Premises as provided in this Lease (including paragraphs 10 and 13 of this Lease) be subordinate to the lien or provisions of any Mortgage.  No Mortgagee shall have any right to receive, retain or apply any proceeds of insurance or condemnation awards with respect to the Premises other than in strict accordance with the provisions of this Lease (including paragraphs 10 and 13 of this Lease).

(b)    Mortgagee Protection Clause.  In the event of any act or omission of Landlord constituting a default by Landlord, Tenant shall not exercise any remedy until Tenant has given any Mortgagee of the Premises written notice of such act or omission, and has given Mortgagee at least thirty (30) days after receipt of such written notice to remedy such act or omission. However, if such act or omission cannot, with due diligence and in good faith, be remedied within such thirty (30) day period or cannot be cured simply by the payment of money, Mortgagee shall be allowed such further period of time as may be reasonably necessary provided that it commences remedying the same with due diligence and in good faith within such thirty (30) day period and thereafter diligently prosecutes such cure, provided such cure period shall not extend beyond one hundred eighty (180) calendar days after the notice of such default. Nothing herein contained shall be construed or interpreted as requiring any Mortgagee receiving such notice to remedy such act or omission.

(c)    Attornment.  If any Mortgagee shall succeed to the rights of Landlord under this Lease or to ownership of the Premises or any Site, whether through possession or foreclosure or the delivery of a deed to the Premises in lieu of foreclosure, then such Mortgagee shall automatically be deemed to have recognized this Lease and to assume the obligations of Landlord hereunder accruing on and after the date such Mortgagee acquired title to the Premises, and Tenant shall attorn to and recognize such Mortgagee as Tenant's landlord under this Lease and shall promptly execute and deliver any instrument consistent with the Subordination, Non-Disturbance and Attornment Agreement that such Mortgagee may reasonably request to

47

* 5 0 0 4 i 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM 2020L012058

evidence such attornment (whether before or after the making of the Mortgage). In the event of any other transfer of Landlord's interest hereunder, such transferee shall automatically be deemed to have recognized this Lease and to assume the obligations of Landlord hereunder accruing on and after the date of such transfer, Tenant shall attorn to and recognize such transferee as Tenant's landlord under this Lease and shall promptly execute and deliver any instrument consistent with the Subordination, Non-Disturbance and Attornment Agreement that such transferee and Landlord may reasonably request to evidence such attornment.

(d)     Acknowledgement. Upon twenty (20) calendar days' advance written notice, Tenant agrees to execute, acknowledge and deliver a document acknowledging the assignment by Landlord of this Lease to a Mortgagee, in a form then in use among Institutional Lenders, with such changes therein as may be reasonably requested by the Mortgagee, and in form and substance reasonably acceptable to Tenant.

## 18.     LANDLORD'S RIGHT OF ENTRY

Landlord, Mortgagee, and their respective designees, shall have the right to enter the Premises, and any part of the Premises, at any time during normal business hours and any part of the Premises on two (2) Business Days' advance notice and to inspect the same, post notices of non-responsibility (subject to Tenant's reasonable requirements as to size and placement), monitor construction, perform appraisals, perform environmental site assessments and engineering studies, and during the last twenty-four (24) months of the Term or at any time after an Event of Default, exhibit the Premises to prospective purchasers and mortgagees, and examine Tenant's books and records pertaining to the Premises, insurance policies, certificates of occupancy and other documents, records and permits in Tenant's possession with respect to the Premises all of which shall be customary and adequate and reasonably satisfactory to Landlord. Landlord hereby indemnifies and agrees to defend and hold harmless Tenant and its partners, members, partners or members of such partners and members and their respective heirs, executors, administrators, personal or legal representatives, successors and assigns from and against any and all claims, expenses, costs, damages, losses and liabilities (including reasonable attorneys' fees) with respect to physical damage (including damage to the Premises and to Tenant's Property) or personal injury to the extent resulting from Landlord's or its agents' or representatives' action on the Premises, which may at any time be asserted against or suffered by Tenant as a result of, on account of, or arising from Landlord or its agents or representatives entering the Premises pursuant to the terms of this paragraph 18.

## 19.     NOTICES

Notices, statements, demands, or other communications required or permitted to be given, rendered or made by either party to the other pursuant to this Lease or pursuant to any applicable law or requirement of public authority, shall be in writing (whether or not so stated elsewhere in this Lease) and shall be deemed to have been properly given, rendered or made, when received by personal delivery or overnight delivery or overnight courier delivery (or, if such delivery is refused, upon the date that delivery would have occurred but for such refusal) or facsimile transmission (with electronic confirmation therefor) with a confirmation copy of the entire original transmittal sent by overnight delivery or by overnight courier delivery addressed to the other parties as follows:

48

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

To Landlord:           Florida 2005 Theaters LLC
                       c/o iStar Financial Inc.
                       1114 Avenue of the Americas, 38th Floor
                       New York, New York 10036
                       Attention: Chief Financial Officer
                       Telephone:(212) 930-9400
                       Facsimile: (212) 930-9494

With a copy to:        iStar Financial Inc.
                       1114 Avenue of the Americas, 38th Floor
                       New York, New York 10036
                       Attention: General Counsel
                       Telephone:(212) 930-9400
                       Facsimile: (212) 930-9494

With a courtesy copy (which shall not constitute notice) to:

                       Katten Muchin Rosenman LLP
                       525 West Monroe Street
                       Chicago, Illinois 60661-3693
                       Attention: Gregory P. L. Pierce, Esq.
                       Telephone:(312) 902-5200
                       Facsimile: (312) 902-1061

To Tenant:             Muvico Entertainment, L.L.C.
                       3101 North Federal Highway, Sixth Floor
                       Ft. Lauderdale, Florida 33306
                       Attention: Michael F. Whalen, Jr.
                       Telephone:(954) 564-6550
                       Facsimile: (954) 564-6553

With a copy to:        3101 North Federal Highway, Sixth Floor
                       Ft. Lauderdale, Florida 33306
                       Attention: General Counsel
                       Telephone:(954) 564-6550
                       Facsimile: (954) 564-6553

With a courtesy copy (which shall not constitute notice) to:

                       Law Offices of Neil F. Bretan
                       2096 Chagall Circle, 2nd Floor
                       West Palm Beach, Florida 33409-7524
                       Attention: Neil F. Bretan
                       Telephone:(561) 640-0525
                       Facsimile: (561) 640-9786

S0524468_9_208972_00182

* 5 0 0 4 1 6 7 4 *

Any party listed in this paragraph 19 may, by notices as aforesaid, designate a different address for addresses for notice, statements, demands or other communications intended for it.

## 20. ESTOPPEL CERTIFICATE; FINANCIAL DATA

(a)     At any time and from time to time, Tenant shall, within twenty (20) days after written request by Landlord, execute, acknowledge and deliver to Landlord a certificate certifying: (a) that this Lease is unmodified and in full force and effect (or, if there have been modifications, that this Lease is in full force and effect as modified, and stating the date and nature of each modification); (b) the Initial Commencement Date, the Consolidated Lease Commencement Date and the Lease Expiration Date or Extension Term Expiration Date, as applicable, determined in accordance with paragraph 4 and the Basic Lease Information, and the date, if any, to which all Rent and other sums payable hereunder have been paid; (c) the amount of Fixed Rent currently payable monthly; (d) the amount of Annual Percentage Rent payable during the immediately preceding Lease Year; (e) that no notice has been received by Tenant of any default by Tenant hereunder which has not been cured, except as to defaults specified in such certificate; (f) that Landlord is not in default under this Lease, except as to defaults specified in such certificate; and (g) such other matters as may be reasonably requested by Landlord or any actual or prospective purchaser or mortgage lender. Any such certificate may be relied upon by Landlord and any actual or prospective purchaser or mortgage lender of the Premises or any part thereof.

(b)     Landlord shall, without charge, at any time and from time to time, within twenty (20) days after request therefor by Tenant, execute, acknowledge and deliver, at no cost or other charge to Tenant, a written estoppel certificate certifying to Tenant, any lender or accountant of Tenant, any prospective assignee hereof (which assignment must be permitted pursuant to the terms hereof), prospective subtenant of the Premises (which sub-tenancy is permitted pursuant to the terms hereof), or other Person acquiring all or part of Tenant's assets or capital stock (which acquisition is not deemed an assignment of this Lease or if deemed to be such an assignment is permitted pursuant to the terms hereof), or any other Person with whom Tenant is contemplating a business arrangement, as of the date of such estoppel certificate, the following: (i) whether or not this Lease is unmodified and in full force and effect (or, if there have been modifications, that this Lease is in full force and effect as modified, and stating the date and nature of each modification); (ii) whether or not the Term has commenced and the full rental is now accruing (subject to any abatements expressly provided in this Lease); (iii) the amounts of Fixed Rent currently due and payable by Tenant; (iv) whether or not any monthly Fixed Rent has been paid more than thirty (30) days in advance of its due date; (v) that Landlord has no knowledge of any then uncured defaults by Tenant of its obligations under this Lease (or, if Landlord has such knowledge, specifying the same in detail); (vi) the address to which notices to Landlord should be sent; and (vii) any other information reasonably requested by Tenant, provided that such information does not require Landlord to obligate itself to undertake any additional acts such as, but not limited to, providing notification to any holder of any financing of any act or failure to act by Tenant. Any such certificate may be relied upon by any recipient thereof.

(c)     Tenant shall deliver to Landlord and to any Mortgagee, lender, or purchaser designated by Landlord the following information within ninety (90) days after the end of each fiscal year of Tenant or such longer period as may be permitted by any nationally recognized

50

FILED DATE: 11/9/2020 6:08 PM   2020L012058

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

stock exchange upon which Tenant's capital stock is listed: an audited balance sheet of Tenant and Tenant's consolidated subsidiaries as at the end of such year, an audited statement of profits and losses of Tenant and Tenant's consolidated subsidiaries for such year, and an audited statement of cash flows of Tenant and Tenant's consolidated subsidiaries for such year, setting forth in each case, in comparative form, the corresponding figures for the preceding fiscal year in reasonable detail and scope and certified by independent certified public accountants of recognized national standing selected by Tenant; and within forty-five (45) days or such longer period as may be permitted by any nationally recognized stock exchange upon which Tenant's stock is listed after the end of each of the first three fiscal quarters of Tenant a balance sheet of Tenant and Tenant's consolidated subsidiaries as at the end of such quarter, statements of profits and losses of Tenant and Tenant's consolidated subsidiaries for such quarter and a statement of cash flows of Tenant and Tenant's consolidated subsidiaries for such quarter, setting forth in each case, in comparative form, the corresponding figures for the similar quarter of the preceding year (or in the case of an interim balance sheet, to the end of the prior year), in reasonable detail and scope, and certified to be complete and accurate by a financial officer of Tenant having knowledge thereof; the foregoing financial statements all being prepared in accordance with generally accepted accounting principles, consistently applied. If and so long as Tenant is a reporting company under the Securities and Exchange Act of 1934, as amended, the foregoing requirements of this subparagraph 20(c) will be satisfied by the delivery of Tenant's Forms 10-K, 10-Q and annual reports promptly upon their filing with the Securities and Exchange Commission. Together with the quarterly financial statements described above, Tenant shall deliver to Landlord on a quarterly basis revenue and operating expense statements for each Site in detail reasonably satisfactory to Landlord and certified to be complete and accurate by an officer of Tenant.

(d)     Upon ten (10) calendar days' prior written notice, Tenant will permit Landlord and its professional representatives to visit Tenant's offices, and discuss Tenant's affairs and finances with appropriate officers, and will make available such information as Landlord may reasonably request bearing on Tenant, the Premises or this Lease as Tenant may maintain in the ordinary course of business. Landlord shall agree to maintain the confidentiality of any information designated by Tenant as "nonpublic" and subject to the terms of subparagraph 20(c) above. Landlord further agrees, if requested by Tenant at any time, and from time to time, to execute and deliver a confidentiality agreement in form and substance satisfactory to Tenant.

(e)     Tenant shall provide to Landlord, not later than the forty-fifth (45th) day after each Quarterly Lease Year Period, a statement (an "**EBITDA Certification**") certified by the Chief Financial Officer of Tenant (or analogous position) setting forth a calculation of EBITDA (calculated on a trailing twelve (12)-month basis) certified by the chief financial officer (or analogous position) of Company, which statement shall be subject to review and verification by Landlord.

(f)     Tenant shall provide to Landlord, not later than the forty-fifth (45th) day after each Quarterly Lease Year Period, a statement (an "**EBITDAR Certification**") certified by the Chief Financial Officer of Tenant (or analogous position) setting forth a calculation of EBITDAR and the EBITDAR Ratio for each Site and for the Premises (calculated on a trailing twelve (12)-month basis), which statement shall be subject to review and verification by Landlord.

51

* 5 0 0 4 1 6 7 4 *

## 21. MECHANICS' LIENS

(a)     Except for liens created through the act of Landlord, Tenant shall not suffer or permit any mechanic's lien or other lien to be filed or recorded against the Premises, equipment or materials supplied or claimed to have been supplied to the Premises at the request of Tenant, or anyone holding the Premises, or any portion thereof, through or under Tenant.  If any such mechanic's lien or other lien shall at any time be filed or recorded against the Premises, or any portion thereof, Tenant shall cause the same to be discharged of record or bonded over within thirty (30) calendar days after the date of filing or recording of the same.  However, in the event Tenant desires to contest the validity of any lien it shall (i) on or before thirty (30) calendar days prior to the due date thereof (but in no event later than thirty (30) calendar days after the filing or recording thereof), notify Landlord, in writing, that Tenant intends to so contest same; (ii) on or before the due date thereof, if such lien involves an amount in excess of $50,000 or if any Mortgagee so requires, deposit with Landlord security (in form and content reasonably satisfactory to Landlord or Mortgagee) for the payment or bonding over of the full amount of such lien, and from time to time deposit additional security so that, at all times, adequate security will be available for the payment of the full amount of the lien together with all interest, penalties, costs and other charges in respect thereof.

If Tenant complies with the foregoing, and Tenant continues, in good faith, to contest the validity of such lien by appropriate legal proceedings which shall operate to prevent the collection thereof and the sale or forfeiture of the Premises, or any part thereof, to satisfy the same, Tenant shall be under no obligation to pay such lien until such time as the same has been decreed, by court order, to be a valid lien on the Premises.  If an Event of Default exists, Landlord may apply any deposit then held by Landlord with respect to any such lien to discharge such lien.  If no Event of Default exists, then any deposit then held by Landlord will be so applied upon Tenant's written direction.  Any surplus deposit retained by Landlord, after the payment of the lien shall be repaid to Tenant.  Provided that nonpayment of such lien does not cause Landlord to be in violation of any of its contractual undertakings, Landlord agrees not to pay such lien during the period of Tenant's contest.  However, if Landlord pays for the discharge of a lien or any part thereof from funds of Landlord (and not amounts deposited with Landlord by Tenant for such event), any amount paid by Landlord, together with all costs, fees and expenses in connection therewith (including attorney's fees of Landlord plus an administration fee equal to three (3%) of such costs and expenses), shall be repaid by Tenant to Landlord on demand by Landlord, together with interest thereon at the Overdue Rate.  Tenant shall indemnify and defend Landlord against and save Landlord and the Premises, and any portion thereof, harmless from and against all losses, costs, damages, expenses, liabilities, suits, penalties, claims, demands and obligations, including attorney's fees, resulting from the assertion, filing, foreclosure or other legal proceedings with respect to any such mechanic's lien or other lien or the attempt by Tenant to discharge same as above provided.

(b)     Landlord's interest in the Premises shall not be subject to liens for improvements made by Tenant, and Tenant shall have no power or authority to create any lien or permit any lien to attach to the Premises or to the present estate, reversion or other estate of Landlord in the Premises herein demised or on the Improvements as a result of any alterations made by Tenant for any other cause or reason.  All materialmen, contractors, artisans, mechanics and laborers and other persons contracting with Tenant with respect to the Premises or any part thereof, or any

S0524468_9_208972_00182

* 5 0 0 4 1 6 7 4 *

such party who may avail himself of any lien against realty (whether same shall proceed in law or in equity), are hereby charged with notice that such liens are expressly prohibited and that they must look solely to Tenant to secure payment for any work done or material furnished for improvements by Tenant or for any other purpose during the term of this Lease. Tenant shall indemnify Landlord against any loss or expenses incurred as a result of the assertion of any such lien. Notice is hereby given that Landlord shall not be liable for any labor, services, materials, supplies, skill, machinery, fixtures or equipment furnished or to be furnished to Tenant upon credit, and that no mechanic's lien or other lien for any such labor, services, materials, supplies, machinery, fixtures or equipment shall attach to or affect the estate or interest of Landlord in and to the Premises, or any portion thereof.

(c) Tenant shall not create, permit or suffer, and, subject to the provisions of subparagraph 21(a) hereof, shall promptly discharge and satisfy of record, any other lien, encumbrance, charge, security interest, or other right or interest which, as a result of Tenant's action or inaction contrary to the provisions hereof, shall be or become a lien, encumbrance, charge or security interest upon the Premises, or any portion thereof, or the income therefrom, other than Permitted Encumbrances. However, in the event Tenant desires to contest the validity of any other lien, encumbrance, charge, security interest, or other right or interest it shall (i) on or before sixty (60) calendar days prior to the due date thereof (but in no event later than sixty (60) calendar days after Tenant receives notice of the filing or recording thereof), notify Landlord, in writing, that Tenant intends to so contest same; (ii) on or before the due date thereof, if such lien, encumbrance, charge, security interest, or other right or interest involves an amount in excess of $50,000, bond over or deposit with Landlord or Mortgagee security (in form and content reasonably satisfactory to Landlord or Mortgagee) for the payment of the full amount of such lien, encumbrance, charge, security interest, or other right or interest, and from time to time deposit additional security so that, at all times, adequate security will be available for the payment or bonding over of the full amount of such lien, encumbrance, charge, security interest, or other right or interest together with all interest, penalties, costs and other charges in respect thereof.

Notwithstanding anything contained herein to the contrary, any lien arising out of Landlord's Work pursuant to the Construction Management Agreement shall not be deemed a lien created through the act of Landlord.

22.    **END OF TERM**

(a) Upon the expiration or earlier termination of the Term of this Lease with respect to any one or more Sites, Tenant shall surrender the Premises, or any Site or portion thereof with respect to which this Lease no longer applies as provided herein, to Landlord in good condition and repair as a first class facility suitable for the same use in which the Premises was originally intended as of the Consolidated Lease Commencement Date for the Oaks Site and as of the Initial Commencement Date for all other Sites except in both cases as repaired, rebuilt or altered as required or permitted by this Lease (or, in the case of termination pursuant to paragraph 13, as condemned), with the Equipment and Improvements, including all systems and components thereof, having a useful life of at least five (5) years as reasonably determined by Landlord, and Tenant shall surrender all keys to the Premises, or to any Site or portion thereof with respect to which this Lease no longer applies as provided herein, to Landlord at the place then fixed for

53

* 5 0 0 4 1 6 7 4 *

notices to Landlord and shall inform Landlord of all combinations on locks, safes and vaults, if any. Except as otherwise provided herein, Tenant shall at such time remove all of its property (including Tenant's Property) therefrom and all alterations and improvements placed thereon by Tenant and not consented to by Landlord. Tenant shall repair any damage to the Premises caused by such removal, and any and all such property not so removed when required shall, at Landlord's option, become the exclusive property of Landlord or be disposed of by Landlord, at Tenant's cost and expense, without further notice to or demand upon Tenant.

(b) If the Premises, or any Site or portion thereof with respect to which this Lease no longer applies as provided herein, are not surrendered as above set forth, Tenant shall indemnify, defend and hold Landlord harmless from and against loss or liability resulting from the delay by Tenant in so surrendering Premises, including any claim made by any succeeding occupant founded on such delay. Tenant's obligation to observe or perform this covenant shall survive the expiration or other termination of this Lease for six (6) years. In addition to the foregoing, and in addition to the Additional Rent, Tenant shall pay in advance and on a monthly basis to Landlord a sum equal to one twelfth (1/12) of one hundred fifty percent (150%) of the Fixed Rent payable during the preceding year during each month or portion thereof for which Tenant shall remain in possession of the Premises or any part thereof after the termination of the Term, whether by lapse of time or otherwise. The provisions of this subparagraph 22(b) shall not be deemed to limit or constitute a waiver of any other rights or remedies of Landlord provided herein, at law or at equity.

(c) Except as otherwise provided in the Lease, all property of Tenant not removed on or before the last day of the Term of this Lease shall be deemed abandoned; provided, however, if the Term of this Lease, or Tenant's right to possession hereunder, is terminated by notice by Landlord as provided in this Lease, only property of Tenant not removed on or before the ninetieth (90th) day following Tenant's receipt of such notice shall be deemed abandoned. Tenant hereby agrees that Landlord may remove all property of Tenant, including Tenant's Property, from the Premises upon termination of this Lease and to cause its transportation and storage, all at the sole cost and risk of Tenant and Landlord shall not be liable for damage, theft, misappropriation or loss thereof and Landlord shall not be liable in any manner in respect thereto and Landlord shall be entitled to dispose of such property, as Landlord deems fit, without the requirement of an accounting, except that Landlord shall remit to Tenant the net proceeds from the disposition of Tenant's Property, after the full payment of all Rent and any other amounts that are then due and owing to Landlord under this Lease. Tenant shall pay all costs and expenses of such removal, transportation and storage. Tenant shall reimburse Landlord upon demand for any expenses reasonably and actually incurred by Landlord with respect to removal or storage of abandoned property and with respect to restoring said Premises in accordance with the terms and conditions of this Lease.

(d) Except for surrender upon the expiration or earlier termination of the Term hereof as expressly provided herein, no surrender to Landlord of this Lease or of the Premises or any Site or portion thereof shall be valid or effective unless agreed to and accepted in writing by Landlord.

54

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6.08 PM   2020L012058

## 23.   ALTERATIONS

(a)   Tenant shall obtain Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned, or delayed so long as the value or utility of the Premises in its current use is not diminished thereby, before making any change in the structure of the Improvements or any building system, which change is reasonably projected to cost at least or in excess of $500,000. Subject to the terms of the preceding sentence, Tenant may make alterations, additions or improvements to the Premises reasonably projected to cost less than $500,000 without Landlord's consent only if (i) such alterations, additions or improvements will be in compliance with all applicable laws, codes, rules, regulations and ordinances, (ii) such alterations, additions or improvements will not materially reduce the value or utility of the Premises in its permitted use, considered as unencumbered by this Lease, and (iii) such alterations, additions or improvements will not materially or adversely affect in any way the structural, exterior or roof elements of the Premises or mechanical, electrical, plumbing, utility or life safety systems of the Premises, but Tenant shall give prior written notice of any and all such alterations, additions or improvements to Landlord. In addition, Tenant shall be permitted to make alterations, additions or improvements to the Premises required by Legal Requirements without Landlord's consent; but Tenant shall give prior written notice to Landlord of any such alterations, additions or improvements, except in the case of an emergency, in which case Tenant shall give Landlord notice of any alterations, additions or improvements as soon as practicable after the emergency has passed. At Landlord's option, any improvement made without Landlord's prior written consent (if required) shall be removed and the area repaired at Tenant's expense at the termination of the Term.

(b)   In no event shall Tenant be permitted to install underground storage tanks or fuel systems on the Premises, or any portion thereof.

(c)   All alterations, additions or improvements requiring Landlord's consent shall be made at Tenant's sole cost and expense as follows:

(i)   Tenant shall submit to Landlord, for Landlord's written approval, complete plans and specifications for all work to be done by Tenant. Such plans and specifications shall be prepared by the licensed architect(s) and engineer(s) reasonably acceptable to Landlord, shall comply with all applicable codes, ordinances, rules and regulations, including, but not limited to, California Civil Code Section 3110.5, and shall otherwise comply with paragraph 12 hereof, shall not adversely affect the structural elements of the Premises, shall be in a form sufficient to secure the approval of all government authorities with jurisdiction over the Premises, and shall be otherwise satisfactory to Landlord in Landlord's reasonable discretion.

(ii)   Landlord shall notify Tenant in writing within thirty (30) calendar days whether Landlord approves, approves on condition that Tenant reverse the alteration at Tenant's expense at the termination or expiration of this Lease, or disapproves such plans and specifications. Tenant may submit to Landlord revised plans and specifications for Landlord's prior written approval, which approval shall not be withheld or delayed if (a) the work to be done would not, in Landlord's reasonable judgment, adversely affect the value, character, rentability or usefulness of the Premises or any part thereof in its current use, or (b) the work to be done

50524468_9_208972_00182

* 5 0 0 4 1 6 7 4 *

shall be required by any Legal Requirement. Tenant shall pay all costs, including the fees and expenses of the licensed architect(s) and engineer(s), in preparing such plans and specifications.

(iii)     All changes (other than field changes for which no change order is proposed and which will be reflected in the final "as built" plans) in the plans and specifications approved by Landlord shall be subject to Landlord's prior written approval, which shall not be unreasonably withheld, conditioned or delayed. If Tenant wishes to make such change in approved plans and specifications, Tenant shall have such architect(s) and engineer(s) prepare plans and specifications for such change and submit them to Landlord for Landlord's written approval. Landlord shall notify Tenant in writing promptly whether Landlord approves, approves on condition that Tenant reverse the alteration at Tenant's expense at the termination or expiration of this Lease, or disapproves such change. Tenant may submit to Landlord revised plans and specifications for such change for Landlord's written approval. After Landlord's written approval of such change, such change shall become part of the plans and specifications approved by Landlord.

(iv)     Tenant shall obtain and comply with all building permits and other government permits and approvals required in connection with the work. Tenant shall, through Tenant's licensed contractor, perform the work substantially in accordance with the plans and specifications approved in writing by Landlord. Tenant shall pay the entire cost of all work (including the cost of all utilities, permits, fees, taxes, and property and liability insurance premiums in connection therewith) required to make the alterations, additions or improvements. Under no circumstances shall Landlord be liable to Tenant for any damage, loss, cost or expenses incurred by Tenant on account of any plans and specifications, contractors or subcontractors, design of any work, construction of any work, or delay in completion of any work.

(v)     Tenant shall give at least ten (10) calendar days prior written notice to Landlord of the date on which construction of any work to be done by outside contractors which involves the roof, a structural element of the building, or otherwise requires Landlord's approval or consent. Landlord shall have the right to post and keep posted on the Premises any notices that may be provided by law or which Landlord may reasonably deem to be proper for the protection of Landlord and the Premises, or any portion thereof, from liens, and to take any other action Landlord deems reasonably necessary to remove or discharge liens at the expense of Tenant, except as otherwise provided in, and subject to the provisions of, paragraph 21 of this Lease.

(vi)     All alterations, additions, improvements, and fixtures, whether temporary or permanent in character, made in or to the Premises by Tenant, shall become part of the Premises and Landlord's property, except those which are readily removable without causing material damage to the Premises (which shall be and remain the property of Tenant). Upon termination or expiration of this Lease, Tenant shall, at Tenant's expense, remove all movable furniture, equipment, trade fixtures, office machines and other personal property (including Tenant's Property) from the Premises (but not the Improvements or Equipment) and repair all damage caused by such removal. If Tenant makes any alterations, additions or improvements to the Premises either (i) in excess of (A) available insurance proceeds after a Casualty or (B) available condemnation proceeds after a non-substantial taking or (ii) as an addition or alteration

56

* 5 0 0 4 1 6 7 4 *

to the existing Improvements (as such improvements exist as of the date of this Lease), notwithstanding the foregoing, during the Term of this Lease ownership of such alterations and/or improvements that are additions to the Improvements (as such Improvements exist as of the date of this Lease) shall be owned by Tenant until the expiration of the Term of this Lease or Tenant's right to possession under this Lease. Upon the expiration of this Lease or Tenant's right to possession under this Lease, the ownership of all such alterations and/or improvements shall revert to Landlord without any further action or direction from either Tenant or Landlord. Termination of this Lease shall not affect the obligations of Tenant pursuant to this subparagraph 23(c) to be performed after such termination.

(vii) Promptly following the completion of any alteration, addition, or improvement to the Premises, Tenant shall furnish Landlord with a copy in electronic form acceptable to Landlord of the complete plans and specifications for such work (including, if available, so-called "as-built" plans and specifications).

## 24.    SHORT FORM OF LEASE

The parties agree to promptly execute a short form of this Lease (a "**Short Form of Lease**") in recordable form and either of the parties shall have the right, without notice to the other party, to record such Short Form of Lease. If a Short Form of Lease is recorded, Landlord and Tenant shall execute such customary amendments and terminations related thereto as may be required or requested by Landlord or Tenant within five (5) Business Days of receipt thereof. Any recorded Short Form of Lease shall make specific reference to the provisions of subparagraph 17(a) with respect to Tenant's superior rights under this Lease to all insurance proceeds and condemnation awards.

## 25.    SUBLETTING/ASSIGNMENT

(a) Except as set forth in subparagraph 25(h) below, Tenant shall not, directly or indirectly, without the prior written consent of Landlord and Mortgagee, assign this Lease or any interest herein, or sublease the Premises or any part thereof, or permit the use or occupancy of the Premises or any part thereof by any Person other than Tenant, such consent not to be unreasonably withheld, conditioned or delayed. This Lease shall not, nor shall any interest herein, be assignable as to the interest of Tenant involuntarily or by operation of law without the prior written consent of Landlord and Mortgagee, such consent not to be unreasonably withheld conditioned or delayed.

For purposes of this subparagraph 25(a), the occurrence of a Corporate Control Event shall be deemed to be an assignment of this Lease which is prohibited by the preceding paragraph unless Tenant obtains Landlord's and Mortgagee's prior written consent (which consent shall not be unreasonably withheld, conditioned or delayed) as set forth above.

Any of the foregoing prohibited acts without such prior written consent of Landlord and, if required, any Ground Landlord and Mortgagee shall be void and shall, at the option of Landlord or Mortgagee, constitute an immediate Event of Default that entitles Landlord to all remedies available at law and pursuant to this Lease. Tenant agrees that the instrument by which any assignment or sublease to which Landlord, Ground Landlord and Mortgagee consent is

57

50524468_9_208972_00182

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM  2020L012058

accomplished shall expressly provide that the assignee or subtenant will perform all of the covenants to be performed by Tenant under this Lease (in the case of a partial assignment or a sublease, only insofar as such covenants relate to the portion of the Premises subject to such partial assignment or sublease) as and when performance is due after the effective date of the assignment or sublease and that Landlord will have the right to enforce such covenants directly against such assignee or subtenant. Any purported assignment or sublease without an instrument containing the foregoing provisions shall be void. Unless and until expressly released by Landlord, Ground Landlord and Mortgagee, Tenant shall in all cases remain primarily liable (and not liable merely as a guarantor or surety) for the performance by any assignee or subtenant of all such covenants, as if no assignment or sublease had been made; provided, however, if Landlord and Mortgagee consent to an assignment in accordance with this <u>subparagraph 25(a)</u>, Tenant shall be released from liability under this Lease effective as of the date such assignee takes possession of the Premises and assumes all of Tenant's obligations under this Lease.

(b)     [Intentionally omitted]

(c)     If Landlord, Ground Landlord and Mortgagee consent in writing, or if Landlord's, Ground Landlord's and Mortgagee's consent is not required, Tenant may complete the intended assignment or sublease subject to the following conditions: (i) no assignment or sublease shall be valid and no assignee or subtenant shall take possession of the Premises or any part thereof until an executed duplicate original of such assignment or sublease, in compliance with <u>subparagraph 25(a)</u>, has been delivered to Landlord and Mortgagee, (ii) no assignee or subtenant shall have a right further to assign or sublease without the prior written consent of Landlord and Mortgagee, which consents shall not be unreasonably withheld, delayed, or conditioned and (iii) Tenant shall, upon its receipt, remit to Landlord fifty percent (50%) of Tenant's "net profit" on any sublease of any portion of the Premises (other than a sublease, license or grant of a concession to any Person, which sublease, license or grant is referred to in subparagraph 25(h) and to the extent resulting in payments to Tenant, shall be included in the calculation of Tenant's Gross Receipts). Solely for purposes of determining Tenant's "net profit," the following shall apply: Tenant's net profit from any sublease shall be determined on a monthly basis and is hereby defined as the amount by which all monthly payments from such subtenant paid to Tenant exceed the Monthly Subtenant Allowance. The term **"Monthly Subtenant Allowance"** means the result of (A) all reasonable out-of-pocket expenses paid by Tenant to third-parties in obtaining such sublease directly relating only to the portions of the Premises which are subject to such sublease  (including, to the extent applicable, brokers fees, attorneys fees, and improvements to the Premises [which shall only be made in accordance with the terms of this Lease] and third party financing costs approved by Landlord) divided by (B) the total months in the term of the sublease. No sublease of an entire Site shall be permitted unless the rental payments from such subtenant to Tenant and paid by Tenant to Landlord pursuant to this <u>subparagraph 25(c)</u> qualify as "rent from real property" under Section 856 of the Internal Revenue Code of 1986, as amended. If Landlord and Mortgagee consent in writing to any assignment, or if Landlord's and Mortgagee's consent is not required for any assignment, Tenant shall be released from liability under this Lease effective as of the date such assignee takes possession of the Premises and assumes all of Tenant's obligations under this Lease.

(d)     Unless and until expressly released by Landlord, Ground Landlord and Mortgagee (it being agreed that none of Landlord nor Mortgagee shall be required to give such release), no

50524468_9_208972_00132

* 5 0 0 4 1 6 7 4 *

sublease whatsoever shall release Tenant from Tenant's obligations and liabilities under this Lease (which shall continue as the obligations of a principal and not of a guarantor or surety) or alter the primary liability of Tenant to pay all Rent and to perform all obligations to be paid and performed by Tenant. The acceptance of Rent by Landlord from any other Person shall not be deemed to be a waiver by Landlord of any provision of this Lease. Consent to one assignment or sublease shall not be deemed consent to any subsequent assignment or sublease. If any assignee, subtenant or successor of Tenant defaults in the performance of any obligation to be performed by Tenant under this Lease, Landlord may proceed directly against Tenant (unless in connection with an assignment of this Lease by Tenant, Tenant has been released of its obligations under this Lease) without the necessity of exhausting remedies against such assignee, subtenant or successor. Landlord may consent to subsequent assignments or subleases or amendments or modifications to this Lease with assignees, subtenants or successor of Tenant, without notifying Tenant or any successor of Tenant and without obtaining any consent thereto from Tenant or any successor of Tenant, and such action shall not release Tenant from liability under this Lease.

(e)     Tenant shall have no right (other than as expressly provided for in this Lease, including in paragraph 29 hereof) to mortgage, grant a lien upon, encumber or otherwise finance Tenant's interest under this Lease or record a lien upon Tenant's interest in the Premises under this Lease, and except as otherwise expressly provided for in this Lease (including in paragraph 29 hereof) Tenant shall not permit, cause or suffer to be recorded in the Records any mortgage, deed to secure debt, deed of trust, assignment, UCC financing statement or any other document granting, perfecting, or recording a lien upon Tenant's interest in this Lease or interest in the Premises under this Lease. Tenant shall not give any notice, or permit or cause any other party to give any notice, to Landlord of any existing lien on or security interest in Tenant's interest in this Lease or interest in the Premises under this Lease. Except as otherwise expressly provided for in this Lease, Tenant shall not request that Landlord execute (nor shall Landlord have any obligation to execute) any non-disturbance, attornment or any other agreement in favor of any party transacting any business or transaction with or related to Tenant.

(f)     If Tenant shall assign this Lease or sublet the Premises or any portion thereof to any Person other than Landlord, or request the consent of Landlord, Ground Landlord and Mortgagee to any assignment, subletting, or other action which requires Landlord's consent hereunder, Tenant shall pay Landlord's, Ground Landlord's and Mortgagee's attorneys' fees and costs incurred in connection therewith. If Landlord's and Mortgagee's consent is required in connection with any assignment, transfer or sublease of this Lease, Landlord and Mortgagee shall each give or withhold their respective consent in writing within fifteen (15) Business Days after receipt of a written notice from Tenant requesting such consent. If either Landlord or Mortgagee fails to respond to Tenant within such fifteen (15) Business Day period, then Tenant shall send an additional written notice to Landlord and Mortgagee, which notice shall include the following language (which shall be clearly typed on the front page of the notice and in bold type): "**FAILURE TO RESPOND TO THIS NOTICE WITHIN FIVE (5) DAYS AFTER RECEIPT THEREOF SHALL CONSTITUTE A DEEMED CONSENT TO THE MATTERS SET FORTH HEREIN**" (the "Second Notice"). If either Landlord or Mortgagee fails to respond to the Second Notice within five (5) days after receipt thereof, it shall be deemed that such party has granted its consent to such assignment. If Landlord and Mortgagee consent, or are deemed to have consented, to an assignment or transfer of this Lease, Landlord and Mortgagee shall each, within fifteen (15) Business Days after receipt of a written request therefor

59

* 5 0 0 4 1 6 7 4 *

by Tenant, execute, acknowledge and deliver, to Tenant, a consent to assignment (which shall be prepared by Tenant), in recordable form and reasonably acceptable to Landlord, Mortgagee, Tenant and its assignee. All costs and expenses incurred by Landlord, Ground Landlord and Mortgagee in connection with each party's review, approval and execution of the consent to assignment shall be borne solely by Tenant. The foregoing shall not relieve Tenant from its obligation to obtain any consent or approval of Ground Landlord as may be required by the applicable Ground Lease.

(g)     Tenant agrees to give notice to Mortgagee of any request for consent to any assignment or transfer of this Lease or subletting of all or any portion of the Premises simultaneously with delivery of notice thereof to Landlord.

(h)     Notwithstanding anything expressed or implied to the contrary in this Lease, it is agreed that at any time during the Term of this Lease, (1) Tenant shall have the right, without Landlord's and Mortgagee's consent, but with the consent of the applicable Ground Landlord, if required, and with ten (10) days' prior written notice which shall include evidence of any required Ground Landlord consent, once or more often, to lease or license the operations referred to in clauses (i), (ii) and (iii) of subparagraph 3(a) of this Lease, or grant concessions giving other parties the right to conduct such operations or any of them; (2) Tenant shall be entitled, without Landlord's and Mortgagee's consent, to enter into so-called "four-walled" deals whereby the Premises or any part thereof is permitted to be used by others on a limited engagement basis for any use permitted to be made thereof by Tenant; and (3) Tenant shall be entitled to collaterally assign, pledge, mortgage or otherwise encumber its interest in this Lease in favor of SFI I, LLC, but in no event to any other party.

26.     **HAZARDOUS MATERIAL**

(a)     Tenant (i) shall comply, and cause the Premises to comply, with all Environmental Laws applicable to the Premises (including the making of all submissions to Governmental Authorities required by Environmental Laws and the carrying out of any remediation program specified by such authority), (ii) shall prohibit the use of the Premises for the generation, manufacture, refinement, production, or processing of any Hazardous Material or for the storage, handling, transfer or transportation of any Hazardous Material (other than in connection with the operation, business, Permitted Use and maintenance of the Premises and in commercially reasonable quantities as a consumer thereof and supplier of consumer products and in compliance with Environmental Laws), (iii) shall not permit to remain, install or permit the installation on the Premises of any surface impoundments, underground storage tanks, pcb-containing transformers or asbestos-containing materials, and (iv) shall cause any alterations of the Premises to be done in a way so as to not expose in an unsafe manner the persons working on or visiting the Premises to Hazardous Materials and in connection with any such alterations shall remove any Hazardous Materials present upon the Premises which are not in compliance with Environmental Laws or which present a danger to persons working on or visiting the Premises.

(b)     "**Environmental Laws**" shall mean (i) the Resource Conservation and Recovery Act of 1976, as amended, 42 U.S.C. §§6901, et seq. (RCRA), as amended, (ii) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§9601 et seq.

60



* 5 0 0 4 1 6 7 4 *

(CERCLA), as amended, (iii) the Toxic Substance Control Act, as amended, 15 U.S.C. §§2601 et seq., (iv) the Federal Insecticide, Fungicide and Rodenticide Act, as amended, 7 U.S.C. §§136 et seq., (v) the Hazardous Materials Transportation Act 49 U.S.C. §§1801 et seq., (vi) all other applicable federal, state and local environmental laws, ordinances, rules and regulations, and with respect to the Oaks Site, including (1) the Porter-Cologne Water Quality Control Act, California Water Code §§13000 et seq., (2) the California Hazardous Waste Control Law, Division 20, Chapter 6.5 of the California Health and Safety Code, (3) the Carpenter-Presley-Tanner Hazardous Substance Account Act, California Health and Safety Code §§25300 et seq., (4) Hazardous Materials Release Response Plans and Inventory, Division 20, Chapter 6.95 of the California Health and Safety Code, and (5) the Safe Drinking Water and Toxic Enforcement Act of 1986, California Health and Safety Code §§25249.5 et seq., and (vii) any other federal, state or local laws, ordinances, rules and regulations, now or hereafter existing relating to regulations or control of Hazardous Material or materials, as any of the foregoing may have been or may be from time to time amended, supplemented or supplanted. The term "**Hazardous Materials**" as used in this Lease shall mean substances defined as "hazardous substances", "hazardous materials", "hazardous wastes" or "toxic substances" in any applicable federal, state or local statute, rule, regulation or determination, including the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §§9601, et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. §§1801, et seq.; the Resource, Conservation and Recovery Act of 1976, 42 U.S.C. §§6901, et seq.; and, asbestos, pcb's, radioactive substances, methane, volatile hydrocarbons, petroleum or petroleum-derived substances or wastes, radon, industrial solvents or any other material as may be specified in applicable law or regulations.

(c)     Tenant agrees to protect, defend, indemnify and hold harmless Landlord, Ground Landlord, their members, directors, officers, employees and agents, and any successors to Ground Landlord's or Landlord's interests in the chain of title to the Premises, their direct or indirect members, partners, directors, officers, employees, and agents (collectively, the "**Indemnified Party**"), from and against any and all liability, including all foreseeable and all unforeseeable damages including reasonable attorney's and consultant's fees, fines, penalties and civil or criminal damages, directly or indirectly arising out of Tenant's use, generation, storage, treatment, release, threatened release, discharge, spill, or disposal of Hazardous Materials from, on, at, to or under (A) the Palace Site and/or the Boynton Site prior to the Consolidated Lease Commencement Date and (B) the Premises prior to or during the Term of this Lease, and including for all matters disclosed in the environmental reports prepared for and delivered to Landlord or its Affiliates by (i) EMG, Inc., dated November 3, 2004, Project number 122876, with respect to the Group One Sites, and (ii) EMG, Inc., dated December 26, 2007, Project number 86328.07R-001.050, with respect to the Oaks Site, copies of which have been delivered to Tenant (collectively, the "**Environmental Reports**"), and the cost of any required or necessary repair, response action, remediation, investigation, cleanup or detoxification and the preparation of any closure or other required plans in connection therewith, whether such action is required or necessary prior to or following transfer of title to the Premises. This agreement to indemnify and hold harmless shall be in addition to any other obligations or liabilities Tenant may have to Landlord at common law under all statutes and ordinances or otherwise, and shall survive following the date of expiration or earlier termination of this Lease for six (6) years, except where the event giving rise to the liability for which indemnity is sought arises out of Tenant's acts, in which case the agreement to indemnify shall survive the expiration or termination of this Lease without limit of time. Tenant expressly agrees that the representations,

61

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

warranties and covenants made and the indemnities stated in this Lease are not personal to Landlord, and the benefits under this Lease may be assigned to subsequent parties in interest to the chain of title to the Premises, which subsequent parties in interest may proceed directly against Tenant to recover pursuant to this Lease. Tenant, at its expense, may institute appropriate legal proceedings with respect to environmental matters of the type specified in this subparagraph 26(c) or any lien for such environmental matters, not involving Landlord or its Mortgagee as a defendant (unless Landlord or its mortgagee is the alleged cause of the damage), conducted in good faith and with due diligence, provided that such proceedings shall not in any way impair the interests of Landlord or Mortgagee under this Lease or contravene the provisions of any Mortgage. Counsel to Tenant in such proceedings shall be reasonably approved by Landlord if Landlord is a defendant in the same proceeding. Landlord shall have the right to appoint co-counsel, which co-counsel will cooperate with Tenant's counsel in such proceedings. The fees and expenses of such co-counsel shall be paid by Landlord, unless such co-counsel are appointed because the interests of Landlord and Tenant in such proceedings, in such counsel's opinion, are or have become adverse, or Tenant or Tenant's counsel is not conducting such proceedings in good faith or with due diligence.

(d)     Tenant, upon two (2) days prior notice shall permit such Persons as Landlord or any assignee of Landlord may designate and (unless an Event of Default has occurred and is continuing) approved by Tenant, which approval shall not be unreasonably withheld or delayed ("**Site Reviewers**"), to visit the Premises from time to time and perform environmental site investigations and assessments ("**Site Assessments**") on the Premises for the purpose of determining whether there exists on the Premises any environmental condition which may result in any liability, cost or expense to Landlord or any other owner or occupier of the Premises. Such Site Assessments may include both above and below the ground testing for environmental damage or the presence of Hazardous Material on the Premises and such other tests on the Premises as may be necessary to conduct the Site Assessments in the reasonable opinion of the Site Reviewers. Tenant shall supply to the Site Reviewers such historical and operational information regarding the Premises as may be reasonably requested by the Site Reviewers to facilitate the Site Assessments (other than information previously supplied in writing to Landlord by Tenant) and shall make available for meetings with the Site Reviewers appropriate personnel having knowledge of such matters. The cost of performing and reporting all Site Assessments shall be paid by Landlord unless an Event of Default has occurred and is continuing or unless the Site Reviewers discover an environmental condition causing the Premises not to be in compliance with applicable Environmental Laws, in either of which events such cost will be paid by Tenant within ten (10) calendar days after written demand by Landlord with interest to accrue at the Overdue Rate from and after ten (10) calendar days after demand by Landlord. Landlord, promptly after written request by Tenant and payment by Tenant to the extent required as aforesaid, shall deliver to Tenant copies of reports, summaries or other compilations of the results of such Site Assessments. Tenant's sole remedy for Landlord's breach of the preceding sentence shall be a mandatory injunction, and not a termination of this Lease or a withholding or reduction of Rent. Landlord hereby indemnifies and agrees to defend and hold harmless Tenant and its partners, members, partners or members of such partners and members and their respective heirs, executors, administrators, personal or legal representatives, successors and assigns from and against any and all claims, expenses, costs, damages, losses and liabilities (including reasonable attorneys' fees) with respect to physical damage (including damage to the Premises and to Tenant's Property) or personal injury to the extent resulting from Landlord's or

62

* 5 0 0 4 1 6 7 4 *

its agents' or representatives' action on the Premises, which may at any time be asserted against or suffered by Tenant as a result of, on account of, or arising from Landlord or its agents or representatives entering the Premises pursuant to the terms of this subparagraph 26(d).

(e)     Tenant shall notify Landlord in writing, promptly upon Tenant's learning thereof, of any:

(i)     notice or claim to the effect that Tenant is or may be liable to any Person as a result of the release or threatened release of any Hazardous Material into the environment from the Premises;

(ii)     notice that Tenant is subject to investigation by any governmental authority evaluating whether any remedial action is needed to respond to the release or threatened release of any Hazardous Material into the environment from the Premises;

(iii)     notice that the Premises are subject to an environmental lien; and

(iv)     notice of violation to Tenant or knowledge by the senior management of Tenant of a condition which might reasonably result in a notice of violation of any applicable Environmental Law that could, in either case, have a material adverse effect upon the Premises.

27.     FINANCING

(a)     Landlord may assign this Lease to any Person, including any Mortgagee. Tenant shall execute, acknowledge and deliver any documents reasonably requested by Landlord, any such transferee, including any Mortgagee relating to such assignment of this Lease by Landlord or the Mortgage financing, which are customary for tenants to sign in connection with an assignment of mortgage financing by their landlords, provided the same does not adversely change Tenant's rights or obligations under this Lease in any way.

(b)     If Landlord proposes to refinance any Mortgage, Tenant shall cooperate in the process, and shall negotiate in good faith any request made by a prospective Mortgagee for changes or modifications to this Lease, and shall not unreasonably withhold its consent to any such proposed change or modification so long as the same does not adversely affect any significant right of Tenant under this Lease, shorten any notice or cure period to which Tenant is entitled, or increase Tenant's obligations under this Lease and, during the last twenty-four (24) months of the term of any Mortgage held by Mortgagee, exhibit the Premises to prospective mortgagees, and permit such potential mortgagee to examine all materials and records which shall be customary for a mortgagee's inspection, subject at all times to Landlord's indemnity set forth in paragraph 18 and the confidentiality requirements set forth in this Lease. Tenant agrees to execute, acknowledge and deliver documents reasonably requested by the prospective Mortgagee (such as a consent to the financing (without encumbering Tenant's assets), a consent to assignment of lease, and a subordination, non-disturbance and attornment agreement meeting the standards set forth in paragraph 17) customary for tenants to sign in connection with mortgage loans to their landlords, so long as such documents are in form then customary among Institutional Lenders (provided the same do not adversely change Tenant's rights or obligations in a way not previously changed by loan documents previously executed by Tenant in connection with an earlier Mortgage).

50524468_9_208972_00182

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

(c)     Tenant shall permit, upon reasonable advance notice, Landlord and any Mortgagee or prospective Mortgagee, at their expense, to meet with management personnel of Tenant at Tenant's offices and to discuss Tenant's business and finances.  On request of Landlord, Tenant agrees to provide any Mortgagee or prospective Mortgagee the information to which Landlord is entitled hereunder. If any such information is non-public each party requesting such information shall sign a confidentiality agreement in form and substance satisfactory to Tenant prior to such Mortgagee's or prospective Mortgagee's receiving such information.

28.     **MISCELLANEOUS PROVISIONS**

(a)     This Lease and all of the covenants and provisions hereof shall inure to the benefit of, and be binding upon, the parties hereto and the heirs, personal representatives, successors and permitted assigns of the parties.

(b)     The titles and headings appearing in this Lease are for reference only and shall not be considered a part of this Lease or in any way to modify, amend or affect the provisions thereof.

(c)     This Lease contains the complete agreement of the parties with reference to the leasing of the Premises, and may not be amended except by an instrument in writing signed by Landlord and Tenant and consented to by Mortgagee (if any).  This Lease shall not be amended, modified or terminated with respect to any Site subject to a Ground Lease without the prior written consent of each Ground Landlord whose consent is required, and Landlord and Tenant; provided, however, that the provisions of this subparagraph 28(c) shall not be construed to create any additional rights or obligations in any Ground Landlord not provided in the Ground Lease to which such Ground Landlord is a party, or grant to any Ground Landlord rights with respect to any other Site.

(d)     Any provision or provisions of this Lease which shall prove to be invalid, void or illegal shall in no way affect, impair or invalidate any other provision hereof, and the remaining provisions hereof shall nevertheless remain in full force and effect.

(e)     This Lease may be executed in one or more counterparts, and may be signed by each party on a separate counterpart, each of which, taken together, shall be an original, and all of which shall constitute one and same instrument.

(f)     The term "Landlord" as used in this Lease shall mean only the owner or owners at the time in question of the Premises and in the event of any transfer of such title or interest, Landlord named in this Lease (and in case of any subsequent transfers, then the grantor) shall be relieved from and after the date of such transfer of all liability as respects Landlord's obligations thereafter to be performed hereunder, provided that any funds in the hands of Landlord or the then grantor at the time of such transfer, in which Tenant has an interest, shall be delivered to the grantee.  The obligations contained in this Lease to be performed by Landlord shall, subject as aforesaid, be binding on Landlord's successors and assigns, only during their respective periods of ownership.

(g)     For all issues which are Site-specific, this Lease shall be governed by and construed and enforced in accordance with and subject to the laws of the state where the

50524468_9_208972_00182

* 5 0 0 4 1 6 7 4 *

applicable Site is located, and for all issues which are not Site-specific, the internal laws, without regard to conflict of laws of Florida, shall govern. In the event a legal action is brought by one party against the other, venue for such action will lie in the county (or other political subdivision) in which the Premises is located.

(h)     Any claim based on or in respect of any liability of Landlord under this Lease shall be enforced only against the Site that is the subject of the claim and not against any other assets, properties or funds of (1) Landlord or any director, officer, member, shareholder, general partner, limited partner, or direct or indirect member, partner, employee or agent of Landlord or any of its members (or any legal representative, heir, estate, successor or assign of any thereof), and (2) any predecessor or successor partnership, corporation or limited liability company (or other entity) of Landlord or any of its members, either directly or through Landlord or its predecessor or successor partnership, corporation of limited liability company (or other Person) of Landlord or its general partners, and (3) any other Person.

(i)     Without the written approval of Landlord and Tenant, no Person other than Landlord (including its direct and indirect partners or members), Mortgagee, Tenant and their respective successors and assigns shall have any rights under this Lease.

(j)     There shall be no merger of the leasehold estate created hereby by reason of the fact that the same Person may own directly or indirectly, (1) the leasehold estate created hereby or any interest in this Lease or such leasehold estate, and (2) the fee estate in the Premises. Notwithstanding any such combined ownership, this Lease shall continue in full force and effect until terminated by an instrument executed by both Landlord and Tenant or as otherwise expressly provided in this Lease.

(k)     Whenever in this Lease either party is required to take an action within a particular time period, delays caused by acts of God, war, major Casualty, strike, labor shortage or other cause beyond the reasonable control of such party shall not be counted in determining the time in which such performance must be completed (except in the case of the obligation to pay money) so long as such party shall, promptly after becoming aware of the commencement of such delay, shall give the other party notice thereof and estimating the duration thereof.

(l)     If at any time a dispute shall arise as to any amount to be paid by one party to the other hereunder, the obligor may make payment "under protest," and such payment shall not be deemed a voluntary payment, and the right of the obligor to contest its liability for such payment shall survive such payment without prejudice to the obligor's position.

(m)     Landlord and Tenant each represent that they have dealt with no broker, finder or other Person who could legally charge a commission in connection with Landlord's acquisition of the Land or with the Lease.

(n)     Landlord and Tenant agree that all litigation fees, costs and expenses incurred, and all fees, costs, settlements or other consideration received, by Tenant, Landlord, or both Tenant and Landlord relating to or involving the City and/or Developer for the Baywalk Site shall be paid and shared, as applicable, equally by Landlord and Tenant, whenever required to be paid or whenever received.

S0524468 9 208972_00182

* 5 0 0 4 1 6 7 4 *

(o)     The parties hereto specifically acknowledge and agree that, notwithstanding any other provision contained in this Lease, it is the intent of the parties that their relationship hereunder is and shall at all times be that of landlord and tenant, and not that of partners, joint venturers, lender and borrower, or any other relationship other than that of a landlord and tenant.

(p)     The parties hereto specifically acknowledge and agree that time is of the essence with regard to all obligations under this Lease.

(q)     **TO THE EXTENT PERMITTED BY APPLICABLE LAW, LANDLORD AND TENANT HEREBY WAIVE TRIAL BY JURY IN ANY ACTION OR PROCEEDING, AND WITH RESPECT TO ANY CLAIM ASSERTED IN ANY SUCH ACTION OR PROCEEDING, BROUGHT BY EITHER OF THE PARTIES AGAINST THE OTHER ON ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES, ANY CLAIM OF INJURY OR DAMAGE, OR ANY EMERGENCY OR OTHER STATUTORY REMEDY WITH RESPECT THERETO.**

(r)     Landlord (and Landlord's affiliates) may, subject to the applicable limitations on distribution of confidential information set forth in this Lease or any other agreement between Landlord and Tenant, and Tenant does hereby authorize Landlord (and its affiliates) to, refer, in its sole discretion, to this Lease in tombstone advertisements, offering memoranda or in connection with securitizations and reports to investors, which references, may include use of photographs, drawings and other depictions, images of the Land and Improvements, a description of the Lease, use of Tenant's name, the address of the Premises and the logo of Tenant and its Affiliates. Tenant shall cause the owner of such "logo" rights to consent to such use.

(s)     Any and all attorney's fees and other expenses incurred by a successful party in the enforcement of this Lease, including any and all such fees and expenses incurred in connection with litigation, mediation, arbitration, other alternative dispute resolution processes, administrative proceedings and bankruptcy proceedings, and any and all appeals from any of the foregoing, will be paid by the non-prevailing party.

## 29.     TENANT'S PROPERTY AND LEASEHOLD INTEREST

(a)     None of Tenant's Property, shall become a part of the realty or of the Premises, and Tenant's Property may be removed from the Premises by Tenant at any time during the Term of this Lease, at the termination of the Term hereof or termination of Tenant's right of possession hereunder. Tenant shall repair any damage to the Premises caused by such removal. Landlord hereby subordinates any and all liens, claims, demands or rights, including rights of levy, execution, sale and distraint for unpaid rent, or any other right, interest or lien which Landlord has or may hereafter acquire, by statute or otherwise, in any of Tenant's Property ("**Landlord's Lien Rights**").

(b)     Notwithstanding the provisions of paragraph 25, Tenant may from time to time enter into equipment leases covering Tenant's Property or secure financing or general credit lines and grant the lessors or lenders as security therefore a security interest in Tenant's Property.

66

50524468_9_208972_00182

* 5 0 0 4 1 6 7 4 *

Landlord will subordinate its Landlord Lien Rights covering Tenant's Property to the lien of the lender's collateral assignment for so long as such collateral assignment shall remain in existence. Landlord will, within twenty (20) days of a request by Tenant, execute and deliver to Tenant any documents that may reasonably be required in order to effect Tenant's financing as contemplated by this provision. Tenant shall also have the right, with Landlord's consent (which consent shall not be unreasonably withheld or delayed) to assign, mortgage or otherwise encumber or pledge its leasehold interest under this Lease to any lender, and in connection therewith, without the consent of Landlord, any said lender of Tenant shall be considered an approved assignee under paragraph 25; provided, however, Landlord's reasonable consent will be required for any subsequent assignee from such lender.

### 30. PRIORITY OF GROUND LEASE

(a) With respect to each Site that is subject to a Ground Lease, this Lease is expressly subordinate to the respective Ground Lease as applicable to the respective Site, in all respects, but no action of Ground Landlord shall result in the cancellation or termination of this Lease or the obligation of Tenant under this Lease, except as specifically provided herein. Tenant agrees to attorn to the applicable Ground Landlord or to any other person succeeding to the interest of Landlord, as a result of any enforcement by such Ground Landlord of any remedy provided by law or in the Ground Lease upon the occurrence of an event of default by Landlord as tenant under such Ground Lease, and Tenant shall agree to recognize such Ground Landlord or such successor in interest as landlord under this Lease, without change in the amount of Rent or other provisions hereof, provided, however, such Ground Landlord or other successor in interest shall not be bound by any payment of Rent or other charges for more than two (2) months in advance or any amendment or modification to this Lease made without the written consent of such Ground Landlord or any successor in interest. Tenant shall, upon request by Ground Landlord or other successor in interest, execute and deliver an instrument or instruments confirming such agreements and attornment.

(b) In no event shall Landlord modify, amend or terminate any Ground Lease without the prior written consent of Tenant, which consent may be arbitrarily withheld in Tenant's sole discretion.

### 31. NON-COMPETE CLAUSE

During the Term of this Lease, neither Tenant (so long as such Person is a party to the Lease as tenant hereunder) nor any of Tenant's members or Affiliates shall, without the prior written consent of Landlord (which consent shall not be unreasonably withheld, conditioned or delayed), directly or indirectly, (i) finance or participate in any new sale/leaseback transaction with respect to any other movie theater within the Radius Area; (ii) participate in any way in any new build-to-suit transactions with respect to any other movie theater within the Radius Area; (iii) build any new movie theater or theaters within the Radius Area; or (iv) acquire any existing movie theater or theaters or an interest in any entity that owns any existing movie theaters within the Radius Area. Notwithstanding the foregoing restrictions, in the event of the sale of (i) substantially all the assets of Tenant to an unaffiliated third party; or (ii) more than fifty percent (50%) of the equity interest in Tenant or in Holding, to an unaffiliated third party; and pursuant to such sale this Lease is assigned in accordance with its terms to a bona-fide, unaffiliated third-

50524468_9_208972_00182

* 5 0 0 4 1 6 7 4 *

party that, at the time of the consummation of such sale, owns, operates, manages, leases or occupies a movie theater or theaters within the Radius Area, such ownership, operation, management, leasing arrangement or occupancy shall not be a violation of the restrictions described in this paragraph 31. Additionally, if Tenant acquires (through a corporate acquisition) a movie theater company or companies that own, operate, manage, lease or occupy a movie theater or theaters within the Radius Area, such ownership, operation, management, leasing arrangement or occupancy shall not be a violation of the restrictions described in this paragraph 31. For purposes of this paragraph 31, the term "**Radius Area**" shall mean an area within a ten (10) mile radius from any boundary line of a Site. Notwithstanding the provisions of this paragraph 31, Tenant shall be bound by, and covenants that it shall comply with, the terms and conditions of each Ground Lease, including the terms and conditions of Section 13.6 of the Parisian Ground Lease and Section 10.4.1 of the Oaks Ground Lease; provided, however, that in no event shall the period during which the non-competition restrictions of this paragraph 31 apply be less than the first three (3) years of the Term of this Lease.

## 32.    NOTICE CONCERNING RADON GAS

Florida law requires that the following notification concerning radon gas be provided to Tenant at the time or prior to Tenant's execution of this Lease: "Radon Gas: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit". By execution of this Lease, Tenant hereby acknowledges receipt of the foregoing notification. This notice is given pursuant to 404.056(8) Florida Statutes.

## 33.    ENERGY DISCLOSURE

Tenant may have the energy efficiency rating of the Improvements determined. A copy of the State of Florida brochure is attached hereto as **Exhibit E**.

## 34.    RIGHTS AGAINST CONTRACTORS AND MECHANICS

Nothing contained herein shall constitute a waiver or release by Landlord or by Tenant of any rights that Landlord or Tenant may have against any General Contractor (as such term is defined in the Construction Management Agreement), any other Contractor (as such term is defined in the Construction Management Agreement) or any Vendors (as such term is defined in the Construction Management Agreement) whether such rights arise by contract, tort, at law or in equity.

## 35.    FORMER TENANT PROPERTY RESERVE ACCOUNT

Pursuant to the Second Consolidated Lease and agreements related thereto, Landlord and Tenant acknowledge and agree that $▓▓▓▓▓ was deposited for uses related to the construction of the Oaks Site and of such amount, $▓▓▓▓▓ ("**Oaks Funds**") is now being held by Landlord and the balance has been applied to construction at the Oaks Site. Landlord agrees that so long as no Event of Default then exists, it will apply such Oaks Funds to the Improvements as set forth in the Construction Management Agreement.

S0524468_9_208972_00182

* 5 0 0 4 1 6 7 4 *

36. **NO CLAIMS**

Tenant hereby confirms that it has no claim of offset against, or default by, Landlord as of the date of this Lease and that the Lease is fully effective pursuant to its terms. Tenant hereby confirms that there is no default by Landlord under the Lease through and including the Consolidated Lease Commencement Date.

37. **CONSTRUCTION MANAGEMENT AGREEMENT REAFFIRMATION**

Tenant hereby ratifies and reaffirms all of its payment and performance obligations, contingent or otherwise, under the Construction Management Agreement to which it is a party. Tenant hereby consents to the terms and conditions of the Construction Management Agreement. Tenant acknowledges receipt of a copy of the Construction Management Agreement and acknowledges that the Construction Management Agreement remains in full force and effect, and is hereby ratified and confirmed. Tenant hereby waives all Landlord defaults and releases any and all claims against Landlord. This section shall not operate as a waiver of any right, power or remedy of the Landlord, nor constitute a novation of any of the obligations under the Construction Management Agreement.

*[SIGNATURE PAGE FOLLOWS]*

69

50524468_9_208972_00182



* 5 0 0 4 1 6 7 4 *

**IN WITNESS WHEREOF**, the parties have hereunto set their hands under seal on the day and year first above written.

**LANDLORD:**

**FLORIDA 2005 THEATERS LLC**, a
Delaware limited liability company, f/k/a
Muvico Realty, L.L.C.

**WITNESS:**

By: iSTAR FINANCIAL INC., a
Maryland corporation, its sole
member

Name: _____

Susan Uzzan

By: _____
Name    Samantha K. Garbus
Title:    Senior Vice President

Name: _____

Victoria Arrington

**TENANT:**

**MUVICO ENTERTAINMENT, L.L.C.**,
a Delaware limited liability company

**WITNESS:**

By: MUVICO THEATERS, INC., a
Florida corporation, its Manager

Name: _____

By: _____
Name _____

Name: _____

Title: _____

50524468_6_208972_00182

\* 5 0 0 4 1 6 7 4 \*

STATE OF NEW YORK

COUNTY OF *New York*

On this *12* day of March, 2009, before me, **DIANE BUGLEWICZ**,
Notary Public, personally appeared *Samantha K. Garbus* the
*Senior Vice President* of iSTAR FINANCIAL INC., a Maryland corporation, as
sole Member of FLORIDA 2005 THEATERS LLC, a Delaware limited liability company, who
proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same
in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument,
the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of ~~California~~ *New York* that
the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public

_____
Typed, printed or stamped name of Notary Public

My Commission Expires:

**DIANE BUGLEWICZ**
Notary Public, State of New York
No. 01BU6079163
Qualified in New York County
Commission Expires August 12, 2010

50524468_6_208972_00182

FILED DATE: 11/9/2020 6:08 PM   2020L012058



FILED DATE: 11/9/2020 6:08 PM    2020L012058

**IN WITNESS WHEREOF**, the parties have hereunto set their hands under seal on the day and year first above written.

<u>LANDLORD</u>:

**FLORIDA 2005 THEATERS LLC**, a Delaware limited liability company, f/k/a Muvico Realty, L.L.C.

WITNESS:

By: iSTAR FINANCIAL INC., a Maryland corporation, its sole member

Name: _____

By: _____
Name _____
Title: _____

Name: _____

<u>TENANT</u>:

**MUVICO ENTERTAINMENT, L.L.C.**, a Delaware limited liability company

WITNESS:

By: MUVICO THEATERS, INC., a Florida corporation, its Manager

Name: Mary Ann Mezni

By: _____
Name ~~Michael F. Whalen, Jr.~~
Title: ~~President & CEO~~

Name: David Glass

50524468_6_208972_00182

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM 2020L012058

STATE OF FLORIDA      )
                         ) SS:
COUNTY OF BROWARD    )

On this _18th_ day of March, 2009, before me, _Mary Ann Majni_,
Notary Public, personally appeared MICHAEL F. WHALEN, JR., the President of MUVICO
THEATERS, INC., a Florida corporation, as Manager of MUVICO ENTERTAINMENT,
L.L.C., a Delaware limited liability company, who proved to me on the basis of satisfactory
evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies),
and that by his/her/their signature(s) on the instrument, the person(s) or the entity upon behalf of
which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that
the foregoing paragraph is true and correct.

WITNESS my hand and official seal.



Notary Public

_____
Typed, printed or stamped name of Notary Public

My Commission Expires:

MARY ANN MAJNI
MY COMMISSION # DD 785505
EXPIRES: August 5, 2012
Bonded Thru Notary Public Underwriters

50524468_9_208972_00182



FILED DATE: 11/9/2020 6:08 PM    2020L012058

# EXHIBIT B



FILED DATE: 11/9/2020 6.08 PM   2020L012058

## FIRST AMENDMENT
## TO
## THIRD AMENDED, RESTATED AND CONSOLIDATED LEASE AGREEMENT

This **FIRST AMENDMENT TO THIRD AMENDED, RESTATED AND CONSOLIDATED LEASE AGREEMENT** ("**First Amendment**") is made and entered into effective as of the 20th day of November, 2013, by and between **FLORIDA 2005 THEATERS LLC**, a Delaware limited liability company, f/k/a MUVICO REALTY, L.L.C., a Delaware limited liability company, with offices c/o iStar Financial Inc., 1114 Avenue of the Americas, 38th Floor, New York, New York 10036 (together with any successor or assign, hereinafter collectively called "**Landlord**"), and **EASTWYNN THEATRES, INC.**, an Alabama corporation ("**Eastwynn**"), **CARMIKE CINEMAS, INC.**, a Delaware corporation ("**Carmike**"), and **GKC THEATERS, INC.**, a Delaware corporation ("**GKC**"), jointly and severally, each having an address c/o Carmike Cinemas, Inc., 1301 First Avenue, Columbus, Georgia 31901, Attention: Daniel E. Ellis (together with any successor or permitted assign, hereinafter collectively called "**Tenant**").

### RECITALS:

A. Landlord and Muvico Entertainment, L.L.C., a Delaware limited liability company ("**Muvico**"), entered into that certain Third Amended, Restated and Consolidated Lease Agreement dated as of March 19, 2009 (together with all amendments and supplements thereto, the "**Lease**"), pursuant to the terms and conditions of which Landlord agreed to lease to Tenant the Premises, as defined in the Lease, which is comprised of the Parisian Site, the BayWalk Site, the Rosemont Site and the Oaks Site (as such terms are defined in the Lease).

B. Pursuant to that certain Agreement for the Purchase and Sale of Assets dated as of November 4, 2013, by and among Eastwynn, Carmike, GKC, Muvico, Muvico Concessions, L.L.C., and Muvico Theaters, Inc., Muvico, Muvico Concessions, LLC, and Muvico Theaters, Inc., have agreed to sell substantially all of their respective assets to Tenant, and in connection therewith, Muvico has agreed to assign the Lease to Tenant and Tenant has agreed to assume all of Muvico's obligations under the Lease, all pursuant to and subject to the terms and conditions more fully set forth herein.

C. Additionally, Landlord and Tenant have agreed to make certain amendments and modifications to the Lease, all pursuant to and subject to the terms and conditions more fully set forth herein.

NOW, THEREFORE, in consideration of the recitals set forth above, the covenants and agreements contained herein, and other good and valuable consideration, the receipt, adequacy and total sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1. <u>Incorporation of Recitals/Terms</u>. The recitals to this First Amendment set forth above are hereby incorporated herein. All terms not otherwise defined herein shall have the meaning ascribed to them in the Lease.

* 5 0 0 4 1 6 7 4 *

2. <u>Amendments to Lease</u>. The Lease is hereby modified and amended as follows:

(a) <u>Modifications to Basic Lease Information</u>. The portion of the Lease referred to as "Basic Lease Information" at the beginning of the Lease and before the Lease title page and table of contents, is hereby modified, amended, and restated, as applicable, as set forth below:

(i) <u>Tenant</u>. The defined term "<u>Tenant</u>", on page i, is hereby amended and restated in its entirety to provide as follows:

> "<u>Tenant</u>: Eastwynn Theatres, Inc., an Alabama corporation ("**Eastwynn**"), Carmike Cinemas, Inc., a Delaware corporation ("**Carmike**"), and GKC Theaters, Inc., a Delaware corporation ("**GKC**"), jointly and severally, together with any successor or assign permitted by this Lease."

(ii) <u>Lease Modification Fee</u>. The paragraph labeled "<u>Lease Consideration</u>" on page i is hereby deleted in its entirety. Accordingly, there is no Lease Modification Fee applicable to the Lease.

(iii) <u>Fixed Rent</u>. Subparagraphs (b), (c) and (d) under the paragraph labeled "<u>Primary Term and any Extension Term Fixed Rent</u>" on pages ii and iii are hereby amended and restated in their entirety to provide as follows:

> "(b)(1) From the Consolidated Lease Commencement Date through the last day of the calendar month in which the First Amendment Effective Date occurs, shall be as set forth in the Third Amended, Restated and Consolidated Lease dated as of March 19, 2009, between Landlord and Muvico.

> (b)(2) From the first day of the calendar month immediately following the calendar month in which the First Amendment Effective Date occurs through the 119th full calendar month after the Consolidated Lease Commencement Date for each Lease Year: for the Rosemont Site, at the annual rate of ▮▮▮▮ for the Parisian Site, at the annual rate of $▮▮▮ and for the Oaks Site, at the annual rate of ▮▮▮ in each case, one twelfth (1/12th) of which shall be payable in advance on the first day of each calendar month in each Lease Year, or portion thereof, following such First Amendment Commencement Date.

> (b)(3) Commencing with the first day of the calendar month immediately following the calendar month in which the First Amendment Effective Date occurs and for the twelve calendar month period thereafter, the Fixed Rent for the BayWalk Site shall be at the annual rate of ▮▮▮ one-twelfth (1/2th)

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM 2020L012058

of which shall be payable in advance on the first day of each calendar month in such period following such First Amendment Commencement Date.

(b)(4) Commencing with the first day of the thirteenth calendar month immediately following the calendar month in which the First Amendment Effective Date occurs and every one (1) year thereafter (each, a "**BayWalk FR Adjustment Date**") through the earlier to occur of (i) the 239th full calendar month after the Consolidated Lease Commencement Date, and (ii) the date the Fixed Rent for the BayWalk Site on an annual basis equals or exceeds ▮▮▮▮▮▮ and, in all event subject to the additional provisions set forth in (b)(5) below, the Fixed Rent for the BayWalk Site shall be at an annual rate equal to the greatest of (i) the BayWalk Minimum FR Amount, (ii) the annual rate for the BayWalk Site for the twelve (12) calendar month period immediately preceding such BayWalk FR Adjustment Date, and (iii) the BayWalk Attendance Amount; in each case, one-twelfth (1/12th) of which shall be payable in advance on the first day of each calendar month commencing on each BayWalk FR Adjustment Date and each calendar month thereafter until the next BayWalk FR Adjustment Date. As used herein, (I) the term "**BayWalk Minimum FR Amount**" shall mean the amount set forth in the chart below.

| BayWalk FR Adjustment Date | BayWalk Minimum FR Amount |
|---|---|
| 1st and 2nd | |
| 3rd and all thereafter |  |

(II) the term "**Baywalk Attendance Amount**" shall mean the product of (a) the BayWalk Annual Attendance for the 12 calendar month period immediately preceding one calendar month prior to such BayWalk FR Adjustment Date, multiplied by (b) 1.525, further multiplied by (c) $1.00, and (III) the term "**BayWalk Annual Attendance**" means, for the 12 calendar month period immediately preceding one calendar month prior to the BayWalk FR Adjustment Date, the number of persons attending the BayWalk improvements. To the extent the BayWalk Annual Attendance is not determined as of a BayWalk FR Adjustment Date and such attendance causes an increase in the Fixed Rent for the BayWalk Site, such adjustment shall be made retroactive to the applicable BayWalk FR Adjustment Date following the determination of such BayWalk Annual Attendance.

3



* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

(b)(5) The computation of Fixed Rent for the BayWalk Site is subject to the following further adjustments: (I) in no event shall the Fixed Rent payable with respect to the BayWalk Site, on an annual basis commencing each BayWalk FR Adjustment Date through the 179th full calendar month after the Consolidated Lease Commencement Date, exceed $ �as███████████ and to the extent the foregoing formula results in Fixed Rent in excess of $ ███████████ during such period, such BayWalk Fixed Rent shall be deemed to be ██████████ and (II) commencing on the first day of the 180th full calendar month after the Consolidated Lease Commencement Date (the first day of such 180th full calendar month after the Consolidated Lease Commencement Date is herein called a "**BayWalk Special FR Adjustment Date**"), the Fixed Rent for the BayWalk Site shall be the annual rate equal to the product of (A) 1.15 multiplied by (B) the annual Fixed Rent for the BayWalk Site determined for the most recent occurring BayWalk FR Adjustment Date; in each case, one-twelfth (1/12th) of which shall be payable in advance on the first day of each calendar month commencing with each BayWalk Special FR Adjustment Date until the next BayWalk FR Adjustment Date, if then applicable.

(b)(6) For the BayWalk Site, to the extent applicable, during each of the Extension Terms for which the BayWalk Site is included in the Premises at such time (the first day of each Extension Term is herein called a "**BayWalk Extension FR Adjustment Date**"), the Fixed Rent for the BayWalk Site for such Extension Term shall be at the annual Fixed Rent equal to the product of (A) 1.15 multiplied by (B) the (i) most recent annual Fixed Rent for the BayWalk Site set pursuant to either subparagraph (b)(4) or (b)(5) above for the first Extension Term, and (ii) the annual Fixed Rent for the BayWalk Site for the twelve (12) calendar month period immediately preceding such BayWalk Extension FR Adjustment Date for the second and third Extension Terms.

(c)     Beginning with the 120th full calendar month after the Consolidated Lease Commencement Date through the 179th full calendar month after the Consolidated Lease Commencement Date for each of the Rosemont Site, Parisian Site and Oaks Site: at the annual rate for each such Site equal to the product of (A) 1.3 multiplied by (B) the annual Fixed Rent for such Site for the twelve (12) calendar month period immediately preceding such 121st full calendar month after the Consolidated Lease Commencement Date, in each case one twelfth (1/12th) of which shall be payable in advance on the first day of each calendar month, commencing with the 120th full calendar month after the

* 5 0 0 4 1 6 7 4 *

Consolidated Lease Commencement Date.

(d)    Beginning with the 180th full calendar month after the Consolidated Lease Commencement Date through the 239th full calendar month after the Consolidated Lease Commencement Date and, to the extent applicable, during each of the Extension Terms (the first day of such 180th full calendar month after the Consolidated Lease Commencement Date and the first day of each Extension Term is herein called a "**Fixed Rent Adjustment Date**") for each of the Rosemont Site, Parisian Site and Oaks Site which is included in the Premises at such time: at the annual Fixed Rent for each Site equal to the product of (A) 1.15 multiplied by (B) the annual Fixed Rent for such Site for the twelve (12) calendar month period immediately preceding such Fixed Rent Adjustment Date, in each case one twelfth (1/12th) of which shall be payable in advance on the first day of each calendar month, commencing with each Fixed Rent Adjustment Date."

(iv)    <u>Percentage Rent</u>.  The paragraph labeled "<u>Percentage Rent</u>" on pages iii through vi is hereby modified to include the following which shall be deemed inserted immediately after the grammatical paragraph on page iv commencing with "For the purpose of computing the Annual Percentage Rent ... " and which ends with ".... and the denominator of which is three hundred sixty-five (365)." and immediately before the paragraph which begins with "Within sixty (60) days following the end of each Lease Year.....":

"Notwithstanding the foregoing computations of Annual Percentage Rent but after computing the Annual Percentage Rent for each Site as set forth above in subparagraphs (a), (b), (c) and (d), including any offset for increases in Fixed Rent paid for each such Site as so described above, if such aggregate amount of Annual Percentage Rent payable pursuant to the foregoing does not at least equal █████████████ then the Annual Percentage Rent for all Sites for such Lease Year shall be deemed to be █████████████,"

(b)    <u>Modification to Lease</u>.  The Lease is hereby modified, amended and restated, as applicable, as set forth below:

(i)    Paragraph 1, <u>Definitions</u>, of the Lease is hereby amended to include the following definitions, each of which shall be deemed inserted in its correct alphabetical order with the existing definitions:

"**BayWalk Annual Attendance**" is defined and shall have the meaning specified in the Basic Lease Information.

"**BayWalk Attendance Amount**" is defined and shall have

5

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

the meaning specified in the Basic Lease Information.

"**BayWalk Extension FR Adjustment Date**" is defined and shall have the meaning specified in the Basic Lease Information.

"**BayWalk FR Adjustment Date**" is defined and shall have the meaning specified in the Basic Lease Information.

"**BayWalk Minimum FR Amount**" is defined and shall have the meaning specified in the Basic Lease Information.

"**BayWalk Special FR Adjustment Date**" is defined and shall have the meaning specified in the Basic Lease Information.

"**Carmike**" is defined and shall have the meaning specified in the Basic Lease Information.

"**Eastwynn**" is defined and shall have the meaning specified in the Basic Lease Information.

"**First Amendment Effective Date**" shall mean November 20, 2013.

"**GKC**" is defined and shall have the meaning specified in the Basic Lease Information.

(ii)   Modification of Certain Definitions.

(I)   The definition of "**Tenant**" contained in Paragraph 1, <u>Definitions</u>, of the Lease is hereby amended and restated in its entirety to provide as follows:

""**Tenant**" is defined in the first paragraph of this Lease on page i of the Basic Lease Information and includes each of Eastwynn, Carmike, and GKC, and all liabilities, obligations, covenants and agreements of Tenant under this Lease are and shall be the joint and several liabilities, obligations, covenants and agreements of each of Eastwynn, Carmike and GKC."

(iii)   The definition of "**Land**" contained in Paragraph 1, <u>Definitions</u>, of the Lease is hereby amended by deleting the last sentence thereof, which reads as follows:

"Upon completion of the Survey of the Oaks Site in accordance with the Oaks Ground Lease and the Construction Management Agreement, the legal description for the Oaks Site

6

* 5 0 0 4 1 6 7 4 *

shall be attached to this Lease as **Exhibit A-4**."

(iv)    <u>Deletion of Certain Definitions</u>.  Each of the following definitions provided in Paragraph 1, <u>Definitions</u>, of the Lease is hereby deleted in its entirety:

**"BayWalk Termination Date"**

**"Construction Management Agreement"**

**"Failed Ratio Site"**

**"Failed Ratio Site Termination Date"**

**"Lease Modification Fee"**

**"Tenant Work"**

(v)    <u>Construction Management Provisions</u>.  Subparagraphs (e) and (f) of Paragraph 2, <u>Demise of Premises</u>, of the Lease are hereby deleted in their entirety.

(vi)    <u>Net Lease; Non-Terminability</u>.  That portion of subparagraph (b) of Paragraph 7, <u>Net Lease; Non-Terminability</u>, of the Lease which reads as follows:  "(viii)  the failure of all or any portion of the improvements to be constructed on the Land pursuant to the applicable Construction Management Agreement; or (ix) any other cause" is hereby amended and restated in its entirety to read as follows:

"or (viii) any other cause"

(vii)    <u>Default: Events of Default</u>.    Subparagraphs (q) and (r) of Paragraph 15, <u>Default: Events of Default</u>, of the Lease are hereby amended and restated in their entirety to read as follows:

"(q)  Tenant acts or fails to act in any manner that shall limit Landlord's right to exercise the Ground Lease Extension Option in order to extend the term of the Parisian Ground Lease through the Lease Expiration Date."

(viii)    <u>Site Terminations</u>.  Paragraph 14, <u>Site Terminations</u>, of the Lease, including all subparagraphs therein, which includes Paragraph 14(a), 14(b) and 14(c), are hereby deleted and Paragraph 14 is hereby amended and restated in its entirety with the following:

"14.  [Intentionally deleted]"

7

FILED DATE: 11/9/2020 6:08 PM    2020L012058

\* 5 0 0 4 1 6 7 4 \*

FILED DATE: 11/9/2020 6:08 PM   2020L012058

(ix)    Notices.  Paragraph 19, Notices.  The addresses to which notices are required to be provided under Paragraph 19 of the Lease solely for addresses to Tenant are hereby amended and restated to read as follows:

To Tenant:    c/o Carmike Cinemas, Inc.
1301 First Avenue
Columbus, GA  31901
Attention:  Daniel E. Ellis, Senior Vice President,
General Counsel and Secretary
Telephone No.: (706) 576-3891
Facsimile No.:  (706) 576-3419

With a copy to:    King & Spalding, LLP
1180 Peachtree Street
Atlanta, GA  30309
Attention:  Alan J. Prince
Telephone No.: (404) 572-3595
Facsimile No.:  (404) 572-5133

(x)    Financial Data.    Paragraph 20, Estoppel Certificate; Financial Data, of the Lease is hereby amended by adding a new subparagraph (g) immediately after subparagraph 20(f) and immediately before Paragraph 21, which new subparagraph (g) provides as follows:

"(g)  Tenant shall provide to Landlord, not later than each BayWalk FR Adjustment Date, a statement certified by the Chief Financial Officer of Tenant (or analogous position) of the BayWalk Annual Attendance for the 12 calendar month period immediately preceding one calendar month prior to such BayWalk FR Adjustment Date, which statement shall be subject to review and verification by Landlord."

(xi)    Mechanics' Liens.  Paragraph 21, Mechanics' Liens, of the Lease is hereby amended by deleting the last sentence thereof which reads as follows:

"Notwithstanding    anything    contained    herein    to    the contrary, any lien arising out of Landlord's Work pursuant to the Construction Management Agreement shall not be deemed a lien created through the act of Landlord."

(xii)    Miscellaneous    Provisions.     Paragraph    28,    Miscellaneous Provisions, of the Lease is hereby amended by adding a new subparagraph (t) immediately after subparagraph 28(s) and immediately before Paragraph 29 as follows:

"(t)    Not only are the Tenant's obligations under this

8

* 5 0 0 4 1 6 7 4 *

Lease joint and several, wherever notice or delivery of a certificate is required to be made by Tenant or a specified officer or representative of Tenant, such notice or certificate shall be effective and binding upon each of Eastwynn, Carmike and GKC if executed by an officer or representative of any one of Eastwynn, Carmike and GKC; provided, however, upon Landlord's request, an officer or representative of each of Eastwynn, Carmike and GCK shall execute such notice or certificate. Furthermore, in each case where the Tenant under this Lease is required to perform any duties or obligations under this Lease, the performance or satisfaction of such duties and obligations by any Person which then comprises the Tenant under this Lease shall be deemed to satisfy such duties and obligations, regardless of whether each and every Person which comprises the Tenant performs the same."

(xiii) <u>Rights Against Contractors and Mechanics</u>. Paragraph 34, <u>Rights Against Contractors and Mechanics</u>, of the Lease is hereby deleted and amended and restated in its entirety as follows:

"34. [Intentionally deleted]"

(xiv) <u>Former Tenant Property Reserve Account</u>. Paragraph 35, <u>Former Tenant Property Reserve Account</u>, of the Lease is hereby deleted and amended and restated in its entirety as follows:

"35. [Intentionally deleted]"

(xv) <u>Construction Management Agreement Reaffirmation</u>. Paragraph 37, <u>Construction Management Agreement Reaffirmation</u>, of the Lease is hereby deleted and amended and restated in its entirety to read as follows:

"37. [Intentionally deleted]"

(xvi) <u>Exhibits</u>. <u>Exhibit G</u> and <u>Exhibit I</u> to the Lease are hereby deleted.

3. <u>Consent and Assumption</u>. Eastwynn, Carmike and GKC, jointly and severally, hereby assume and agree to be bound by all of the terms and provisions of the Lease, as amended by this First Amendment. Landlord hereby consents to the assignment and assumption of Muvico's interest as the Tenant under the Lease and to Eastwynn, Carmike and GKC, jointly and severally, becoming the Tenant under the Lease as amended by this First Amendment.

4. <u>Costs and Expenses</u>. Tenant shall be responsible for and shall pay all costs and expenses in connection with the preparation, negotiation, execution and delivery of this First Amendment, including the legal fees and expenses of Landlord. Tenant also shall be responsible for and shall pay all accrued and outstanding legal fees incurred by Landlord in connection with the Lease as of the date hereof.

* 5 0 0 4 1 6 7 4 *

5. <u>Confirmation</u>. Except as expressly modified by the terms and provisions of this First Amendment, all of the terms and provisions of the Lease are unchanged and to be continued in full force and effect and all rights, remedies, liabilities and obligations evidenced by the Lease are hereby acknowledged by Tenant to be valid and subsisting and to be continued in full force and effect. The Lease, as modified and amended hereby, is hereby ratified and confirmed by Landlord and Tenant, and every provision, covenant, condition, obligation, right, term and power contained in and under the Lease, as modified and amended hereby, shall continue in full force and effect. All references to the Lease in the Lease shall mean the Lease as modified and amended by this First Amendment. Tenant has no claim of offset against, or default by, Landlord as of the date of this First Amendment. Tenant hereby confirms that there is no default by Landlord under the Lease through and including the date of this First Amendment. Landlord hereby confirms, that to Landlord's knowledge, there is no default by Tenant under the Lease through and including the date of this First Amendment.

6. <u>No Other Modifications</u>. Landlord and Tenant hereby acknowledge and agree that the Lease has not been modified, amended, canceled, terminated, released, superseded or otherwise rendered of no force or effect except as described herein.

7. <u>Parties Bound</u>. This First Amendment shall be binding upon the parties hereto and their respective permitted successors and assigns.

8. <u>Counterparts</u>. This First Amendment may be executed in counterparts, each of which shall be an original but all of which together shall constitute one agreement, binding on all of the parties hereto notwithstanding that all of the parties hereto are not signatories to the same counterpart. For purposes of this First Amendment, each of the parties hereto agree that a facsimile copy of the signature of the person executing this First Amendment on either party's behalf shall be effective as an original signature and legally binding and effective as an execution counterpart hereof. Each of the undersigned parties authorizes the assembly of one or more original copies of this First Amendment through the combination of the several executed counterpart signature pages with one or more bodies of this First Amendment including the Exhibits, if any, to this First Amendment, such that this First Amendment shall consist of the body of this First Amendment, counterpart signature pages which collectively will contain the signatures of the undersigned parties hereto, and the Exhibits, if any, to this First Amendment. Each such compilation of this First Amendment shall constitute one original of this First Amendment.

9. <u>Signor's Warranty</u>. Each individual executing and delivering this First Amendment on behalf of the party hereby warrants and represents to the other party that he or she has been duly authorized and has the power to make such execution and delivery.

10. <u>Captions</u>. Article and Section headings used herein are for convenience of reference only and should not affect the construction of any provision of the Lease, as amended and modified hereby.

11. <u>Governing Law</u>. This First Amendment shall be governed by the laws of the State of Florida, without regard to its conflict of law or principles.

FILED DATE: 11/9/2020 6:08 PM    2020L012058



FILED DATE: 11/9/2020 6:08 PM 2020L012058

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment as of the date first above written.

**LANDLORD:**

**WITNESSED BY (2 witnesses required):**

Printed Name: Debby Melnick

Printed Name: Brigitte Miles

**FLORIDA 2005 THEATERS LLC**, a Delaware limited liability company, f/k/a Muvico Realty, L.L.C.

By:  SFI BELMONT LLC,
a Delaware limited liability company, its sole member

By: _____
Name: ___Julia Butler___
Title: ___Senior Vice President___

**TENANT:**

**WITNESSED BY (2 witnesses required):**

_____
Printed Name:_____

_____
Printed Name:_____

**EASTWYNN THEATRES, INC.,**
an Alabama corporation

By:  _____
Name:_____
Title:_____

**WITNESSED BY (2 witnesses required):**

_____
Printed Name:_____

_____
Printed Name:_____

**CARMIKE CINEMAS, INC.,**
a Delaware corporation

By:  _____
Name:_____
Title:_____

*[Signatures Continued on Next Page]*



* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM    2020L012058

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment as of the date first above written.

**LANDLORD:**

**WITNESSED BY (2 witnesses required):**

**FLORIDA 2005 THEATERS LLC**, a
Delaware limited liability company, f/k/a
Muvico Realty, L.L.C.

_____

Printed Name:_____

By: iSTAR FINANCIAL INC.,
    a Maryland corporation, its sole member

_____

Printed Name:_____

By: _____
Name:_____
Title: _____

**TENANT:**

**WITNESSED BY (2 witnesses required):**

**EASTWYNN THEATRES, INC.,**
an Alabama corporation

Printed Name:   Linda Day

By: Daniel E. Ellis
Name: Daniel E. Ellis
Title: Senior Vice President

Printed Name:   Jackie Harris

**WITNESSED BY (2 witnesses required):**

**CARMIKE CINEMAS, INC.,**
a Delaware corporation

Printed Name:   Linda Day

By: Daniel E. Ellis
Name: Daniel E. Ellis
Title: Senior Vice President

Printed Name:   Jackie Harris

*[Signatures Continued on Next Page]*

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

**WITNESSED BY (2 witnesses required):**

Printed Name:  Linda Day

Printed Name:  Jackie Harris

**GKC THEATERS, INC.,**
a Delaware corporation

By:  Daniel E. Ellis
Name:  Daniel E. Ellis
Title:  Senior Vice President



FILED DATE: 11/9/2020 6:08 PM 2020L012058

# EXHIBIT C



* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM 2020L012058

### SECOND AMENDMENT
### TO
### THIRD AMENDED, RESTATED AND CONSOLIDATED LEASE AGREEMENT

This **SECOND AMENDMENT TO THIRD AMENDED, RESTATED AND CONSOLIDATED LEASE AGREEMENT** ("**Second Amendment**") is made and entered into effective as of the 24th day of August, 2017 (the "**Second Amendment Effective Date**"), by and between **FLORIDA 2005 THEATERS LLC**, a Delaware limited liability company, f/k/a MUVICO REALTY, L.L.C., a Delaware limited liability company, with offices c/o iStar Inc., 1114 Avenue of the Americas, 38th Floor, New York, New York 10036 (together with any successor or assign, hereinafter collectively called "**Landlord**"), and **EASTWYNN THEATRES, INC.,** an Alabama corporation ("**Eastwynn**"), **CARMIKE CINEMAS, LLC,** a Delaware limited liability company, f/k/a CARMIKE CINEMAS, INC., a Delaware corporation ("**Carmike**"), and **GKC THEATRES, INC.,** a Delaware corporation ("**GKC**"), jointly and severally, each having an address c/o American Multi-Cinema, Inc., 11500 Ash Street, Leawood, Kansas 66211, Attention: Lease Administration (collectively with any successor or permitted assign, hereinafter collectively called "**Tenant**").

### RECITALS:

A.      Landlord and Tenant, as successor-in-interest to Muvico Entertainment, L.L.C., a Delaware limited liability company ("**Muvico**"), entered into that certain Third Amended, Restated and Consolidated Lease Agreement dated as of March 19, 2009 (the "**Original Lease**"), as amended by that certain First Amendment to Third Amended, Restated and Consolidated Lease Agreement dated as of November 20, 2013 ("**First Amendment**"; together with the Original Lease and all amendments and supplements thereto, the "**Lease**"), pursuant to the terms and conditions of which Landlord agreed to lease to Tenant the Premises, as defined in the Lease, which is comprised of the Parisian Site, the BayWalk Site, the Rosemont Site and the Oaks Site (as such terms are defined in the Lease).

B.      Tenant has requested that Landlord enter into that certain Real Estate Purchase and Sale Agreement (the "**Purchase Agreement**"), by and between Landlord and the Village of Rosemont, Illinois, an Illinois municipal corporation ("**Village**"), relating to the Rosemont Site pursuant to which Landlord shall sell to Village those certain portions of the Rosemont Site commonly referred to as Parcel A, Parcel B and Parcel C (as such terms are defined and more particularly described in the Purchase Agreement), and Tenant has requested that Village and Landlord grant each other certain reciprocal easements over the Rosemont Site, Parcel A, Parcel B and Parcel C, pursuant to that certain Grant of Reciprocal Access Easements (the "**Easement Agreement**"; collectively with all documents and instruments related thereto, the "**Transaction Documents**"), all pursuant and subject to the terms and conditions set forth in the Transaction Documents.

C.      Pursuant to paragraph 3(b) of the Lease, Tenant has requested and Landlord has agreed to enter into the Transaction Documents and in connection therewith, Tenant and Landlord have agreed to enter into this Second Amendment for purposes of, among other things, (i) clarifying the parties' obligations with respect to the Transaction Documents and (ii) making

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

certain amendments and modifications to the Lease, all pursuant to and subject to the terms and conditions more fully set forth herein.

NOW, THEREFORE, in consideration of the recitals set forth above, the covenants and agreements contained herein, and other good and valuable consideration, the receipt, adequacy and total sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.      Incorporation of Recitals/Terms. The recitals to this Second Amendment set forth above are hereby incorporated herein. All terms not otherwise defined herein shall have the meaning ascribed to them in the Lease.

2.      Consent to Transaction Documents. This Second Amendment shall constitute Tenant's written consent of the Transaction Documents. Tenant hereby authorizes Landlord to enter into the Transaction Documents and agrees to be bound by and subject to the benefits and burdens of the Transaction Documents.

3.      Amendments to Lease. The Lease is hereby modified and amended as follows:

(a)     Exhibit A-3. Exhibit A-3 of the Lease is hereby deleted in its entirety and replaced with the attached Exhibit A-3.

(b)     Exhibit C. The "Rosemont Site" portion of Exhibit C to the Lease is hereby amended and restated in its entirety to provide as follows:

"**Rosemont Site**

1.  General real estate taxes for the year(s) 2016 (Final Installment), 2017 and subsequent years.

2.  Terms, provisions and conditions contained in Lease by and between Florida 2005 Theaters LLC formerly known as Muvico Realty, L.L.C., Lessor, and Muvico Entertainment, L.L.C., Lessee, dated August 25, 2006 as disclosed by a Memorandum of Lease recorded November 21, 2006 as document 0632531065, as modified by a Memorandum of Third Consolidated Lease recorded March 20, 2009 as document 0907929039, and all rights thereunder of and all acts done and suffered thereunder of said lessee or any parties claiming by, through or under said lessee

3.  Grant of Utility Easement Agreement between Florida 2005 Theaters LLC and the Village of Rosemont, recorded December 01, 2006 as document 0633539037 and as shown on the plat recorded as document 0712215139, and the terms and provisions contained therein. (affects Parcel 4)

4.  Easement for public utilities and drainage recorded as document 17801132, and shown on the plat of Rosemont Entertainment District Subdivision recorded as document 0712215139, and the terms and provisions contained therein. (affects

2

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM    2020L012058

Parcel 4)

5.  Terms, conditions and provisions of Development and Use Agreement dated August 22, 2006, and recorded August 22, 2006 as document 0623410136 by and between Village of Rosemont, an Illinois home rule municipal corporation and Florida 2005 Theaters LLC, a Delaware limited liability company, acknowledged by Muvico Entertainment, L.L.C., a Delaware limited liability company.

6.  Parking Agreement dated as of August 22, 2006 and recorded August 22, 2006 as document 0623410134 by and between the Village of Rosemont, an Illinois home rule municipal corporation and Muvico Entertainment, L.L.C., a Delaware limited liability company, and the terms and provisions contained therein, as assigned by that certain Assignment of Parking Agreement dated August 22, 2006 and recorded August 22, 2006 as document 0623410137, as amended by that certain Amendment to Parking Agreement dated October 7, 2009, that certain Second Amendment to Parking Agreement dated October 10, 2012 and that certain Third Amendment to Parking Agreement by and between Florida 2005 Theaters LLC, a Delaware limited liability company, and the Village of Rosemont, Illinois, an Illinois municipal corporation, dated as of August 24, 2017, which has been submitted for recording in the real property records of Cook County, Illinois. [as modified based on execution and recording of Transaction Documents]

7.  Temporary Construction, Permanent Skybridge Walkway and Non-Exclusive Access Easement Agreement between the Village of Rosemont and Continental 191 Fund, L.L.C., recorded May 14, 2007 as document 0713415148, and the terms and provisions contained therein. (affects Parcel 2)

8.  Relinquishment of all rights or easements of access, crossing, light, air and view over adjoining land dedicated for road purposes as F.A.I. Route I 294.

9.  Terms, conditions and provisions of Grant of Easement recorded October 21, 2016 as document 1629545027 by and between Commonwealth Edison Company, an Illinois Corporation, and Florida 2005 Theaters LLC, a Delaware limited liability company.

10. Terms, conditions and provisions of Grant of Reciprocal Access Easements by and between Florida 2005 Theaters LLC, a Delaware limited liability company, and the Village of Rosemont, Illinois, an Illinois municipal corporation, dated as of August 24, 2017, which has been submitted for recording in the real property records of Cook County, Illinois. [as modified based on execution and recording of Transaction Documents]"

4.      The definition of "Permitted Exceptions" is hereby amended to include the Transaction Documents.

US_122427549v8_208972-00182

* 5 0 0 4 1 6 7 4 *

5. <u>Consent and Assumption</u>. Eastwynn, Carmike and GKC, jointly and severally, hereby assume and agree to be bound by all of the terms and provisions of the Lease, as amended and modified by this Second Amendment and the Transaction Documents.

6. <u>Costs and Expenses</u>. Tenant shall be responsible for and shall pay all costs and expenses in connection with the preparation, negotiation, execution and delivery of this Second Amendment and the Transaction Documents, including the legal fees and expenses of Landlord. Tenant also shall be responsible for and shall pay all accrued and outstanding legal fees incurred by Landlord in connection with the Lease as of the date hereof.

7. <u>Confirmation</u>. Except as expressly modified by the terms and provisions of this Second Amendment, all of the terms and provisions of the Lease are unchanged and to be continued in full force and effect and all rights, remedies, liabilities and obligations evidenced by the Lease are hereby acknowledged by Tenant to be valid and subsisting and to be continued in full force and effect. The Lease, as modified and amended hereby, is hereby ratified and confirmed by Landlord and Tenant, and every provision, covenant, condition, obligation, right, term and power contained in and under the Lease, as modified and amended hereby, shall continue in full force and effect. All references to the Lease in the Lease shall mean the Lease as modified and amended by this Second Amendment. Tenant has no claim of offset against, or default by, Landlord as of the date of this Second Amendment. Tenant hereby confirms that there is no default by Landlord under the Lease through and including the date of this Second Amendment. Landlord hereby confirms, that to Landlord's knowledge, there is no default by Tenant under the Lease through and including the date of this Second Amendment.

8. <u>No Other Modifications</u>. Landlord and Tenant hereby acknowledge and agree that the Lease has not been modified, amended, canceled, terminated, released, superseded or otherwise rendered of no force or effect except as described herein.

9. <u>Parties Bound</u>. This Second Amendment shall be binding upon the parties hereto and their respective permitted successors and assigns.

10. <u>Counterparts</u>. This Second Amendment may be executed in counterparts, each of which shall be an original but all of which together shall constitute one agreement, binding on all of the parties hereto notwithstanding that all of the parties hereto are not signatories to the same counterpart. For purposes of this Second Amendment, each of the parties hereto agree that a facsimile copy of the signature of the person executing this Second Amendment on either party's behalf shall be effective as an original signature and legally binding and effective as an execution counterpart hereof. Each of the undersigned parties authorizes the assembly of one or more original copies of this Second Amendment through the combination of the several executed counterpart signature pages with one or more bodies of this Second Amendment including the Exhibits, if any, to this Second Amendment, such that this Second Amendment shall consist of the body of this Second Amendment, counterpart signature pages which collectively will contain the signatures of the undersigned parties hereto, and the Exhibits, if any, to this Second Amendment. Each such compilation of this Second Amendment shall constitute one original of this Second Amendment.

FILED DATE: 11/9/2020 6:08 PM 2020L012058

4

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

11.     Signor's Warranty.  Each individual executing and delivering this Second Amendment on behalf of the party hereby warrants and represents to the other party that he or she has been duly authorized and has the power to make such execution and delivery.

12.     Captions.  Article and Section headings used herein are for convenience of reference only and should not affect the construction of any provision of the Lease, as amended and modified hereby.

13.     Governing Law.  This Second Amendment shall be governed by the laws of the State of Illinois, without regard to its conflict of law or principles.

US_122427549v8_208972-00182

* 5 0 0 4 1 6 7 4 *

IN WITNESS WHEREOF, the parties hereto have executed this Second Amendment as of the date first above written.

**LANDLORD:**

**WITNESSED BY (2 witnesses required):**

**FLORIDA 2005 THEATERS LLC**, a Delaware limited liability company, f/k/a Muvico Realty, L.L.C.

Printed Name: Jason Duckworth

By: iStar Inc., a Maryland corporation, its Sole Member

Printed Name: Christine M. Formica

By: _____

Name: Stephen Spencer

Title: Senior Vice President

*[Signatures Continued on Next Page]*

FILED DATE: 11/9/2020 6:08 PM    2020L012058

* 5 0 0 4 1 6 7 4 *

**WITNESSED BY (2 witnesses required):**

_____
Printed Name: Ronald Herman

_____
Printed Name: Jamie Davis

**TENANT:**

**EASTWYNN THEATRES, INC.,**
an Alabama corporation

By: _____
Name: Daniel E. Ellis
Title: Senior Vice President


**WITNESSED BY (2 witnesses required):**

_____
Printed Name: Ronald Herman

_____
Printed Name: Jamie Davis

**CARMIKE CINEMAS, INC.,**
a Delaware corporation

By: _____
Name: Daniel E. Ellis
Title: Senior Vice President


**WITNESSED BY (2 witnesses required):**

_____
Printed Name: Ronald Herman

_____
Printed Name: Jamie Davis

**GKC THEATRES, INC.,**
a Delaware corporation

By: _____
Name: Daniel E. Ellis
Title: Senior Vice President

FILED DATE: 11/9/2020 6:08 PM    2020L012058



* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

## Exhibit A-3

### Description of the Land

### Rosemont Theater,
### Rosemont, Illinois

PARCEL 1:

LOT 4 IN THE ROSEMONT ENTERTAINMENT DISTRICT SUBDIVISION, BEING A RESUBDIVISION OF LOT 1 THROUGH 20 (INCLUSIVE) AND THE ADJOINING MILTON PARKWAY IN REP SUBDIVISION AND ALSO PART OF LOT 2 IN FREDERICK JOSS DEVELOPMENT OF LAND, ALL IN THE NORTHEAST QUARTER OF SECTION 9, TOWNSHIP 40 NORTH, RANGE 12, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED MAY 2, 2007 AS DOCUMENT NO. 0712215139, IN THE VILLAGE OF ROSEMONT, COOK COUNTY, ILLINOIS. EXCEPTING THEREFROM THE FOLLOWING DESCRIBED PARCELS:

EXCEPTION PARCEL A:

THAT PART OF LOT 2 IN FREDERICK JOSS' DEVELOPMENT OF LAND IN SECTION 9, TOWNSHIP, 40 NORTH, RANGE 12, EAST OF THE THIRD PRINCIPAL MERIDIAN DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF LOT 1 IN REP SUBDIVISION, ACCORDING TO THE PLAT THEREOF RECORDED FEBRUARY 4, 1963, AS DOCUMENT 18712534; THENCE SOUTH 88 DEGREES 03 MINUTES 19 SECONDS WEST, A DISTANCE OF 125.72 FEET, ALONG THE NORTH LINE OF SAID LOT 1 IN REP SUBDIVISION TO THE POINT ON A CURVE; THENCE SOUTHERLY ALONG A CURVE, CONCAVE WESTERLY, HAVING A RADIUS OF 43.50 FEET, AN ARC DISTANCE OF 28.01 FEET AND CHORD BEARING SOUTH 32 DEGREES 32 MINUTES 06 SECONDS EAST; THENCE SOUTH 01 DEGREES 44 MINUTES 06 SECONDS EAST, A DISTANCE OF 255.25 FEET TO A POINT ON A CURVE; THENCE WESTERLY ALONG A CURVE, CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 14.50 FEET, AN ARC DISTANCE OF 15.07 FEET AND CHORD BEARING SOUTH 58 DEGREES 29 MINUTES 27 SECONDS WEST; THENCE SOUTH 88 DEGREES 15 MINUTES 54 SECONDS WEST, A DISTANCE OF 416.61 FEET; THENCE NORTH 01 DEGREES 44 MINUTES 06 SECONDS WEST, A DISTANCE OF 65.30 FEET, AT RIGHT ANGLES TO THE LAST DESCRIBED COURSE; THENCE SOUTH 88 DEGREES 15 MINUTES 54 SECONDS WEST, A DISTANCE OF 183.54 FEET, AT RIGHT ANGLES TO THE LAST DESCRIBED COURSE TO THE POINT OF BEGINNING; THENCE SOUTH 88 DEGREES 15 MINUTES 54 SECONDS WEST, A DISTANCE OF 24.96 FEET, CONTINUING ALONG THE LAST DESCRIBED COURSE; THENCE NORTH 14 DEGREES 11 MINUTES 20 SECONDS EAST,

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020.012058

A DISTANCE OF 261.77 FEET, TO THE NORTH LINE OF SAID LOT 2 IN FREDERICK JOSS' DEVELOPMENT OF LAND; THENCE NORTH 88 DEGREES 03 MINUTES 19 SECONDS EAST, A DISTANCE OF 19.07 FEET, ALONG THE NORTH LINE OF SAID LOT 2 IN FREDERICK JOSS' DEVELOPMENT OF LAND TO THE NORTHEAST CORNER OF SAID LOT 2 IN FREDERICK JOSS' DEVELOPMENT OF LAND; THENCE SOUTH 00 DEGREES 12 MINUTES 38 SECONDS WEST, A DISTANCE OF 50.04 FEET, ALONG THE EAST LINE OF SAID LOT 2 IN FREDERICK JOSS' DEVELOPMENT OF LAND; THENCE SOUTH 88 DEGREES 03 MINUTES 19 SECONDS WEST, A DISTANCE OF 6.67 FEET, ALONG A LINE 50 FEET SOUTH OF AND PARALLEL WITH THE NORTH LINE OF SAID LOT 2 IN FREDERICK JOSS' DEVELOPMENT OF LAND; THENCE SOUTH 14 DEGREES 11 MINUTES 20 SECONDS WEST, A DISTANCE OF 209.81 FEET, TO THE POINT OF BEGINNING, IN THE VILLAGE OF ROSEMONT, COOK COUNTY, ILLINOIS.

AND ALSO EXCEPTION PARCEL B:

THAT PART OF LOT 4 IN THE ROSEMONT ENTERTAINMENT DISTRICT SUBDIVISION, BEING A RESUBDIVISION OF LOT 1 THROUGH 20 (INCLUSIVE) AND THE ADJOINING MILTON PARKWAY IN REP SUBDIVISION AND ALSO PART OF LOT 2 IN FREDERICK JOSS DEVELOPMENT OF LAND, ALL IN THE NORTHEAST QUARTER OF SECTION 9, TOWNSHIP 40 NORTH, RANGE 12, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED MAY 2, 2007 AS DOCUMENT NO. 0712215139, DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHERLY MOST SOUTHWEST CORNER OF SAID LOT 4; THENCE NORTH 01 DEGREES 44 MINUTES 06 SECONDS WEST, A DISTANCE OF 59.61 FEET, ALONG A BOUNDARY LINE OF SAID LOT 4; THENCE NORTH 87 DEGREES 57 MINUTES 47 SECONDS EAST, A DISTANCE OF 44.29 FEET; THENCE SOUTH 01 DEGREES 36 MINUTES 22 EAST, A DISTANCE OF 4.42 FEET; THENCE SOUTH 47 DEGREES 17 MINUTES 14 SECONDS EAST, A DISTANCE OF 14.84 FEET TO A POINT ON A NON-TANGENT CURVE; THENCE SOUTHWESTERLY ALONG A CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 1943.00 FEET WITH AN ARC LENGTH OF 54.48 FEET AND A CHORD BEARING OF SOUTH 32 DEGREES 31 MINUTES 15 SECONDS WEST TO THE SOUTHERLY MOST LINE OF SAID LOT 4; THENCE SOUTH 88 DEGREES 15 MINUTES 54 SECONDS WEST, A DISTANCE OF 24.21 FEET ALONG SAID SOUTHERLY MOST LINE TO THE POINT OF BEGINNING, IN THE VILLAGE OF ROSEMONT, COOK COUNTY, ILLINOIS.

AND ALSO EXCEPTION PARCEL C:

THAT PART OF LOT 4 IN THE ROSEMONT ENTERTAINMENT DISTRICT SUBDIVISION, BEING A RESUBDIVISION OF LOT 1 THROUGH 20 (INCLUSIVE) AND THE ADJOINING MILTON PARKWAY IN REP SUBDIVISION AND ALSO PART OF LOT 2 IN FREDERICK JOSS DEVELOPMENT OF LAND, ALL IN THE NORTHEAST QUARTER OF SECTION 9, TOWNSHIP 40 NORTH, RANGE 12, EAST OF THE THIRD

* 5 0 0 4 1 6 7 4 *

PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED MAY 2, 2007 AS DOCUMENT NO. 0712215139, DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHERLY MOST SOUTHEAST CORNER OF SAID LOT 4; THENCE SOUTH 88 DEGREES 15 MINUTES 54 SECONDS WEST, A DISTANCE OF 170.94 FEET, ALONG THE SOUTH LINE OF SAID LOT 4; THENCE NORTH 33 DEGREES 02 MINUTES 06 SECONDS WEST, A DISTANCE OF 35.25 FEET TO A POINT OF CURVATURE; THENCE NORTHWESTERLY ALONG A CURVE, CONCAVE SOUTHWESTERLY, HAVING A RADIUS OF 59.00 FEET WITH AN ARC LENGTH OF 32.31 FEET AND A CHORD BEARING OF NORTH 48 DEGREES 43 MINUTES 17 SECONDS WEST; THENCE NORTH 01 DEGREES 44 MINUTES 06 SECONDS WEST, A DISTANCE OF 8.02 FEET; THENCE NORTH 88 DEGREES 15 MINUTES 54 SECONDS EAST, A DISTANCE OF 149.48 FEET; THENCE NORTH 01 DEGREES 44 MINUTES 06 SECONDS WEST, A DISTANCE OF 9.00 FEET; THENCE NORTH 88 DEGREES 15 MINUTES 54 SECONDS EAST, A DISTANCE OF 75.60 FEET TO THE EAST LINE OF SAID LOT 4; THENCE SOUTH 01 DEGREES 44 MINUTES 06 SECONDS EAST, A DISTANCE OF 61.75 FEET ALONG SAID EAST LINE TO A POINT ON A NON-TANGENT CURVE; THENCE SOUTHWESTERLY ALONG A CURVE, CONCAVE NORTHWESTERLY, HAVING A RADIUS OF 14.50 FEET WITH AN ARC LENGTH OF 15.07 FEET AND A CHORD BEARING OF SOUTH 58 DEGREES 29 MINUTES 27 SECONDS WEST ALONG A BOUNDARY LINE OF SAID LOT 4 TO THE POINT OF BEGINNING, IN THE VILLAGE OF ROSEMONT, COOK COUNTY, ILLINOIS.

PARCEL 2:

THAT PART OF LOTS 3, 4, 5, 6, 7 AND 8 ALL IN REP SUBDIVISION OF PART OF THE NORTHEAST QUARTER OF SECTION 9, TOWNSHIP 40 NORTH, RANGE 12, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED FEBRUARY 4, 1963, AS DOCUMENT 18712534, DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF LOT 1 IN SAID REP SUBDIVISION; THENCE SOUTH 00 DEGREES 12 MINUTES 38 SECONDS WEST, A DISTANCE OF 357.55 FEET, ALONG THE EAST LINE OF LOTS 1, 2 AND 3 IN SAID REP SUBDIVISION TO THE POINT OF BEGINNING; THENCE SOUTH 00 DEGREES 12 MINUTES 38 SECONDS WEST, A DISTANCE OF 546.98 FEET, ALONG THE EAST LINE OF LOTS 3, 4, 5, 6, 7, AND 8 IN SAID REP SUBDIVISION; THENCE SOUTH 88 DEGREES 15 MINUTES 54 SECONDS WEST, A DISTANCE OF 121.22 FEET, TO A POINT ON A CURVE; THENCE WESTERLY ALONG A CURVE, CONCAVE NORTHERLY, HAVING A RADIUS OF 60.00 FEET, AN ARC DISTANCE OF 46.07 FEET AND CHORD BEARING SOUTH 66 DEGREES 16 MINUTES 06 SECONDS WEST; THENCE SOUTH 88 DEGREES 15 MINUTES 54 SECONDS WEST, A DISTANCE OF 112.75 FEET, ALONG A LINE TANGENT TO THE LAST DESCRIBED COURSE; THENCE NORTH 00 DEGREES 22 MINUTES 31 SECONDS WEST, A DISTANCE OF 41.25 FEET; THENCE NORTH 89 DEGREES 37 MINUTES 29 SECONDS EAST, A DISTANCE OF 16.50 FEET, AT RIGHT

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM    2020L012058

ANGLES TO THE LAST DESCRIBED COURSE; THENCE NORTH 00 DEGREES 22 MINUTES 31 SECONDS WEST, A DISTANCE OF 498.30 FEET, AT RIGHT ANGLES TO THE LAST DESCRIBED COURSE; THENCE SOUTH 89 DEGREES 37 MINUTES 29 SECONDS WEST, A DISTANCE OF 28.00 FEET, AT RIGHT ANGLES TO THE LAST DESCRIBED COURSE; THENCE NORTH 00 DEGREES 22 MINUTES 31 SECONDS WEST, A DISTANCE OF 23.84 FEET, AT RIGHT ANGLES TO THE LAST DESCRIBED COURSE; THENCE NORTH 88 DEGREES 15 MINUTES 54 SECONDS EAST, A DISTANCE OF 292.35 FEET, TO THE POINT OF BEGINNING, IN THE VILLAGE OF ROSEMONT, COOK COUNTY, ILLINOIS.

ALSO KNOWN AS:

LOT 2 IN ROSEMONT ENTERTAINMENT DISTRICT SUBDIVISION, BEING A RESUBDIVISION OF LOTS 1 THROUGH 20 (INCLUSIVE) AND THE ADJOINING MILTON PARKWAY IN REP SUBDIVISION AND ALSO PART OF LOT 2 IN FREDERICK JOSS DEVELOPMENT OF LAND, ALL IN THE NORTHEAST QUARTER OF SECTION 9, TOWNSHIP 40 NORTH, RANGE 12, EAST OF THE THIRD PRINCIPAL MERIDIAN, ACCORDING TO THE PLAT THEREOF RECORDED MAY 2, 2007 AS DOCUMENT NO. 0712215139, IN COOK COUNTY, ILLINOIS.

PARCEL 3: Intentionally Omitted.

PARCEL 4:

NON-EXCLUSIVE ACCESS EASEMENTS FOR THE BENEFIT OF PARCEL 1 PURSUANT TO GRANT OF RECIPROCAL ACCESS EASEMENTS DATED AUGUST 24, 2017, AND RECORDED AUGUST 28, 2017, AS DOCUMENT 1724015011 BY AND BETWEEN VILLAGE OF ROSEMONT, AN ILLINOIS HOME RULE MUNICIPAL CORPORATION AND FLORIDA 2005 THEATERS LLC, A DELAWARE LIMITED LIABILITY COMPANY.



FILED DATE: 11/9/2020 6:08 PM 2020L012058

# EXHIBIT D

# THIRD AMENDMENT
## TO
### THIRD AMENDED, RESTATED AND CONSOLIDATED LEASE AGREEMENT

This **THIRD AMENDMENT TO THIRD AMENDED, RESTATED AND CONSOLIDATED LEASE AGREEMENT** ("**Third Amendment**") is made and entered into effective as of the 8th day of January, 2018 (the "**Third Amendment Effective Date**"), by and between **FLORIDA 2005 THEATERS LLC**, a Delaware limited liability company, f/k/a MUVICO REALTY, L.L.C., a Delaware limited liability company, with offices c/o iStar Inc., 1114 Avenue of the Americas, 38th Floor, New York, New York 10036 (together with any successor or assign, hereinafter collectively called "**Landlord**"), and **EASTWYNN THEATRES, LLC**, an Alabama limited liability company f/k/a EASTWYNN THEATRES, **INC.**, an Alabama corporation ("**Eastwynn**"), **CARMIKE CINEMAS, LLC**, a Delaware limited liability company, f/k/a CARMIKE CINEMAS, INC., a Delaware corporation ("**Carmike**"), and **GKC THEATRES, INC.**, a Delaware corporation ("**GKC**"), jointly and severally, each having an address c/o American Multi-Cinema, Inc., 11500 Ash Street, Leawood, Kansas 66211, Attention: Lease Administration (collectively with any successor or permitted assign, hereinafter collectively called "**Tenant**").

### RECITALS:

A.      Landlord and Tenant, as successor-in-interest to Muvico Entertainment, L.L.C., a Delaware limited liability company ("**Muvico**"), entered into that certain Third Amended, Restated and Consolidated Lease Agreement dated as of March 19, 2009 (the "**Original Lease**"), as amended by that certain First Amendment to Third Amended, Restated and Consolidated Lease Agreement dated as of November 20, 2013 ("**First Amendment**"), as amended by that certain Second Amendment to Third Amended, Restated and Consolidated Lease Agreement dated as of August 24, 2017 ("**Second Amendment**", collectively with the Original Lease, First Amendment and all amendments and supplements thereto, the "**Lease**"), pursuant to the terms and conditions of which Landlord agreed to lease to Tenant the Premises, as defined in the Lease, which is comprised of the Parisian Site, the BayWalk Site, the Rosemont Site and the Oaks Site (as such terms are defined in the Lease).

B.      Tenant has been acquired (the "**Acquisition Transaction**") by American Multi-Cinema, Inc., a Missouri corporation ("**Guarantor**"). Tenant has requested that Landlord acknowledge and approve of the Acquisition Transaction, which constitutes a Corporate Control Event under the Lease. In connection therewith, Tenant and Landlord have agreed to enter into this Third Amendment for purposes of, among other things, (i) approving the Acquisition Transaction and Corporate Control Event, (ii) making certain amendments and modifications to the Lease, and (iii) obtaining a Guaranty (the "**Guaranty**") in favor of Landlord from Guarantor, all pursuant to and subject to the terms and conditions more fully set forth herein.

NOW, THEREFORE, in consideration of the recitals set forth above, the covenants and agreements contained herein, and other good and valuable consideration, the receipt, adequacy and total sufficiency of which are hereby acknowledged, Landlord (subject to Guarantor's execution of the Guaranty contemporaneously herewith) and Tenant hereby agree as follows:

FILED DATE: 11/9/2020 6:08 PM    2020L012058

1.    Incorporation of Recitals/Terms. The recitals to this Third Amendment set forth above are hereby incorporated herein.  All terms not otherwise defined herein shall have the meaning ascribed to them in the Lease.

2.    Consent to Acquisition Transaction.  This Third Amendment shall constitute Landlord's written consent of the Acquisition Transaction.

3.    Amendments to Lease.  The Lease is hereby modified and amended as follows:

(a)    Defined Terms. The following defined terms set forth in Paragraph 1 of the Lease are hereby deleted in their entirety and replaced with the following:

(i)    "**Affiliates**" shall mean Persons (other than individuals) Controlled by, Controlling, or under Common Control with Tenant or Guarantor.

(ii)    "**Company**" shall mean Tenant and Guarantor and any subsidiaries of Tenant of either.

(iii)    "**Corporate Control Event**" shall mean any of the following: (i) a merger or consolidation of Tenant or Guarantor with another entity, (ii) the sale of all or substantially all the assets of Tenant or Guarantor to any party, (iii) any one Person acquiring fifty percent (50%) or more of publicly traded common stock, voting securities or economic benefits and burdens (including distributions) of Tenant or Guarantor within any twelve (12)-month period, (iv) a change of Tenant's or Guarantor's board of directors in any twelve (12)-month period, as a result of which change Persons controlling fifty percent (50%) or more of the total votes of Tenant's or Guarantor's board of directors (or its functional equivalent) prior to such change no longer control fifty percent (50%) or more of such votes, or (v) Tenant or Guarantor has sold, or has committed to sell, such assets that, cumulatively, such sale would reduce EBITDA, on a trailing twelve (12)-month and pro forma basis, by fifty percent (50%).

(iv)    "**Holdings**" shall mean Guarantor.

(b)    The defined term "Theaters" is hereby deleted from the definitions in Paragraph 1 of the Lease.

(c)    The following defined terms are hereby added to Paragraph 1 of the Lease in the applicable alphabetical order:

"**Guarantor**" means American Multi-Cinema, Inc., a Missouri corporation, together with any successor or assign permitted by this Lease.

"**Guaranty**" means that certain Guaranty dated as of January 8th, 2018, from Guarantor to Landlord, pursuant to which, among other things, Guarantor unconditionally guarantees the payment and performance of Tenant's obligation under the Lease, all upon the terms and subject to the conditions set forth therein, as such Guaranty is amended, modified or restated from time to time.

2

FILED DATE: 11/9/2020 6:08 PM    2020L012058

(d)    Subparagraph (q) of Paragraph 15 of the Lease is hereby amended by replacing the period at the end of such subparagraph with the following: "; or".

(e)    Paragraph 15 of the Lease is hereby amended to add the following new subparagraphs (r) and (s) immediately after subparagraph (q):

"(r)    Any one of Guarantor or Tenant or anyone claiming on behalf of either party asserts any claim that the Guaranty is not then in full force and effect; or

(s)    An "Event of Default" occurs and is continuing under the Guaranty, as defined therein."

4.    <u>Guaranty</u>. Tenant acknowledges and agrees that it was a condition precedent to Landlord entering into this Third Amendment that Landlord receive the Guaranty from Guarantor, which Guaranty is being entered into contemporaneously with the execution of this Third Amendment. Tenant hereby represents and warrants to Landlord as of the date hereof and covenants to Landlord that throughout the Term of this Lease, Guarantor shall be bound by the terms of the Guaranty to Landlord.

5.    <u>Consent and Assumption</u>. Eastwynn, Carmike and GKC, jointly and severally, hereby assume and agree to be bound by all of the terms and provisions of the Lease, as amended and modified by this Third Amendment and the Transaction Documents.

6.    <u>Costs and Expenses</u>. Tenant shall be responsible for and shall pay all costs and expenses in connection with the preparation, negotiation, execution and delivery of this Third Amendment and the Transaction Documents, including the legal fees and expenses of Landlord.

7.    <u>Confirmation</u>. Except as expressly modified by the terms and provisions of this Third Amendment, all of the terms and provisions of the Lease are unchanged and to be continued in full force and effect and all rights, remedies, liabilities and obligations evidenced by the Lease are hereby acknowledged by Tenant to be valid and subsisting and to be continued in full force and effect. The Lease, as modified and amended hereby, is hereby ratified and confirmed by Landlord and Tenant, and every provision, covenant, condition, obligation, right, term and power contained in and under the Lease, as modified and amended hereby, shall continue in full force and effect. All references to the Lease in the Lease shall mean the Lease as modified and amended by this Second Amendment. Tenant has no claim of offset against, or default by, Landlord as of the date of this Third Amendment. Tenant hereby confirms that there is no default by Landlord under the Lease through and including the date of this Third Amendment. Landlord hereby confirms, that to Landlord's knowledge, there is no default by Tenant under the Lease through and including the date of this Third Amendment.

8.    <u>No Other Modifications</u>. Landlord and Tenant hereby acknowledge and agree that the Lease has not been modified, amended, canceled, terminated, released, superseded or otherwise rendered of no force or effect except as described herein.

3

FILED DATE: 11/9/2020 6:08 PM    2020L012058

9.    Parties Bound.  This Third Amendment shall be binding upon the parties hereto and their respective permitted successors and assigns.

10.    Counterparts.  This Third Amendment may be executed in counterparts, each of which shall be an original but all of which together shall constitute one agreement, binding on all of the parties hereto notwithstanding that all of the parties hereto are not signatories to the same counterpart.  For purposes of this Third Amendment, each of the parties hereto agree that a facsimile copy of the signature of the person executing this Third Amendment on either party's behalf shall be effective as an original signature and legally binding and effective as an execution counterpart hereof.  Each of the undersigned parties authorizes the assembly of one or more original copies of this Third Amendment through the combination of the several executed counterpart signature pages with one or more bodies of this Third Amendment including the Exhibits, if any, to this Third Amendment, such that this Third Amendment shall consist of the body of this Third Amendment, counterpart signature pages which collectively will contain the signatures of the undersigned parties hereto, and the Exhibits, if any, to this Third Amendment. Each such compilation of this Third Amendment shall constitute one original of this Third Amendment.

11.    Signor's Warranty.   Each individual executing and delivering this Third Amendment on behalf of the party hereby warrants and represents to the other party that he or she has been duly authorized and has the power to make such execution and delivery.

12.    Captions.   Article and Section headings used herein are for convenience of reference only and should not affect the construction of any provision of the Lease, as amended and modified hereby.

13.    Governing Law.  This Third Amendment shall be governed by the laws of the State of Illinois, without regard to its conflict of law or principles.

4

IN WITNESS WHEREOF, the parties hereto have executed this Third Amendment as of the date first above written.

**LANDLORD:**

**WITNESSED BY (2 witnesses required):**

**FLORIDA 2005 THEATERS LLC**, a
Delaware limited liability company, f/k/a
Muvico Realty, L.L.C.

Printed Name: _KYLE R. REED_

By:    iStar Inc., a Maryland corporation,
its Sole Member

Printed Name: _Jason Duckworth_

By: _____
Name: Stephen M. Spence
Title: Senior Vice President

*[Signatures Continued on Next Page]*

FILED DATE: 11/9/2020 6:08 PM   2020L012058

FILED DATE: 11/9/2020 6:08 PM   2020L012058

**TENANT:**

**WITNESSED BY (2 witnesses required):**

_(signature)_

Printed Name: _Ronald Herman_

_(signature)_

Printed Name: _Jamie Davis_

**EASTWYNN THEATRES, LLC,**
an Alabama limited liability company f/k/a
EASTWYNN THEATRES, INC.

By: _(signature)_

Name: Daniel E. Ellis
Title: Senior Vice President

**WITNESSED BY (2 witnesses required):**

_(signature)_

Printed Name: _Ronald Herman_

_(signature)_

Printed Name: _Jamie Davis_

**CARMIKE CINEMAS, LLC,**
a Delaware limited liability company, f/k/a
Carmike Cinemas, Inc.

By: _(signature)_

Name: Daniel E. Ellis
Title: Senior Vice President

**WITNESSED BY (2 witnesses required):**

_(signature)_

Printed Name: _Ronald Herman_

_(signature)_

Printed Name: _Jamie Davis_

**GKC THEATRES, INC.,**
a Delaware corporation

By: _(signature)_

Name: Daniel E. Ellis
Title: Senior Vice President



* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

# EXHIBIT E



* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM    2020L012058

# FOURTH AMENDMENT
## TO
## THIRD AMENDED, RESTATED AND CONSOLIDATED LEASE AGREEMENT

This **FOURTH AMENDMENT TO THIRD AMENDED, RESTATED AND CONSOLIDATED LEASE AGREEMENT** ("**Fourth Amendment**") is made and entered into effective as of the 13th day of December, 2018 (the "**Fourth Amendment Effective Date**"), by and between **FLORIDA 2005 THEATERS LLC**, a Delaware limited liability company, f/k/a MUVICO REALTY, L.L.C., a Delaware limited liability company, with offices c/o iStar Inc., 1114 Avenue of the Americas, 38th Floor, New York, New York 10036 (together with any successor or assign, hereinafter collectively called "**Landlord**"), and **EASTWYNN THEATRES, LLC**, an Alabama limited liability company, f/k/a **EASTWYNN THEATRES, INC.**, an Alabama corporation ("**Eastwynn**"), **CARMIKE CINEMAS, LLC**, a Delaware limited liability company, f/k/a CARMIKE CINEMAS, INC., a Delaware corporation ("**Carmike**"), and **GKC THEATRES, INC.**, a Delaware corporation ("**GKC**"), jointly and severally, each having an address c/o American Multi-Cinema, Inc., 11500 Ash Street, Leawood, Kansas 66211, Attention: Lease Administration (collectively with any successor or permitted assign, hereinafter collectively called "**Tenant**").

## RECITALS:

A.      Landlord and Tenant, as successor-in-interest to Muvico Entertainment, L.L.C., a Delaware limited liability company ("**Muvico**"), entered into that certain Third Amended, Restated and Consolidated Lease Agreement dated as of March 19, 2009 (the "**Original Lease**"), as amended by that certain First Amendment to Third Amended, Restated and Consolidated Lease Agreement dated as of November 20, 2013 ("**First Amendment**"), as amended by that certain Second Amendment to Third Amended, Restated and Consolidated Lease Agreement dated as of August 24, 2017 ("**Second Amendment**"), as amended by that certain Third Amendment to Third Amended, Restated and Consolidated Lease Agreement dated as of January 8, 2018 ("**Third Amendment**", collectively with the Original Lease, First Amendment, Second Amendment and all amendments and supplements thereto, the "**Lease**"), pursuant to the terms and conditions of which Landlord agreed to lease to Tenant the Premises, as defined in the Lease, which is comprised of the Parisian Site, the BayWalk Site, the Rosemont Site and the Oaks Site (as such terms are defined in the Lease).

B.      Landlord and Tenant desire to further amend the Lease, all pursuant to and subject to the terms and conditions more fully set forth herein.

NOW, THEREFORE, in consideration of the Recitals set forth above, the covenants and agreements contained herein, and other good and valuable consideration, the receipt, adequacy and total sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.      Incorporation of Recitals/Terms. The Recitals to this Fourth Amendment set forth above are hereby incorporated herein. All terms not otherwise defined herein shall have the meaning ascribed to them in the Lease.



* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

2. <u>Amendments to Lease</u>. The Lease is hereby modified and amended as follows:

(a) <u>Modifications to Basic Lease Information</u>. The portion of the Lease referred to as "Basic Lease Information" at the beginning of the Lease and before the Lease title page and table of contents, is hereby modified, amended, and restated, for those portions as applicable, as set forth below:

(i) <u>Lease Expiration Date</u>. The defined term "Lease Expiration Date" on page i of the Original Lease, is hereby amended and restated in its entirety to provide as follows:

"Lease Expiration Date: February 28, 2029, which is the last day of the 239th full calendar month following the Consolidated Lease Commencement Date, as extended pursuant to Subparagraph 4(a) of the Lease to be the last day of the 180th full calendar month following the Contribution Adjustment Date."

(ii) <u>Fixed Rent</u>. Subparagraphs (b), (c) and (d) under the paragraph labeled "Primary Term and any Extension Term Fixed Rent" (on pages 2 through 5 of the First Amendment) are hereby amended and restated in their entirety to provide as follows:

"(b)(1) From the Consolidated Lease Commencement Date through the last day of the calendar month in which the Fourth Amendment Effective Date occurs, shall be as set forth in the Original Lease, as modified by the First Amendment, Second Amendment and Third Amendment.

(b)(2) From the first (1st) day of the calendar month immediately following the calendar month in which the Fourth Amendment Effective Date occurs until February 28, 2019: for the Rosemont Site, at the annual rate of $1,912,010; for the Parisian Site, at the annual rate of $800,000; for the BayWalk Site, at the annual rate of $924,000; for the Oaks Site, at the annual rate of $1,500,000; in each case, one twelfth (1/12th) of which shall be payable in advance on the first (1st) day of each calendar month following such Fourth Amendment Effective Date until February 28, 2019.

(b)(3) Commencing on March 1, 2019, and for each calendar month thereafter until the Contribution Adjustment Date: for the Rosemont Site, at the annual rate of $2,485,613; for the Parisian Site, at the annual rate of $1,040,000; for the BayWalk Site, at the annual rate of $924,000; and for the Oaks Site, at the annual rate of $1,950,000; in each case, one-twelfth (1/12th) of which shall be payable in advance on the first (1st) day of each calendar month commencing on March 1, 2019, and each calendar

2

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

month thereafter until and excluding the Contribution Adjustment Date.

(b)(4)  Commencing on the Contribution Adjustment Date and for each calendar month thereafter through the 59th full calendar month after the Contribution Adjustment Date, the Fixed Rent for the Premises shall increase by an amount equal to ten percent (10%) of the Landlord Contribution, which increase in Fixed Rent for the Premises shall be allocated to each Site based on the percentage by which the Total Cost for the Renovations as attributable to each Site (including the Renovations FF&E for each Site) bears to the Total Cost for the Renovation for all Sites (including the Renovations FF&E for each Site)[1]; in each case, one-twelfth ($1/12^{th}$) of which shall be payable in advance on the first (1st) day of each calendar month commencing on the Contribution Adjustment Date and each calendar month thereafter through the 59th full calendar month after the Contribution Adjustment Date.

(b)(5)  Beginning with the first (1st) day of the 60th full calendar month after the Contribution Adjustment Date, and every 60 full calendar months thereafter, including, to the extent applicable, each Extension Term (each, an "**Adjustment Date**") through the Primary Term and, to the extent applicable, each Extension Term, the annual Fixed Rent (except Percentage Replacement Fixed Rent) for each Site shall be increased to be the product of (A) one hundred and ten percent (110%) multiplied by (B) the annual Fixed Rent for such Site for the twelve (12) month period immediately preceding the Adjustment Date; one-twelfth ($1/12^{th}$) of which shall be payable in advance on the first (1st) day of each calendar month, commencing with each Adjustment Date."

(iii)  <u>Percentage Rent</u>.  The portion of the "Basic Lease Information" labeled "<u>Percentage Rent</u>" (on pages iii through vi of the Original Lease) is hereby modified, amended, and restated, as applicable, as set forth below:

A.  The paragraph inserted into the Lease pursuant to Section 2(a)(iv) of the First Amendment is hereby deleted in its entirety.

B.  The phrase "During each Lease Year of the Term, the

---

[1] For example, if the Landlord Contribution is $12,500,000, Fixed Rent for the Premises would increase by ($12,500,000 x 10%) = $1,250,000. Then if the cost of the Renovations for the Parisian Site is $8,500,000 and the Total Cost for all Renovations is $27,500,000, the Parisian Site share would be 30.9% ($8,500,000/$27,500,000) in which case Fixed Rent for the Parisian Site shall increase by $386,250 ($1,250,000 x 30.9%). The remainder of the increase in Fixed Rent for the Premises would be similarly allocated to the remaining Sites.

3

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

Annual Percentage Rent:" on page iii of the Original Lease is hereby amended and restated in its entirety to provide as follows:

> "During each Lease Year of the Term through and including the Lease Year immediately preceding the Lease Year in which the Contribution Adjustment Date occurs, the Annual Percentage Rent shall be computed as follows:"

C.     A new paragraph is hereby added which shall be deemed inserted immediately after the grammatical paragraph on page iv of the Original Lease commencing with "(d) with respect to the Oaks Site,...." and which ends with "...for the Oaks Site is in excess of $1,500,000, if at all." and immediately before the paragraph which begins with "For the purposes of computing the Annual Percentage Rent for any Lease Year......" and ends with "....the denominator of which is three hundred sixty-five (365)." which new paragraph reads as follows:

> "During each Lease Year of the Term from (and including) and after the Lease Year in which the Contribution Adjustment Date occurs, the Annual Percentage Rent shall be an amount equal to eight percent (8%) of Tenant's Gross Receipts for such Lease Year in excess of a breakpoint of Fifty-Five Million and No/100ths Dollars ($55,000,000.00) ("**Breakpoint Amount**") in the aggregate for the entire Premises."

D.     A new paragraph is hereby added which shall be deemed inserted immediately after the grammatical paragraph on page iv of the Original Lease commencing with "For the purpose of computing the Annual Percentage Rent..." and which ends with "....and the denominator of which is three hundred sixty-five (365)." and immediately before the paragraph which begins with "Within sixty (60) days following the end of each Lease Year...." which new paragraph reads as follows:

> "In addition to Tenant's obligations to pay Fixed Rent and Annual Percentage Rent, Tenant shall pay an additional rent as set forth below for each Site (collectively, the "**Percentage Replacement Fixed Rent**"). The Percentage Replacement Fixed Rent (i) shall remain fixed at the below annual amounts throughout the Term, including any and all Extension Terms, and (ii) so long as each such Site, or a portion thereof, remains a part of the Premises, one-twelfth (1/12th) of such annual amount for each such Site shall be payable in advance on the first (1st) day of each calendar month following the Fourth Amendment Commencement Date:

4

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

- Parisian Site:      $81,254.91
- BayWalk Site:    $72,191.87
- Oaks Site:          $152,352.96
- Rosemont Site:   $194,200.26"

E.      The definition of "Gross Receipts" set forth on pages v and vi of the Original Lease is hereby amended and restated in its entirety to read as follows:

The term "Gross Receipts" as used in this Lease shall mean all cash, credit card and other receipts received by Tenant in, from or related to the Premises or the use of the Premises (including from the sale of all goods, wares, merchandise, food, beverage, including bar and restaurant revenue, which revenue shall include revenue from sales of alcoholic beverages, and services at the Premises) during each Lease Year; PROVIDED, HOWEVER, there shall be deducted from such receipts in the computation of Gross Receipts to the extent the same are included in Tenant's computations:

(i)      Credits or refunds made to customers in the ordinary course of Tenant's business.

(ii)     All federal, state, county and city sales taxes or other similar taxes collected from customers, and all occupational taxes, use taxes and other taxes which must be paid by Tenant or collected by Tenant, by whatever name they are known or assessed, and regardless of whether or not they are imposed under any existing or future orders, regulations, laws or ordinances.

(iii)    Agency commissions paid to independent third parties for selling tickets, surcharges in excess of the standard ticket price for tickets purchased by use of credit cards and surcharges and fees paid to any Person, including the Company (but, for the Company, only to the extent such surcharges and fees paid to the Company are at market rates which would have been paid to unrelated third parties for such items), in excess of the standard ticket price for tickets purchased online.

(iv)    Receipts from the sale of student and senior citizens discount cards permitting discounts on tickets or other items constituting Gross Receipts.

(v)     Proceeds from the sale of Tenant's Property.

(vi)    Internet or other e-commerce advertising or other internet or e-commerce revenues (except that vouchers or other evidence of purchase of tickets, concessions, merchandise and/or any other services and/or property purchased over the internet or through any other e-commerce format, including Tenant's Stubs program, shall be included in Gross Receipts upon their redemption at the Premises less any service fees charged

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM    2020L012058

thereon).

(vii)     Proceeds from advertising revenue derived from the Premises under Tenant's existing agreement with Screenvision Exhibition, Inc., or any similar agreement which is regional, national or international in scope and under which revenue is not earned at the individual theatre level, whether now or hereafter entered into by Tenant (collectively, the "**Screenvision Type Agreements**"), and proceeds from other advertising revenue derived from the Premises, except proceeds from such other advertising revenue specifically earned at the Premises and actually retained by Tenant pursuant to non-Screenvision Type Agreements shall be included in Gross Receipts.

(b)     <u>Modifications to Lease</u>.  The Lease is hereby modified, amended and restated, as applicable, as set forth below:

(i)     Paragraph 1, Definitions, of the Lease is hereby amended to delete the defined term "Radius Area".

(ii)     Paragraph 1, Definitions, of the Lease is hereby amended to include the following definitions, each of which shall be deemed inserted in its correct alphabetical order with the existing definitions:

"**Adjustment Date**" is defined and shall have the meaning specified in the Basic Lease Information.

"**Auditorium Termination Date**" is defined in <u>subparagraph 14(b)</u> of this Lease.

"**Breakpoint Amount**" is defined and shall have the meaning specified in the Basic Lease Information.

"**Contribution Adjustment Date**" shall mean the first (1st) day of the first full calendar month occurring after Landlord's payment of the Landlord Contribution but in no event later than February 1, 2020.

"**Estimated Amount**" is defined in <u>subparagraph 31(a)</u> of this Lease.

"**First Amendment**" shall mean that certain First Amendment to Third Amended, Restated and Consolidated Lease Agreement dated as of November 20, 2013 by and between Landlord and Tenant.

"**First Amendment Effective Date**" shall mean November 20, 2013.

6

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

."**Fourth Amendment**" shall mean that certain Fourth Amendment to Third Amended, Restated and Consolidated Lease Agreement dated as of December 13, 2018 by and between Landlord and Tenant.

"**Fourth Amendment Effective Date**" shall mean December 13, 2018.

"**Ground Lease Extension Option**" shall mean Landlord's option(s) to extend the term of the Parisian Ground Lease and the Oaks Ground Lease in accordance with the respective terms of each.

"**Landlord Contribution**" shall mean the lesser of (i) fifty percent (50%) of the Total Cost or (ii) $12,500,000.00; provided, however, in no event shall more than $9,000,000.00 of the Landlord Contribution be used to reimburse Tenant for furniture, fixtures and equipment.

"**Landlord Delays**" shall mean any delay in the performance of the Renovations due to acts or omissions of Landlord, or Landlord's agents, employees or contractors, which are not cured by Landlord within ten (10) Business Days of Landlord's receipt of written notice from Tenant claiming such Landlord Delay; provided that Tenant shall submit a written notice to Landlord alleging such Landlord Delay within ten (10) Business Days of the occurrence of the events underlying such alleged Landlord Delay or such claim shall be deemed waived by Tenant.

"**Non-Renovated Auditorium**" is defined in subparagraph 14(b) of this Lease.

"**Percentage Replacement Fixed Rent**" is defined and shall have the meaning specified in the Basic Lease Information and shall be deemed referenced and included in the use of Fixed Rent as set forth in the definition of Fixed Rent.

"**Renovations**" shall mean all work Tenant deems necessary to renovate the improvements of the Premises, which shall include that certain work described on Exhibit J hereto, and the Renovations FF&E described on Exhibit K, all of which shall be further detailed and agreed to in the Renovations Final Plans which are approved by Landlord pursuant to Paragraph 31 of the Lease, with such cosmetic changes therein as may be made by Tenant so long as such changes do not reduce the cost of such Renovations set forth in the Renovations Final Plans by more than $300,000 in the aggregate without Landlord's prior written consent.

"**Renovations Closeout Items**" shall mean (i) unconditional lien waivers from Tenant's general contractor and all subcontractors with contracts exceeding Fifty Thousand and no/100ths Dollars ($50,000), (ii) an original certificate of substantial completion signed by Tenant and Tenant's general contractor and architect, (iii) an affidavit from Tenant's

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

general contractor certifying that (a) the Renovations have been substantially completed in accordance with the Renovations Final Plans and (b) all subcontractors, laborers and material suppliers in connection with the Renovations have been paid in full, (iv) evidence satisfactory to Landlord that the Renovations are lien free and completed in accordance with all applicable Legal Requirements, and (v) a written certification by Tenant representing and warranting the Total Cost of the Renovations, including an allocation of Landlord's Contribution among the Total Cost of Renovations showing no more than $9,000,000.00 of Landlord's Contribution being used to reimburse Tenant for furniture, fixtures and equipment, supported by evidence acceptable to Landlord (which may include the other requirements of Renovations Closeout Items).

"**Renovations General Contractor List**" shall mean that certain list of general contractors set forth on Exhibit L hereto, which general contractors have been prequalified and approved by Tenant and Landlord to complete the Renovations.

"**Renovations FF&E**" shall mean those certain items described on Exhibit K hereto; provided, however, notwithstanding any reference on Exhibit K to flooring, all flooring shall be deemed a part of the Premises and be Landlord's property upon termination of the Lease for each Site.

"**Renovations Final Plans**" shall mean the final as-built plans and specifications for the Renovations as set forth in the contracts for the construction and installation of the Renovations approved pursuant to Paragraph 31 of the Lease.

"**Rosemont Termination Date**" is defined in subparagraph 14(a) of this Lease.

"**Second Amendment**" shall mean that certain Second Amendment to Third Amended, Restated and Consolidated Lease Agreement dated as of August 24, 2017 by and between Landlord and Tenant.

"**Second Amendment Effective Date**" shall mean August 24, 2017.

"**Third Amendment**" shall mean that certain Third Amendment to Third Amended, Restated and Consolidated Lease Agreement dated as of January 8, 2018 by and between Landlord and Tenant.

"**Third Amendment Effective Date**" shall mean January 8, 2018.

"**Total Cost**" shall mean, with regard to the Renovations, the sum of (i) all amounts paid under construction contracts (either fixed price or actual amount spent under a guaranteed maximum price contract, as

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

applicable), (ii) the actual cost of applicable architects and related design fees, (iii) soft costs such as license fees, permit fees and third-party inspection fees, and (iv) the actual cost of Renovations FF&E (which are not otherwise included in construction contracts in clause (i) above).

(iii)　In Paragraph 1, <u>Definitions</u> of the Lease, the defined term below is amended and restated to read as set forth below:

"**Fixed Rent**" is defined and shall have the meaning specified in the Basic Lease Information and all references to "Fixed Rent" in the Lease, specifically <u>excluding</u> the Basic Lease Information portion of the Lease, shall, from and after the Fourth Amendment Effective Date, be deemed to reference and include both Fixed Rent and Percentage Replacement Fixed Rent.

(iv)　<u>Term</u>.
(a)　Subparagraph 4(a) of the Lease is hereby deleted in its entirety and replaced with the following:

"(a)　The primary term of this Lease (the "**Primary Term**"), subject to the terms and conditions of this Lease, for each Site commenced as set forth in the Basic Lease Information and for all Sites remaining after the Consolidated Lease Commencement Date continuing for a period of approximately twenty (20) years, provided, however, upon Landlord's payment of the Landlord Contribution, the Primary Term of the Lease shall be deemed to be extended until the last day of the one hundred and eightieth (180th) full calendar month following the Contribution Adjustment Date (and the Lease Expiration Date shall be deemed to be amended and restated to be such date)."

(b)　Subparagraph 4(b) of the Lease is hereby deleted in its entirety and replaced with the following:

"(b)　Notwithstanding the foregoing, Tenant acknowledges that (i) the "Initial Term" (as such term is defined in the Parisian Ground Lease) and at least the first, second, third and fourth Ground Lease Extension Terms <u>of the Parisian Ground Lease</u> shall expire during the Primary Term hereof, and (ii) the "Initial Term" (as such term is defined in the Oaks Ground Lease) and at least the first Ground Lease Extension Term <u>of the Oaks Ground Lease</u> shall expire during the Primary Term hereof, and Landlord shall have no liability for such disparity between the lengths of such terms.  Tenant covenants that it shall not act or fail to act in any manner that shall limit Landlord's right to exercise its Ground Lease Extension Option to extend the term of the Parisian Ground Lease and the Oaks Ground Lease through the Lease Expiration Date.  Landlord shall exercise all Ground Lease Extension Options necessary to extend the term of <u>the Parisian Ground Lease</u> and <u>the Oaks Ground Lease</u> through the

9

* 5 0 0 4 1 6 7 4 *

Lease Expiration Date, provided, however, that Landlord shall have no liability for any Ground Landlord's failure to honor any Ground Lease Extension Option on account of any act or omission of Tenant in violation of the Parisian Ground Lease, including Section 3.7 of the Parisian Ground Lease, or the Oaks Ground Lease, including Section 4.2 of the Oaks Ground Lease. In the event Landlord fails to act in accordance with the requirements of this subparagraph 4(b) in any way and fails to cure such failure within twenty (20) days following written notice thereof from Tenant, Tenant may act in Landlord's stead for the limited purpose of carrying out the intent and terms of this subparagraph 4(b), and in furtherance thereof, Landlord appoints Tenant as Landlord's attorney-in-fact (coupled with an interest and for the sole purpose of extending the term of the Parisian Ground Lease and the Oaks Ground Lease through the Lease Expiration Date); provided, however, nothing contained herein shall permit Tenant to create or incur any other obligations on Landlord's behalf."

(v)     Security Deposit.  Sub-subparagraph 5(d)(iv) of the Lease is hereby modified, amended, and restated, as applicable, as set forth below:

(a)     The portion of the first sentence in sub-subparagraph 5(d)(iv) of the Lease which reads "From time to time as set forth herein, when Tenant's EBITDAR Ratio for the Premises" is hereby amended and restated to read as follows:

"From time to time prior to the Contribution Adjustment Date, when Tenant's EBITDAR Ratio for the Premises"

(b)     Sub-subparagraph 5(d)(iv) of the Lease is hereby amended to include after the last sentence therein, the following:

"Notwithstanding the foregoing, the requirements of maintaining the Security Deposit shall be permanently waived by Landlord upon the earlier to occur of (a) (1) completion of the Renovations and (2) when Tenant's EBITDAR Ratio for the Premises equals or exceeds 1.0 for two consecutive Quarterly Lease Year Periods; or (b) twenty-four (24) months after completion of the Renovations."

(vi)     Rosemont Early Termination Option and Auditorium Termination Options. Paragraph 14 of the Lease, which currently reads "14. [Intentionally deleted]" is hereby amended and restated in its entirety to read as follows:

"14.     **SITE TERMINATIONS AND PARTIAL TERMINATIONS**.

* 5 0 0 4 1 6 7 4 *

(a)     Tenant and Landlord agree that Tenant shall have a one time option to remove the Rosemont Site from the Lease as of February 28, 2029 (the "**Rosemont Termination Date**"), exercisable by providing Landlord with no less than nine (9) months' advance written notice, in which event all of the following shall occur: (A) Tenant shall continue to pay Fixed Rent, Annual Percentage Rent, Percentage Replacement Fixed Rent, and Additional Rent in accordance with this Lease for the Rosemont Site through the Rosemont Termination Date without abatement or reduction of any such amount, (B) Tenant shall vacate the Rosemont Site by 11:59 p.m. local time on the Rosemont Termination Date and as otherwise required by Paragraph 22, except that Tenant shall leave at the Rosemont Site all of Tenant's Property applicable to such Rosemont Site (specifically excluding any leased equipment, projectors and Tenant's proprietary equipment (equipment in which Tenant has a proprietary right to said equipment), signage and specifically including all flooring and seating), free and clear of all liens and encumbrances (other than those in favor of Landlord), and, at Landlord's option, Tenant shall deliver a bill of sale or other conveyance document acceptable to Landlord and Tenant sufficient to convey title in such Tenant's Property applicable to the Rosemont Site to Landlord, (C) this Lease shall no longer apply to the Rosemont Site after the Rosemont Termination Date except for liabilities which accrued prior thereto related to the Rosemont Site (excluding Tenant's obligations under subparagraph 5(d), if any), (D) this Lease shall remain in full force and effect for the remaining Sites except that the Fixed Rent, Annual Percentage Rent, Percentage Replacement Fixed Rent, and Additional Rent payable for the Rosemont Site shall no longer be owed for the period after the Rosemont Termination Date, (E) Landlord shall not be required to pay Tenant any amount for the termination of this Lease with respect to the Rosemont Site or the conveyance of such Tenant's Property applicable to the Rosemont Site to Landlord, (F) effective as of the Rosemont Termination Date, the Breakpoint Amount shall be deemed reduced by Nineteen Million and no/100ths Dollars ($19,000,000.00) for the remaining Premises, and (G) Landlord and Tenant shall execute an amendment to this Lease confirming the foregoing, which amendment shall be prepared by or on behalf of Landlord and be reasonably acceptable to Tenant.

(b)     Tenant and Landlord agree that Tenant shall not make the Renovations to certain auditoriums at the BayWalk Site, Parisian Site, and the Rosemont Site which are shown with an "x" marked through such auditoriums on Exhibit M hereto (each a "**Non-Renovated Auditorium**"), which Exhibit M also shows the remaining seat count at the remaining auditoriums to be renovated. Tenant shall discontinue the use of all of the Non-Renovated Auditoriums no later than the date of completion of the Renovations at such Site. Tenant shall continue to pay all obligations related to such Non-Renovated Auditoriums under the Lease, including

11

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM    2020L012058

Fixed Rent, Annual Percentage Rent, Percentage Replacement Fixed Rent, and Additional Rent in accordance with this Lease for the complete Rosemont Site, Parisian Site, and BayWalk Site, as applicable. Notwithstanding anything to the contrary contained herein, if after Tenant has completed the Renovations, Tenant determines that it would be in Tenant's best interest to operate any or all of the Non-Renovated Auditoriums, Tenant shall have the right, provided that Landlord has not given Tenant a termination notice as described below, to renovate and open the Non-Renovated Auditoriums.

(c)     Tenant and Landlord further agree that Landlord shall have an ongoing option to remove any of the Non-Renovated Auditoriums from the Lease, at one time or from time to time for each Non-Renovated Auditorium exercisable by providing Tenant written notice (each a **"Landlord's Option Notice"**). Prior to the Auditorium Terminate Date (as defined below), Tenant shall continue to pay Fixed Rent, Annual Percentage Rent, Percentage Replacement Fixed Rent, and Additional Rent in accordance with this Lease for the complete Rosemont Site, Parisian Site or BayWalk Site, as applicable, through the applicable Auditorium Termination Date without abatement or reduction of any such amount.

(i)     Within thirty (30) days of Tenant's receipt of Landlord's Option Notice, Tenant and Landlord shall negotiate in good faith to enter into a takeback agreement acceptable to Landlord and Tenant, which shall detail the manner, timing, and allocation of costs and responsibilities associated with the separation of such Non-Renovated Auditoriums, and shall otherwise contain the following:

(I)     the date on which such Non-Renovated Auditoriums shall be vacated (each an **"Auditorium Termination Date"**);

(II)     certain obligations of Landlord, which Landlord may elect to satisfy, prior to the Auditorium Termination Date, in Landlord's sole discretion at Landlord's sole cost and expense, as applicable, that may include the following:

(1)     the full and complete separation of the applicable Non-Renovated Auditoriums from the remaining Rosemont Site, Parisian Site or BayWalk Site, as applicable, including construction of separate access points, separation of utilities, construction of walls, creation of separate legal descriptions, whether by plat or otherwise, creation of separate tax parcels, and creation of separate units within any owner's association, planned development or related organization, as applicable, all in a form approved in advance and in writing by Tenant and Landlord;

12

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

(2)     a use agreement between Landlord and Tenant that shall govern Landlord's use of the Non-Renovated Auditoriums and Tenant's use of the remaining Rosemont Site, Parisian Site or BayWalk Site, to the extent required by the separation contemplated by this Paragraph; and

(III)     an obligation that Tenant shall reasonably cooperate with Landlord in achieving the foregoing conditions, including providing such other actions, documents or instruments as Landlord may reasonably request, at Landlord's cost and expense, to accomplish the separation of such Non-Renovated Auditoriums as contemplated by this Paragraph.

(ii)     Upon the Auditorium Termination Date, all of the following shall occur:

(I)     Tenant shall vacate the applicable Non-Renovated Auditoriums by 11:59 p.m. local time on such Auditorium Termination Date and as otherwise required by Paragraph 22 of the Lease;

(II)     this Lease shall no longer apply to such Non-Renovated Auditorium(s) at the Rosemont Site or the BayWalk Site, as applicable, after such Auditorium Termination Date except for liabilities which accrued prior thereto related to such Non-Renovated Auditoriums (excluding Tenant's obligations under subparagraph 5(d), if any);

(III)     this Lease shall remain in full force and effect for the remaining Sites and the remaining portion of the Rosemont Site, Parisian Site or BayWalk Site, as applicable, except that the Fixed Rent, Annual Percentage Rent, Percentage Replacement Fixed Rent, and Additional Rent payable on a pro rata basis for such Non-Renovated Auditoriums shall no longer be owed for the period after such Auditorium Termination Date;

(IV)     Landlord shall not be required to pay Tenant any amount for the termination of this Lease with respect to those Non-Renovated Auditoriums; and

(V)     Landlord and Tenant shall execute an amendment to this Lease confirming the foregoing, which amendment shall be prepared by or on behalf of Landlord and be reasonably acceptable to Tenant."

(vii)     Non-Complete Clause. Paragraph 31 of the Lease is hereby deleted in its entirety and Paragraph 31 of the Lease is hereby amended and restated in its entirety as follows:

31.     Renovations.

13

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

(b)     Subject to extension pursuant to subparagraph 28(k) of the Lease and due to Landlord Delays, Tenant shall cause the Renovations to be made to the improvements of the Premises, which shall be completed on or before December 31, 2019.     The Renovations, specifically excluding the Renovations FF&E but specifically including all flooring, shall be deemed part of and included within the Premises upon completion thereof.     The Renovations FF&E (excluding any flooring) shall become part of Tenant's Property and included on and made a part of Exhibit B-2. Notwithstanding anything to the contrary contained herein, in the event the Lease is terminated as a result of Tenant being in default of the Lease, Tenant shall not remove the seating and the seating shall become a part of the Premises and become Landlord's property.  The estimated cost of the Renovations, including hard costs, soft costs and FF&E costs is approximately [**$27,500,000**] ("**Estimated Amount**"), with the breakdown on a Site by Site basis as follows:

- Parisian Site:     $8,500,000  (renovate 12 of 20 auditoriums)
- BayWalk Site:     $5,700,000  (renovate 12 of 20 auditoriums)
- Oaks Site:     $6,700,000  (renovate 14 of 14 auditoriums)
- Rosemont Site:     $6,600,000  (renovate 12 of 18 auditoriums)

(c)     In addition to the other terms and conditions of this Paragraph 31, all Renovations shall be as an alteration requiring Landlord's consent pursuant to Paragraph 23; provided, however, solely with respect to the Renovations, Paragraph 23 is deemed modified as follows:

(i)     If Landlord fails to respond to Tenant's submitted complete plans and specifications for such Renovations within thirty (30) calendar days as required by sub-subparagraph 23(c)(ii), such submitted complete plans and specifications for such Renovations shall be deemed approved by Landlord.

(ii)     Tenant agrees to engage only one or more of the general contractors on the Renovation General Contractor List to perform the Renovations.

(iii)     Within one hundred twenty (120) days after the Fourth Amendment Effective Date, Tenant shall prepare and

14



* 5 0 0 4 1 6 7 4 *

submit to the applicable governing authorities and Landlord for approval, Tenant's plans and specifications for Tenant's Renovations, which approval by Landlord shall not be unreasonably withheld, delayed or conditioned, and the Renovations shall be diligently pursued thereafter.

(iv) If Tenant is unable to obtain all governmental approvals, permits, and third-party consents (e.g., ground lessors, easement owners) necessary to perform the Renovations in accordance with Tenant's plans and specifications therefor within 270 days after the date of this Fourth Amendment, then Tenant and Landlord shall work together in good faith to modify Tenant's plans and specifications for Tenant's Renovations for the Site(s) where Tenant is unable to obtain such approvals, permits, and third-party consents in a manner acceptable to both Landlord and Tenant to obtain such approvals, permits and third-party consents; provided, however, if such efforts remain unsuccessful for 360 days after the date of this Fourth Amendment, then Tenant shall not be required to make the Renovations at such Site to the extent such approvals, plans, and third-party consents prohibit such Renovations.

(d) Upon completion of the Renovations, Landlord shall pay to Tenant the Landlord Contribution in accordance with this paragraph. The Landlord Contribution for such Renovations shall be due and payable in a lump sum payment within thirty (30) days of Landlord's receipt of the following: (a) confirmation of final completion of the Renovations, and (b) the Renovations Closeout Items. If Landlord fails to pay Tenant all or any portion of the Landlord Contribution when due Tenant, then, in addition to Tenant's other rights and remedies under the Lease and notwithstanding anything to the contrary contained in the Lease upon thirty (30) days' prior written notice of Tenant's intent to offset Fixed Rent and to the extent Landlord does not subsequently pay Landlord's Contribution, Tenant may withhold payment of 100% of the Fixed Rent payable under the Lease, as herein amended, until Tenant has recouped the amount of the Landlord Contribution, and such amounts shall bear interest at the Overdue Rate from the due date until received by Tenant.

3. <u>Repairs and Maintenance</u>. The fifth grammatical sentence in paragraph 9(a) of the Lease is hereby amended and restated to read as follows: "Tenant shall pay the cost up to $5,000 per Site of one (1) such inspection at each Site by or on behalf of Landlord once in every five (5) years commencing on the Fourth Amendment Effective Date; provided however, if such inspection by Landlord reveals that the Premises, or any portion thereof, including any equipment thereon, is not in the condition required by this Lease, then Tenant shall pay for such

* 5 0 0 4 1 6 7 4 *

additional inspection performed by Landlord through the inspection approving the condition of the such Premises as being in conformity with this Lease".

4.     Exhibits.  The Lease is hereby amended to add Exhibits J, K, L and M to this Fourth Amendment as Exhibits J, K, L and M to the Lease.

5.     Costs and Expenses.  The parties shall be responsible for their own costs and expenses in connection with the preparation, negotiation, execution and delivery of this Fourth Amendment.

6.     Confirmation.  Except as expressly modified by the terms and provisions of this Fourth Amendment, all of the terms and provisions of the Lease are unchanged and to be continued in full force and effect and all rights, remedies, liabilities and obligations evidenced by the Lease are hereby acknowledged by Tenant to be valid and subsisting and to be continued in full force and effect.  The Lease, as modified and amended hereby, is hereby ratified and confirmed by Landlord and Tenant, and every provision, covenant, condition, obligation, right, term and power contained in and under the Lease, as modified and amended hereby, shall continue in full force and effect.  All references to the Lease in the Lease shall mean the Lease as modified and amended by this Fourth Amendment.  Tenant has no claim of offset against, or default by, Landlord as of the date of this Fourth Amendment.  Tenant hereby confirms that there is no default by Landlord under the Lease through and including the date of this Fourth Amendment.  Landlord hereby confirms, that to Landlord's knowledge, there is no default by Tenant under the Lease through and including the date of this Fourth Amendment.

7.     No Other Modifications.  Landlord and Tenant hereby acknowledge and agree that the Lease has not been modified, amended, canceled, terminated, released, superseded or otherwise rendered of no force or effect except as described herein.

8.     Parties Bound.  This Fourth Amendment shall be binding upon the parties hereto and their respective permitted successors and assigns.

9.     Counterparts.  This Fourth Amendment may be executed in counterparts, each of which shall be an original but all of which together shall constitute one agreement, binding on all of the parties hereto notwithstanding that all of the parties hereto are not signatories to the same counterpart.  For purposes of this Fourth Amendment, each of the parties hereto agree that a facsimile copy of the signature of the person executing this Fourth Amendment on either party's behalf shall be effective as an original signature and legally binding and effective as an execution counterpart hereof.  Each of the undersigned parties authorizes the assembly of one or more original copies of this Fourth Amendment through the combination of the several executed counterpart signature pages with one or more bodies of this Fourth Amendment including the Exhibits, if any, to this Fourth Amendment, such that this Fourth Amendment shall consist of the body of this Fourth Amendment, counterpart signature pages which collectively will contain the signatures of the undersigned parties hereto, and the Exhibits, if any, to this Fourth Amendment. Each such compilation of this Fourth Amendment shall constitute one original of this Fourth Amendment.

FILED DATE: 11/9/2020 6:08 PM    2020L012058

* 5 0 0 4 1 6 7 4 *

10.     Signor's Warranty.   Each individual executing and delivering this Fourth Amendment on behalf of the party hereby warrants and represents to the other party that he or she has been duly authorized and has the power to make such execution and delivery.

11.     Captions.  Article and Section headings used herein are for convenience of reference only and should not affect the construction of any provision of the Lease, as amended and modified hereby.

12.     Governing Law.  This Fourth Amendment shall be governed by the laws of the State of Illinois, without regard to its conflict of law or principles.

13.     Amendment to Memorandum of Lease.  Within thirty (30) days of the Fourth Amendment Effective Date, Tenant shall cause to be recorded a memorandum of lease amendment prepared by Landlord, duly executed and acknowledge by Tenant and Landlord and in proper form for recording.

*[Remainder Left Blank Intentionally]*



* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM    2020L012058

IN WITNESS WHEREOF, the parties hereto have executed this Fourth Amendment as of the date first above written.

**LANDLORD:**

**WITNESSED BY (2 witnesses required):**

**FLORIDA 2005 THEATERS LLC**, a
Delaware limited liability company, f/k/a
Muvico Realty, L.L.C.

Printed Name: Kimberly Tewksbury

By:    iStar Inc., a Maryland corporation,
its Sole Member

Printed Name: Grayson Jacobs

By: Mathew Ballinger
Name: Mathew Ballinger
Title: SVP

*[Signatures Continued on Next Page]*



* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

**TENANT:**

**WITNESSED BY (2 witnesses required):**

_____
Printed Name:  Ronald Herman

_____
Printed Name:  Jamie Davis

**EASTWYNN THEATRES, LLC,**
an Alabama limited liability company, f/k/a
EASTWYNN THEATRES, INC.

By: _____
Name: Daniel E. Ellis
Title: Senior Vice President


**WITNESSED BY (2 witnesses required):**

_____
Printed Name:  Ronald Herman

_____
Printed Name:  Jamie Davis

**CARMIKE CINEMAS, LLC,**
a Delaware limited liability company, f/k/a
Carmike Cinemas, Inc.

By: _____
Name: Daniel E. Ellis
Title: Senior Vice President


**WITNESSED BY (2 witnesses required):**

_____
Printed Name:  Ronald Herman

_____
Printed Name:  Jamie Davis

**GKC THEATRES, INC.,**
a Delaware corporation

By: _____
Name: Daniel E. Ellis
Title: Senior Vice President

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

## <u>CONSENT AND ACKNOWLEDGMENT OF GUARANTOR</u>

AMERICAN MULTI-CINEMA, INC., a Missouri corporation, the Guarantor under that certain Guaranty, dated January 8, 2018, in favor of Landlord, hereby consents to the foregoing Fourth Amendment and acknowledges and agrees that the Lease and the Guaranty, as modified by the Fourth Amendment, shall each remain in full force and effect.

In connection with the Fourth Amendment and the execution thereof by Tenant, Guarantor represents, warrants and covenants as follows:

1.      All of Tenant's obligations under the Lease (as modified by the Fourth Amendment) remain the subject of the Guaranty, which Guaranty is hereby ratified and confirmed.

2.      The Guaranty shall continue in full force and effect and Guarantor, as of the date hereof, has no claims, defenses, offsets or counterclaims to or against enforcement of the Guaranty.

3.      Any breach of, or failure to perform or comply with, any of the Guarantor covenants set forth in the Lease (as modified by the Fourth Amendment) shall constitute a breach or default under the Guaranty in accordance with the terms of the Guaranty, entitling Landlord to exercise any and all of its rights and remedies thereunder, and all such rights and remedies are hereby expressly reserved.

AMERICAN MULTI-CINEMA, INC., a Missouri corporation

By: _____

Name: Daniel E. Ellis

Its: Senior Vice President



Case: 1:20-cv-07503 Document #: 1 Filed: 12/18/20 Page 160 of 184 PageID #:160

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM 2020L012058

**List of Exhibits**

| | |
|---|---|
| Exhibit J | Scope and Budget of Work |
| Exhibit K | Renovations FF&E |
| Exhibit L | Approved General Contractors |
| Exhibit M | Non-Renovated Auditoriums |

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

## EXHIBIT J

### SCOPE AND BUDGET OF WORK

- **Renovated Auditorium Count (50 auditoriums across 4 theatres):**
  - Parisian Site (Cityplace):      Renovate 12 of 20 auditoriums
  - Baywalk Site (Sundial):        Renovate 12 of 20 auditoriums
  - Oaks Site (Thousand Oaks):   Renovate 14 of 14 auditoriums
  - Rosemont Site (Rosemont):    Renovate 12 of 18 auditoriums

- **Auditorium Renovations:** All auditoriums except IMAX auditoriums to be reseated with powered luxury recliners on a minimum of 77" deep platforms. Seat type in IMAX auditoriums is subject to IMAX approval and may or may not be a powered recliner. Screens will be enlarged where feasible. Acoustical panel upgrade at sidewalls, auditorium walls will be repainted, and reserved seating will be introduced in all auditoriums.

- **PLF Auditoriums:** New DOLBY auditoriums will be added at Cityplace, Rosemont, and Thousand Oaks. Existing IMAX auditoriums at City Place and Sundial will be reseated with new seats, aisle lighting and carpet, and reserved seating will be introduced in all PLF auditoriums.

- **Concessions:** Upgrade food service equipment at the 'Dine-In' Operations.

- **MacGuffins' Bars:** Subject to liquor license availability each of the four theatres will have a MacGuffins' bar accessible from the main theatre lobby. These may be new construction or a remodel of an existing bar, and some locations may include closure of upper level existing bars which AMC has found to be operationally inefficient.

- **Lobby & Hallways:** Due to extensive theming in all existing locations, de-theming is not contemplated to be part of the scope. New carpet and touch-up paint where necessary will be included in the SOW to refresh existing spaces.

- **Restrooms:** Repairs & Maintenance scope will be included in public restrooms. Number of plumbing fixtures as required by code will be maintained but closure of some public restrooms consistent with reduction in overall seat count at each theatre may be considered as part of the renovation.

- **Exterior Rebranding:** All buildings are currently in the process or have already been rebranded as AMC on the building exteriors. "IMAX" and/or "Dolby" exterior signs may be added.

- **D-Box Seating:** Pending the conclusion of discussions with D-Box vendor existing D-Box seating will be removed from all four theatres. AMC is currently reviewing replacement D-Box seating on recliners, but this is still in testing staging and AMC is not able to commit to re-installing this product at any of these theatres at this time. If AMC

elects not to reinstall D-Box seats the current D-Box auditoriums will receive the same power recliners as the other auditoriums.

- **ADA Compliance:** All guest facing areas of the theatres will be brought up to compliance with ADA if/where deficiencies currently exist.

Any change involving either an increase or decrease in the above scope of work for the Renovations shall be included in Tenant's renovations plans being submitted to Landlord and must be approved by Landlord as required by <u>Paragraph 31</u> of the Lease.

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

| | 1000 Oaks 14 | Rosemont 18/12 | City Place 20/12 | Sundial 20/12 |
|---|---|---|---|---|
| Current Screen Count | 14 | 18 | 20 | 20 |
| Screens to be Renovated | 14 | 12 | 12 | 12 |
| **Necessary/Core Scope** | **W/DI DTS** | **W/DI DTS** | **No DI DTS** | **No DI DTS** |
| Auditoriums: Hard cost related to rescating (Excludes seat costs) see below | $2,346,000 | $2,940,000 | $1,740,000 | $1,959,450 |
| Seats: Seats cost (Material only) | $934,000 | $985,300 | $1,019,400 | $920,550 |
| Sight & Sound: (Max Allocation) | $130,000 | $110,000 | $100,000 | $110,000 |
| IMAX-Scope TBD | $0 | $0 | $150,000 | $350,000 |
| PLF  Convert Audiotorium one auditorium to Dolby 100? | $850,000 | $850,000 | $850,000 | $0 |
| DI DTS- Have to add Space for Service kitchen | $850,000 | $850,000 | $0 | $0 |
| Concession Stand: - The existing Concession Stand will remain and be refreshed. | $150,000 | $300,000 | $300,000 | $350,000 |
| MarGuffins: Add or upgrade existing | $250,000 | $200,000 | $200,000 | $400,000 |
| Lobby and Hallways: All other guest-facing areas of the theatre will undergo remodel scope limited to the extent | $250,000 | $300,000 | $300,000 | $300,000 |
| Restrooms: - All other guest-facing areas of the theatre will undergo remodel scope limited to the extent permitted by the available budget. | $150,000 | $200,000 | $200,000 | $200,000 |
| Box Office: -The existing exterior Box Office's & interior Guest Services will remain and be refreshed. | $50,000 | $50,000 | $50,000 | $50,000 |
| Exterior: - | $0 | $100,000 | $150,000 | $0 |
| Miscellaneous LCM: | $140,000 | $120,000 | $125,000 | $130,000 |
| **Sub total  Core scope** | **$6,110,000** | **$7,005,300** | **$5,384,400** | **$4,660,000** |

| | | | | |
|---|---|---|---|---|
| Contingency | $510,000 | $505,000 | $437,000 | $466,000 |
| Texas Remodel Tax 6.5% | $0 | | $0 | $0 |
| Permit/Fees | $25,000 | $25,000 | $50,000 | $25,000 |
| AMC Labor | $60,000 | $60,000 | $60,000 | $60,000 |
| Contract Labor | $130,000 | $130,000 | $130,000 | $130,000 |
| Soft Costs Includes Licenses /Fees & inspections | $375,000 | $375,000 | $375,000 | $375,000 |

| | | | | |
|---|---|---|---|---|
| **Grand Total** | **$7,440,000** | **$8,100,300** | **$6,536,400** | **$5,716,200** |

| | | | | |
|---|---|---|---|---|
| Per screen | $529,266 | $675,025 | $544,700 | $476,333 |

| | | |
|---|---|---|
| Total Budget all Locations | $27,762,700 |
| Total Screens | 50 |
| Cost per screen | $555,254 |

Construction documents have not been completed and projects have not been bid so above requirements are AMC's best estimate of the total cost, including all hard costs, soft costs and FF&E costs as of 11/6/18.
Actual costs may be different from the above

* 5 0 0 4 1 6 7 4 *

**EXHIBIT K**

**RENOVATIONS FF&E**

Auditorium Renovations
- Seats / Tables
- Sound equipment
- Screens / front ends
- LCD & entry portal
- Trash/ recycle/Compost cans

PLF Auditoriums
- Seats / Tables
- Sound equipment
- Screens / front ends
- LCD & entry portal
- Trash/ recycle/ compost cans

Box office/ Guest Services
- Various IT components
- LCDs/Televisions

Concessions
- Food prep & cooking equipment.
- Popcorn Popper(s)
- Food warming equipment
- Refrigeration equipment
- Various IT components
- Storage components.
- Shelving / racks
- Misc. Inventory
- Various coke/Soda equipment
- LCDs/Televisions

MacGuffins Bar
- Bar equipment.
- Wine Storage/dispensers
- Refrigeration equipment
- Various IT components
- Storage components.
- Shelving / racks
- Misc. Inventory
- LCDs/Televisions

- Bar furniture, including bar stools.
- Various coke/Soda equipment
- Tensa barriers

Lobby & Hallways
- Poster cases
- Lobby benches/Furniture
- Trash/ recycle/Compost cans
- Tensa Barriers

Exterior Rebranding
- AMC Branding/ Channel letters
- Poster Cases
- Bus shelters if applicable.
- Exterior trash cans if applicable

Interior Branding
- Misc. Signs (branding) including, bar, restroom, concession.

Projection Booth
- Projection equipment and associated computer
- Sound racks & equipment
- Dimmers
- Servers (network, computers)
- Desks
- Ladders
- Projection Lamps

Misc (office/breakroom, etc.)
- Printers
- Office furniture
- File cabinets
- Trash bins
- Money counters/ sorters
- IT equipment / components
- Misc. Cleaning equipment not limited to, vacuum, tile scrubber, carpet cleaners
- Genie Lift
- Refrigeration equipment
- Trash Compactor, if applicable

Construction documents have not been completed so above represents AMC's estimate of Renovations FF&E that could be included/added during the renovations.

* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

## EXHIBIT L
## APPROVED GENERAL CONTRACTORS

Alegis Construction, Inc.
AR Mays Construction, Inc.
Aspen Builders, Inc.
Bailey Construction and Consulting, LLC
Bayley Construction
Benning Construction Company
The Bouma Corporation and Bouma Construction, Inc. and Bouma Construction, LLC
Colorado Structures Inc. d/b/a CSI Construction
Deacon Construction, LLC
EDC
E.W. Howell Co., LLC
Fulcrum Construction, Inc.
Grace Construction Management Company, LLC
Key Construction, Inc.
Leopardo Companies, Inc.
MAPP, LLC
Parkway C&A, LP and Parkway Construction & Associates, LP
Petrie Construction LLC
Prosser Wilbert Construction, Inc.
Schimenti Construction Company, LLC
Tri-North Builders, Inc.
VCC, LLC and VCC Construction Corp.
The Whiting-Turner Contracting Company
William A. Randolph, Inc.



* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM   2020L012058

## EXHIBIT M
## NON-RENOVATED AUDITORIUMS

(see following 5 pages)



* 5 0 0 4 1 6 7 4 *

FILED DATE: 11/9/2020 6:08 PM 2020L012058









FILED DATE: 11/9/2020 6:08 PM 2020L012058





FILED DATE: 11/9/2020 6:08 PM   2020L012058





FILED DATE: 11/9/2020 6:08 PM    2020L012058





FILED DATE: 11/9/2020 6:08 PM   2020L012058

# EXHIBIT F

FILED DATE: 11/9/2020 6:08 PM   2020L012058

## GUARANTY

This Guaranty (as amended, modified and restated from time to time is herein called the **"Guaranty"**) is made as of January 8, 2018, by American Multi-Cinema, Inc., a Missouri corporation (**"Guarantor"**), to and for the benefit of Florida 2005 Theaters LLC, a Delaware limited liability company, f/k/a Muvico Realty, L.L.C., a Delaware limited liability company (**"Florida 2005"**), together with its successors, transferees and assigns is herein called the **"Landlord"**).

## RECITALS

**A.**   **EASTWYNN THEATRES, LLC**, an Alabama limited liability company (**"Eastwynn"**), **CARMIKE CINEMAS, LLC**, a Delaware limited liability company, f/k/a CARMIKE CINEMAS, INC., a Delaware corporation (**"Carmike"**), and **GKC THEATRES, INC.**, a Delaware corporation (**"GKC"**), jointly and severally (collectively with any successor or permitted assign, **"Tenant"**), have entered into that certain Third Amended, Restated and Consolidated Lease Agreement with Landlord dated as of March 19, 2009 (such Lease Agreement as amended, modified and restated from time to time is herein called the **"Lease"**), relating to the properties more particularly described in the Lease. Tenant is entering into that certain Third Amendment to Third Amended, Restated and Consolidated Lease Agreement with Landlord dated as of the date hereof (**"Third Amendment"**).

**B.**   All terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Lease.

**C.**   Guarantor owns all of the membership interests and issued and outstanding shares, as applicable, in Tenant, directly or indirectly. Guarantor has received and shall receive substantial benefits from Tenant's entering into the Lease and the Third Amendment. Guarantor has received and reviewed, and hereby approves and acknowledges the terms and conditions of the Lease and the Third Amendment.

**D.**   The execution and delivery of this Guaranty by Guarantor is a condition precedent to Landlord's entering into the Third Amendment with Tenant, and without this Guaranty, Landlord would be unwilling to enter into the Third Amendment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby conclusively acknowledged by Guarantor, and to induce Landlord to enter into the Third Amendment with Tenant, Guarantor hereby absolutely, unconditionally and irrevocably agrees as follows:

**1.**   **Guaranty.**

(a)   Guarantor, as a primary obligor and not merely as a surety, hereby absolutely, unconditionally and irrevocably guarantees to Landlord the prompt and complete payment and, in the case of non-pecuniary obligations, performance, of all of the Guaranteed Obligations (as defined below) in full, when and as the same shall become due, whether on any due date or performance date, or upon demand or otherwise. This Guaranty constitutes the agreement to pay money and to act in the first instance and is not to be construed as a contract of indemnity or a guaranty of collectability.

(b)     As used in this Guaranty, **"Guaranteed Obligations"** means, collectively, all of the following:

(i)     all of the indebtedness, liabilities and obligations of every kind and nature of Tenant to Landlord relating to the payment of money arising under or in any way relating to the Lease, howsoever created, incurred or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, due or to become due, and howsoever owned, held, or acquired by Landlord (collectively, with the items set forth in (iii) and (iv) below, the **"Monetary Obligations"**), including all of Tenant's payment obligations owed to Landlord under the Lease, including timely full payment of all Rent and all other amounts payable by Tenant under the Lease, including, to the extent applicable, all payments required under Section 16 of the Lease;

(ii)     all of the covenants, liabilities, and obligations of every kind and nature of Tenant to Landlord which do not relate to the payment of money arising under or in any way relating to the Lease, however created, incurred or evidenced, whether direct or indirect, absolute or contingent, new or hereafter existing, due or to become due, and howsoever owned, held, or acquired by Landlord;

(iii)     all interest, fees, costs and expenses due Landlord after the filing of a bankruptcy petition by or against Tenant regardless of whether such amounts can be collected during the pendency of the bankruptcy proceedings; and

(iv)     all Enforcement Costs (as defined herein).

(c)     Guarantor shall remain liable for all Guaranteed Obligations regardless of the disallowance or reduction of all or any part of Landlord's claim for such Guaranteed Obligations in any proceeding involving Tenant under Title 11, United States Code or any similar statute.

**2.     Representations and Warranties.** Guarantor acknowledges and agrees that Landlord's agreement to enter into the Lease with Tenant is of substantial and material benefit to Guarantor and further agrees that the following shall constitute representations and warranties of Guarantor, and Guarantor acknowledges that Landlord intends to enter into the Lease in reliance thereon:

(a)     To the knowledge of the Tenant, there is no existing material event of default, and no event has occurred which with the passage of time or the giving of notice or both will constitute an event of default, under any agreement to which Guarantor is a party, the effect of which event of default will materially impair performance by Guarantor of Guarantor's obligations pursuant to and as contemplated by the terms of this Guaranty, and neither the execution and delivery of this Guaranty nor compliance with the terms and provisions hereof (i) will violate any presently existing provision of law or any presently existing regulation, order, writ, injunction or decree of any court or governmental department, commission, board, bureau, agency or instrumentality, or (ii) will conflict or will be materially inconsistent with, or will result in any breach of, any of the terms, covenants, conditions or provisions of, or constitute a default under, any indenture, mortgage, deed of trust, instrument, document, agreement or contract of any kind that creates, represents, evidences or provides for any lien, charge or encumbrance upon any of the property or assets of Guarantor, or any other indenture, mortgage, deed of trust, instrument, document, agreement or contract of any kind to which Guarantor is a party or by which Guarantor or any of Guarantor's property may be subject, or in the event of

any such conflict, the required consent or waiver of the other party or parties thereto has been validly granted, is in full force and effect, is valid and sufficient therefor and has been approved in writing by Landlord;

(b)     To the knowledge of the Tenant, there are no actions, suits or proceedings pending or threatened against Guarantor before any court or any governmental, administrative, regulatory, adjudicatory or arbitrational body or agency of any kind that will adversely affect performance by Guarantor of Guarantor's obligations pursuant to and as contemplated by the terms and provisions of this Guaranty;

(c)     Neither this Guaranty nor any document, financial statement, credit information, certificate or statement heretofore furnished or required herein to be furnished to Landlord by Guarantor contains any materially untrue statement of fact or omits to state a fact material to this Guaranty; and

(d)     Guarantor is a corporation, duly incorporated and in good standing under the laws of the State of Missouri and has as its principal place of business at 11500 Ash Street, Leawood, Kansas 66211.

3.     **Covenants.** Guarantor agrees and covenants that:

(a)     (1) No payment by Guarantor under any provision of this Guaranty shall entitle Guarantor, by subrogation to the rights of Landlord or otherwise, to (i) any payment by Tenant or out of its property, or (ii) any payment from or rights in any applicable bonds, title insurance certifications, commitments or indemnities or other security held by or for the benefit of Landlord in connection with the Premises; (2) until the Guaranteed Obligations are indefeasibly paid in full, Guarantor knowingly, and with advice of counsel, waives, relinquishes, releases and abandons all rights and claims to indemnification, contribution, reimbursement, subrogation and payment which such Guarantor may now or hereafter have by and from Tenant and the successors and assigns of Tenant, for any payments made by Guarantor to Landlord, including any rights which might allow Tenant, Tenant's successors, a creditor of Tenant, or a trustee in bankruptcy of Tenant to claim in bankruptcy or any other similar proceedings that any payment made by Tenant or Tenant's successors and assigns to Landlord was on behalf of or for the benefit of Guarantor and that such payment is recoverable by Tenant, a creditor or trustee in bankruptcy of Tenant as a preferential payment, fraudulent conveyance, payment of an insider or any other classification of payment which may otherwise be recoverable from Landlord; and (3) unless and until Tenant's obligations under the Lease and the Guaranteed Obligations have been indefeasibly paid and performed in full, Guarantor will not assign or otherwise transfer any such claim to any other person or entity;

(b)     Landlord, in its sole discretion, may at any time enter into agreements with Tenant to amend and modify the Lease, and may waive or release any provision or provisions thereof and, with reference thereto, may make and enter into any such agreement or agreements as Landlord or Tenant may deem proper or desirable, without any notice to or further assent from Guarantor and without in any manner impairing or affecting this Guaranty or any of Landlord's rights hereunder;

FILED DATE: 11/9/2020 6:08 PM   2020L012058

(c)     Landlord may enforce this Guaranty without the necessity at any time of resorting to or exhausting any other remedy or any other security or collateral and without the necessity of proceeding against Tenant;

(d)     Nothing contained herein or otherwise shall prevent Landlord from pursuing concurrently or successively all rights and remedies available to Landlord pursuant to any document or agreement in law or in equity and against any persons, firms or entities whatsoever (and particularly, but not by way of limitation, Landlord may exercise any rights available to Landlord under the Lease), and the exercise of any of Landlord's rights or the completion of any of Landlord's remedies shall not constitute a discharge of any obligation of Guarantor hereunder, it being the purpose and intent of Guarantor that Guarantor's obligations shall be absolute, independent and unconditional under any and all circumstances whatsoever;

(e)     The liability of Guarantor hereunder or any remedy for the enforcement thereof shall in no way be affected by (i) the release or discharge of Tenant in any creditors' receivership, bankruptcy or other similar proceedings, (ii) the impairment, limitation, modification or termination of the liabilities of Tenant to Landlord or the estate of Tenant in bankruptcy, or of any lien or security interest securing said liabilities, or any remedy for the enforcement of Tenant's said liability under the Lease, resulting from the operation of any present or future provision of Title 11 of the United States Code or other similar statute or from the decision in any court arising from, (iii) the rejection or disaffirmance of the Lease in any such proceedings, (iv) any disability or other defense of Tenant, (v) the cessation from any cause whatsoever of the liability of the Tenant to Landlord, or (vi) any defense, current or future, of Guarantor to any action, suit or proceeding at law or otherwise, that may be instituted on this Guaranty;

(f)     This Guaranty shall continue to be effective and be deemed to have continued in existence or be reinstated (as the case may be) if at any time payment of all or any part of any sum payable pursuant to the Lease is rescinded or otherwise required to be returned by the payee upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the payor, all as though such payment to Landlord had not been made, regardless of whether Landlord contested the order requiring the return of such payment. The obligations of Guarantor pursuant to the preceding sentence shall survive any termination, cancellation, or release of this Guaranty; and

(g)     On the date hereof and immediately following the effectiveness of this Guaranty, the Guarantor will be Solvent.  As used in this paragraph, the term "**Solvent**" means, with respect to a particular date, that on such date (A) the present fair market value (or present fair saleable value) of the assets of the Guarantor is not less than the total amount required to pay the probable liabilities of the Guarantor on its total existing debts and liabilities (including contingent liabilities) as they become absolute and matured, (B) the Guarantor is able to realize upon its assets and pay its debts and other liabilities, contingent obligations and commitments as they mature and become due in the normal course of business, (C) the Guarantor is not incurring debts or liabilities beyond its ability to pay as such debts and liabilities mature and (D) the Guarantor is not engaged in any business or transaction, and is not about to engage in any business or transaction, for which its property would constitute unreasonably small capital after giving due consideration to the prevailing practice in the industry in which the Guarantor is engaged.  In computing the amount of such contingent liabilities at any time, it is intended that such liabilities will be computed at the amount that, in the light of all the facts and circumstances

FILED DATE: 11/9/2020 6:08 PM   2020L012058

FILED DATE: 11/9/2020 6:08 PM    2020L012058

existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

**4.    Continuing Guaranty.**  Guarantor agrees that the obligations of Guarantor to Landlord hereunder constitute an absolute, present, primary, continuing, irrevocable, unlimited, unconditional guaranty of payment and performance and, without limitation, is not conditioned or contingent upon any effort to attempt to seek payment or performance from any other person or entity (whether or not pursuant to this Guaranty) or upon any other condition or contingency. Specifically and without limitation of the foregoing, the obligations of Guarantor hereunder shall not be affected by:

(a)    any termination, amendment, modification or other change in the Lease;

(b)    any waiver, compromise, release, settlement, forbearance or extension of time of payment or performance or observance of any of the obligations or agreements contained in the Lease;

(c)    the death or incapacity of Guarantor, as applicable, or any voluntary or involuntary bankruptcy, insolvency, reorganization, arrangement, readjustment, assignment for the benefit of creditors, composition, receivership, liquidation, marshalling of assets and liabilities or similar events or proceedings with respect to Tenant or Guarantor, as applicable, or any of their respective properties, or any action taken by any trustee or receiver or by any court in any such proceeding;

(d)    any merger or consolidation of Tenant into or with any other entity, or any sale, lease or transfer of any of the assets of Tenant or Guarantor to any other person or entity;

(e)    to the extent permitted by law, any release or discharge by operation of law of Tenant from any obligation or agreement contained in the Lease;

(f)    any conveyance, mortgage, or other transfer of all or any part of Tenant's interest in the Premises, or all or part of Guarantor's interest therein;

(g)    the power or authority or lack thereof of Tenant to execute, acknowledge or deliver the Lease;

(h)    the existence or non-existence of Tenant as a legal entity;

(i)    any sale or assignment by Landlord of the Premises, this Guaranty, and/or the Lease (including any assignment by Landlord to any party holding a mortgage or deed of trust (herein, a **"Mortgage"**) on all or any portion of the Premises **"Mortgagee"** consistent with the provisions of Paragraph 10 of this Guaranty); and

(j)    any default by Tenant under the Lease or any right of setoff, counterclaim or defense (other than payment in full of Tenant's Monetary Obligations in accordance with the terms of the Lease) that Guarantor may or might have to its respective undertaking, liabilities, and obligations hereunder, each and every such defense being hereby waived by Guarantor.

FILED DATE: 11/9/2020 6:08 PM   2020L012058

5.    **Waivers.** Guarantor irrevocably waives (i) notice of acceptance of this Guaranty by the Landlord, (ii) presentment, demand, notice of dishonor, protest and all other notices whatsoever, (iii) any right to participate in any security now or hereafter held by Landlord, (iv) any right to enforce remedies Landlord now has, or later may have, against Tenant, Guarantor, or any other party, (v) diligence in collection or protection of or realization upon any obligation hereunder, or any security for or guaranty of any of the foregoing, (vi) any right to require Landlord to proceed against Tenant or any other person at any time or to proceed against or exhaust any security held by Landlord at any time or to pursue or exhaust any other remedy whatsoever at any time, (vii) any duty of Landlord to advise Guarantor of any information known to Landlord regarding any and all favorable or unfavorable information, financial or otherwise, about the Premises learned or acquired by Landlord at any time, (viii) all rights at law or in equity to seek subrogation, contribution, indemnification or any other form of reimbursement or repayment from Tenant, (ix) any defense arising by reason of any election of remedies made by Landlord or any other election afforded to Landlord pursuant to applicable law, whether or not pursuant to a bankruptcy, insolvency, liquidation, reorganization or similar proceeding filed by or against Tenant, and (x) any defense based on any of the circumstances or conditions set forth in items (a) through (n), inclusive, of Paragraph 4 above.

6.    **Financial Reporting**. Guarantor shall deliver to Landlord and to any Mortgagee, lender, or purchaser designated by Landlord the following information within ninety (90) days after the end of each fiscal year of Guarantor or such longer period as may be permitted by any nationally recognized stock exchange upon which Guarantor's capital stock is listed: an audited balance sheet of Guarantor and Guarantor's consolidated subsidiaries as at the end of such year, an audited statement of profits and losses of Guarantor and Guarantor's consolidated subsidiaries for such year, and an audited statement of cash flows of Guarantor and Guarantor's consolidated subsidiaries for such year, setting forth in each case, in comparative form, the corresponding figures for the preceding fiscal year in reasonable detail and scope and certified by independent certified public accountants of recognized national standing selected by Guarantor; and within forty-five (45) days or such longer period as may be permitted by any nationally recognized stock exchange upon which Guarantor's stock is listed after the end of each of the first three fiscal quarters of Guarantor a balance sheet of Guarantor and Guarantor's consolidated subsidiaries as at the end of such quarter, statements of profits and losses of Guarantor and Guarantor's consolidated subsidiaries for such quarter and a statement of cash flows of Guarantor and Guarantor's consolidated subsidiaries for such quarter, setting forth in each case, in comparative form, the corresponding figures for the similar quarter of the preceding year (or in the case of an interim balance sheet, to the end of the prior year), in reasonable detail and scope, and certified to be complete and accurate by a financial officer of Guarantor having knowledge thereof; the foregoing financial statements all being prepared in accordance with generally accepted accounting principles, consistently applied. So long as AMC Entertainment Holdings, Inc. ("AMCEH"), the parent company of Guarantor, is a reporting company under the Securities and Exchange Act of 1934, as amended, the foregoing requirements of this paragraph 6 will be satisfied by the delivery of AMCEH's Forms 10-K, 10-Q and annual reports, which shall be deemed to be delivered upon their filing with the Securities and Exchange Commission.

7.    **Effect of Landlord's Delay or Action.** No delay on the part of Landlord in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by Landlord of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy. No action of Landlord permitted hereunder shall in any way affect or impair the rights of Landlord and the obligation of Guarantor under this Guaranty.

FILED DATE: 11/9/2020 6:08 PM 2020L012058

**8.** **Enforcement.** All of the remedies set forth herein or provided by the Lease or law or equity shall be equally available to Landlord. The obligations of Guarantor hereunder are independent of the obligations of Tenant and, in the event of a default hereunder, a separate action or actions may be brought and prosecuted against Guarantor whether or not Guarantor is the alter ego of Tenant and whether or not Tenant is joined therein or a separate action or actions are brought against Tenant. Guarantor agrees that one or more successive actions may be brought against Guarantor, as often as Landlord deems advisable, until all of the Guaranteed Obligations are paid and performed in full.

**9.** **Enforcement Costs.** If: (i) this Guaranty is placed in the hands of an attorney for collection and collected through a corresponding legal proceeding; (ii) an attorney is retained to represent Landlord in any bankruptcy, reorganization, receivership, or other proceedings affecting creditors' rights and involving a claim under this Guaranty or the Lease; or (iii) an attorney is retained to enforce the Lease or Guaranty, and Landlord is the prevailing party in such enforcement action, then Guarantor shall pay to Landlord upon demand all attorney's fees, costs and expenses, including, court costs, filing fees, recording costs, expenses of foreclosure, title insurance premiums, survey costs, minutes of foreclosure, and all other costs and expenses incurred in connection therewith (all of which are referred to herein as **"Enforcement Costs"**), in addition to all other amounts due hereunder.

**10.** **Notices.** Any notice, demand, request, or other communication which any party hereto may be required or may desire to give hereunder shall be in writing, addressed as follows, and shall be deemed to have been properly given, rendered, made and delivered (i) when sent by certified mail, postage prepaid, return receipt requested, on the fifth (5th) day after deposit in such mail, or (ii) when received by overnight courier delivery (or if such delivery is refused, the date of such refusal) or (iii) by facsimile transmission with a confirmation copy sent by overnight courier delivery addressed to the other party as follows:

| | |
|---|---|
| If to Guarantor: | American Multi-Cinema, Inc.<br>11500 Ash Street<br>Leawood, Kansas 66211<br>Attention:    Lease Administrator |
| To Landlord: | Florida 2005 Theaters LLC<br>c/o iStar Inc.<br>1114 Avenue of the Americas<br>38th Floor<br>New York, New York 10036<br>Attention:    Chief Financial Officer<br>Telephone:    212-930-9400<br>Fax:              212-930-9494 |
| With copies to: | iStar Inc.<br>1114 Avenue of the Americas<br>38th Floor<br>New York, New York 10036<br>Attention:    General Counsel<br>Telephone:    212-930-9400<br>Fax:              212-930-9494 |

and
Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, Illinois 60661-3693
Attention: Gregory P. L. Pierce, Esq.
Telephone: 312-902-5541
Fax: 312-902-1061

or at such other address as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice. Notices given in any other fashion shall be effective only upon receipt.

**11. Assignment and Modifications.** This Guaranty shall be assignable by Landlord, its successors and assigns to any assignee of all or a portion of Landlord's rights under the Lease, including Mortgagee, whether directly or by way of a grant of a security interest herein, without the consent of Guarantor, and Guarantor shall execute, acknowledge and deliver any documents reasonably requested by Landlord or such assignee in connection therewith. No modification, waiver, amendment, discharge or change of this Guaranty shall be binding upon Landlord except as expressly set forth in a writing duly signed and delivered on behalf of Landlord.

**12. Severability.** The parties hereto intend and believe that each provision in this Guaranty comports with all applicable local, state and federal laws and judicial decisions. However, if any provision or provisions, or if any portion of any provision or provisions, in this Guaranty is found by a court of law to be in violation of any applicable local, state, or federal law, statute, ordinance, administrative or judicial decision, or public policy, or if such court declares such portion, provision, or provisions of this Guaranty to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent of all parties hereto that such portion, provision, or provisions shall be given force to the fullest possible extent that they are legal, valid and enforceable, and that the remainder of this Guaranty shall be construed as if such illegal, invalid, unlawful, void, or unenforceable portion, provision, or provisions were not contained therein, and that the rights, obligations, and interests of Guarantor and Landlord under the remainder of this Guaranty shall continue in full force and effect.

**13. Successors and Assigns.** This Guaranty shall be binding upon the heirs, executors, successors and assigns of Guarantor and shall inure to the benefit of Landlord's successors and assigns.

**14. Jurisdiction.** With respect to any suit, action or proceedings relating to this Guaranty, the Premises or the Lease ("**Proceedings**") Guarantor (i) submits to the non-exclusive jurisdiction of the state and federal courts located in the County and State where any of the Premises are located or in the State of New York and (ii) waives any objection which Guarantor may have at any time to the laying of venue of any proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have jurisdiction over Guarantor.

**15. Use of Terms.** All personal pronouns used in this Guaranty, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include

FILED DATE: 11/9/2020 6:08 PM   2020L012058

the plural and vice versa and shall refer solely to the parties signatory thereto except where otherwise specifically provided. The words **"include"**, **"includes"**, **"including"** and any other derivation of "include" means "including, but not limited to" unless specifically set forth to the contrary.

**16.     Material Inducement.**  Guarantor acknowledges and agrees that Landlord is specifically relying upon the representations, warranties, agreements and waivers contained herein and that such representations, warranties, agreements and waivers constitute a material inducement to Landlord to accept this Guaranty and to enter into the Lease and the transaction contemplated therein.

**17.     Recitals Incorporated.**  The Recitals to this Agreement are hereby incorporated into this Agreement together with all exhibits, schedules and appendices hereto.

**18.     Governing Law.**   THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED UNDER THE INTERNAL LAWS (AS OPPOSED TO THE LAW OF CONFLICTS) OF THE STATE OF NEW YORK.

**19.     WAIVER OF JURY TRIAL.**  GUARANTOR HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS GUARANTY OR ANY OTHER LOAN DOCUMENTS OR RELATING THERETO OR ARISING FROM THE LENDING RELATIONSHIP WHICH IS THE SUBJECT OF THIS GUARANTY AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

**20.     Certificate.**   Within fifteen (15) days after request by Landlord, Guarantor shall deliver a certificate confirming that this Guaranty is in full force and effect and unamended (or, if amended, specifying such amendment), and whether, to the knowledge of Guarantor, any default exists under the Lease or this Guaranty.

**21.     Refinance Cooperation.**    If Landlord proposes to finance or refinance the Premises, Guarantor shall cooperate in the process, and shall negotiate in good faith any reasonable request made by a prospective Mortgagee for changes or modifications to the Lease and this Guaranty, and shall not unreasonably withhold its consent to any such proposed change or modification so long as the same does not adversely affect any significant right or obligation of Tenant under the Lease, increase Tenant's obligations under the Lease or change Guarantor's rights and obligations under this Guaranty.   Guarantor agrees to execute, acknowledge and deliver documents reasonably requested by the prospective Mortgagee (such as a consent to the financing (without encumbering Guarantor's or Tenant's assets), a consent to assignment of lease and of this Guaranty, estoppel certificate and a subordination, non-disturbance and attornment agreement) customary for tenants and their guarantors to sign in connection with mortgage loans to landlords, so long as such documents are in form then customary among institutional lenders (provided the same do not adversely change Tenant's rights or obligations in a way not previously changed by loan documents previously executed by Tenant in connection with an earlier Mortgage or adversely change Guarantor's rights and obligations under this Guaranty).   Guarantor agrees that Landlord may, upon written consent of Guarantor, provide to any Mortgagee or prospective Mortgagee the information to which Landlord is entitled hereunder, provided that if any such information is non-public and designated as such by Guarantor, Landlord will take reasonable steps to assure the confidentiality of such information.

IN WITNESS WHEREOF, Guarantor has delivered this Guaranty in as of the date first written above.

**GUARANTOR**:

AMERICAN MULTI-CINEMA, INC.,
a Missouri corporation

By: *Daniel E. Ellis*
Name:  Daniel E. Ellis
Title:    Senior Vice President

STATE OF KANSAS            )
                                               )SS
COUNTY OF JOHNSON      )

I, *Marcel Richardson*                    , a Notary Public in and for said County, in the State aforesaid, do hereby certify that Daniel E. Ellis, personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that he signed, sealed and delivered the same instrument as his free and voluntary act, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal this _8th_ day of January, 2018.

*Marcel Richardson*
Notary Public

My Commission expires:

_July 20th, 2021_

NOV 2 0 2020